## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 19-10031 (___) |
| | ) | |
| Debtors.[1] | ) | Joint Administration Requested |
| | ) | |

## DECLARATION OF TIMOTHY BOATES IN SUPPORT OF FIRST DAY MOTIONS

1.      I am the President of RAS Management Advisors, LLC ("RAS") and have been appointed to serve and am currently serving as the Chief Restructuring Officer ("CRO")[2] for Beauty Brands, LLC and its affiliated debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors" or "Beauty Brands" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), subject to Court approval.[3]  I am generally familiar with the day-to-day operations, business, and financial affairs and books and records of the Debtors, having served in my current capacity as CRO for the Debtors since December 21, 2018.

2.      I joined RAS in 2000 and have served as its President since 2008.  I have served as Chief Restructuring Officer, Interim CEO, Interim CFO, and Restructuring / Financial Advisor for clients in many different industries (both private and public companies), including manufacturing, distribution, retail and catalogue operations, oilfield services, financial services, specialty pharmaceuticals, staffing, equipment rental, real estate development, nutritional supplements,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789).  The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] By separate application, the Debtors are seeking the approval of my appointment as CRO.

[3] An organization chart showing the Debtors' and certain of their affiliates equity ownership is attached hereto as **Exhibit A**.

technology services, metal recycling, and medical services among others.  I have participated in numerous restructurings and recapitalizations in both in- and out of Court proceedings and have extensive financial and operational management experience.  I have served as a member of the board of directors of companies in industries including oilfield services, container manufacturing, food packaging and distribution, and commercial printing.

3.  Prior to joining RAS, I worked with both private equity and international accounting firms.  I am a licensed CPA in the State of Texas (non-practicing) and a graduate of the University of Houston where I earned a BBA in Accounting.

4.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.  To enable the Debtors to minimize the adverse effects of the commencement of their Chapter 11 Cases on their business, the Debtors have requested various types of relief in a number of applications and motions (each a "First Day Motion" and collectively, the "First Day Motions").  I have been authorized by the Debtors to submit this declaration (the "Declaration") to provide support for the Debtor's First Day Motions, the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Business Locations; (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions; (V) Authorizing the Debtors to Abandon Certain Unsold Property; and (VI) Granting Related Relief* (the "Store Closing Motion"), and the *Debtors' Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors'*

*Assets Free and Clear of All Encumbrance, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and Bid Protections and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) An Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Motion"), as well as to assist the Court and parties-in-interest in understanding the circumstances that compelled the Debtors to seek relief under Chapter 11 of the Bankruptcy Code.

6.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the operations of the Debtors and the industry in which they conduct business.  If called upon to testify, I would testify competently to the facts set forth in this Declaration, which are incorporated into each of the First Day Motions, the Store Closing Motion, and the Sale Motion, as appropriate.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant motion.

## BACKGROUND

**A.      Overview of The Debtors' Business**

7.      Founded in 1995 and headquartered in Kansas City, Missouri, the Debtors operate specialty beauty stores under the trade name "Beauty Brands" that provide salon and spa services and retail and third-party branded beauty products.

8.      The Debtors currently operate 58 retail locations (collectively, the "Stores") and across 12 states, including Kansas, Texas, Oklahoma, North Carolina, Arizona, Colorado, Illinois,

Nebraska, Iowa, Indiana, Ohio, and Missouri, and an e-commerce business managed out of its distribution center located in Lenexa, Kansas. The Debtors also have a corporate office located in Kansas City, Missouri. The Debtors previously utilized the leased premises located at 410 S. University Avenue, Suite 160, Little Rock, Arkansas, 72205 to operate one of their retail store locations (Store No. 167) (the "Dark Store"); however, the Debtors ceased operations at Store No. 167 on December 1, 2016, which has been vacant since that time.

9. The Debtors do not own any of the real property upon which the Stores, corporate office, or distribution center are located; rather, each location is subject to a lease with the owner of the premises.

10. As of the Petition Date, the Company employed approximately 1,571 employees, including 893 salon professionals and another 678 employees focused on retail and corporate operations in the Debtors' Stores, corporate office, and distribution center. Approximately 840 employees work on a full-time basis while approximately 731 are part-time employees.

11. For fiscal year ended February 3, 2018, the Company generated approximately $125 million of net sales, of which approximately 70% was derived from retail products and approximately 30% from salon and spa services. The Company also maintains an eCommerce platform that accounted for approximately 6.2% of net sales.

**B.      The Debtors' Assets and Capital Structure**

12. The Debtors' principal assets consist of inventory and accounts receivable. The Debtors typically maintain on hand inventory of approximately $14 million at cost, although this amount is subject to daily fluctuation due to the nature of the Debtors' business.

**1.      PNC Bank, National Association Credit Facility**

13. Beauty Brands, LLC, as borrower, Beauty Brands Payroll Holdings, Inc. and Beauty Brands Payroll, LLC, as guarantors (the "Guarantors"), PNC Bank, National Association

("PNC"), in its capacity as administrative agent (in such capacity, the "Pre-Petition Agent"), and the financial institutions from time to time party thereto (the "Pre-Petition Lenders" and, together with the Pre-Petition Agent, the "Pre-Petition Secured Parties") are parties to that certain Revolving Credit and Security Agreement dated March 10, 2017 (as amended, modified, supplemented, or extended from time to time, the "Pre-Petition Credit Agreement"). Pursuant to the Pre-Petition Credit Agreement, the Pre-Petition Secured Parties provided the Debtors with a revolving loan up to a maximum amount of $17,500,000,[4] subject to a borrowing base formula (the "Revolving Loan") and a letter of credit commitment of up to $2,000,000 (the "LOC Commitment" and, collectively with the Revolving Loan, the "Pre-Petition Loan Facility").

14.     The Debtors' obligations under the Pre-Petition Loan Facility are secured by first priority security interests and liens granted by the Debtors to the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, in substantially all of the Debtors' receivables, equipment, inventory, investment property, real property, cash, cash equivalents, and other personal property more fully described in the Pre-Petition Credit Agreement (the "First Lien Collateral"),[5] subject only to any Prior Permitted Liens.

15.     On December 20, 2018, the Pre-Petition Agent issued a notice of default under the Pre-Petition Credit Agreement. As a result of the defaults, the Pre-Petition Agent imposed interest

---

[4] By agreement among the Borrower, the Guarantors, and PNC, the "Maximum Revolving Advance Amount" was reduced from $25 million to $17.5 million through certain amendments to the Pre-Petition Credit Agreement.

[5] More specifically, in connection with the Pre-Petition Loan Facility, PNC filed U.C.C. 1 financing statements asserting perfected security interests with respect to each of the Debtors in all of the Debtors' personal property and other assets of the Debtors, whether now owned or existing or hereafter acquired or arising and wherever located, including, without limitation, all accounts, books, commercial tort claims, deposit accounts, equipment, fixtures, general intangibles (including, without limitation, payment intangibles, contract rights, rights to payment, rights arising under common law, statutes or regulations, choses or things in action, goodwill, copyrights, patents, trademarks and licenses), inventory, investment property, letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, chattel

at the Default Rate set forth in the Pre-Petition Credit Agreement, resulting in the Pre-Petition Obligations (as defined below) bearing interest at the Revolving Interest Rate for Domestic Rate Loans plus 2.00% per annum and Eurodollar Rate Loans bearing interest at the Revolving Interest Rate for Eurodollar Loans plus 2.0% per annum until such Obligations are paid in full.

16.    As of the Petition Date, the aggregate amount of all Obligations (as defined in the Pre-Petition Credit Agreement) owing by Debtors to the Pre-Petition Secured Parties under and in connection with the Pre-Petition Financing Documents was not less than (a) $6,904,426.26, consisting of Revolving Loans outstanding under the Pre-Petition Credit Agreement, plus interest accrued and accruing thereon at the rate in effect on the Petition Date, plus (b) accrued and accruing fees, plus (c) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses), plus (d) all accrued and accruing charges and obligations in respect of Bank Products (as defined in the Pre-Petition Credit Agreement), plus (e) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Pre-Petition Credit Agreement (collectively, the "Pre-Petition Obligations").  The Debtors are not indebted to the Pre-Petition Secured Parties with respect to the LOC Commitment.

**2.    Other Indebtedness and Claims**

17.    The Debtors estimate aggregate unsecured debt of approximately $11 million as of the Petition Date.  These obligations are generally owed to trade creditors (i.e., suppliers of inventory and equipment) and landlords with respect to the Debtors' Store locations, corporate office, and distribution center.

**C.    Events Leading to the Filing of the Debtors' Chapter 11 Cases**

---

paper (whether tangible or electronic), supporting obligations, money or other assets of the Debtors, and all proceeds and products, whether tangible or intangible, of any of the foregoing.

18.     Beauty Brands' liquidity and financial position has been adversely affected by declining sales and rising costs associated with doing business as a predominantly "brick and mortar" retailer.  These factors have adversely impacted the Debtors' profitability and its liquidity, which in turn has made it increasingly difficult to source replenishment inventory, which in turn contributes to further declines in the Company's sales.

19.     The challenges impacting Beauty Brands has affected its ability to borrow under the Pre-Petition Credit Agreement.  As a result of the pre-petition default under the Pre-Petition Credit Agreement, the Pre-Petition Agent imposed certain terms and conditions in connection with the Revolving Loan.  As set forth in the *Agreement and Reservation of Rights* dated January 3, 2019 between the Debtors and Pre-Petition Agent, and in anticipation of commencement of these Chapter 11 Cases, the Debtors were required to engage a chief restructuring officer and deliver certain documents (including a budget) to the Pre-Petition Agent in order for the Pre-Petition Agent to make requested advances under the Revolving Loan.

20.     From 2014 through 2016, Beauty Brands unsuccessfully attempted to reposition its brand identity and store model by opening 11 new format store locations, which required significant capital expenditures, deferral of other investment opportunities, and management's focus on the new format stores to the detriment of its existing store locations.  These new format store locations, which remain operational, have underperformed Beauty Brands' expectations and contributed to operating losses incurred by the Debtors.

**D.     Pre-Petition Restructuring Efforts**

21.     Notwithstanding these circumstances, Beauty Brands believed its financial challenges could be overcome by accessing additional liquidity to acquire more inventory, exiting certain unprofitable store locations, opening additional retail stores in promising geographical

markets, and recruiting new management talent.  For months prior to the Petition Date, with the assistance of the Debtors' proposed investment banker, Lazard Middle Market, LLC ("Lazard"), and a former financial advisor, Beauty Brands undertook an extensive marketing effort for an infusion of additional liquidity and/or the sale of some or all of the Stores.  Details regarding the pre-petition marketing process are set forth in the *Declaration of Dermott O'Flanagan in Support of Debtors' Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrance, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and Bid Protections and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) An Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Lazard Declaration").

22.     Despite a comprehensive and robust pre-petition marketing process, the Debtors were unable to generate a going concern sale for all of the Debtors' Stores, and as such, the Debtors, in conjunction with their former financial advisor, determined that, under the circumstances, the best way to maximize value for their estate and creditors was to commence a firm-wide liquidation of the Company.  In connection therewith, the Debtors solicited both fee based and guarantee liquidation proposals from three of the leading national asset disposition firms that specialize in, among other things, the large scale liquidation of assets of the type owned by the Debtors.  The Debtors worked with those firms to improve the terms of their proposals to maximize the Debtors' recovery of the value of their assets.  Ultimately, after considering the economic and other terms of the various proposals received, the Debtors chose to proceed with the

guarantee proposal submitted by Hilco Merchant Resources, LLC ("Hilco") and selected Hilco to serve as the Debtors' agent for purposes of conducting "store closing" themed sales at all of the Debtors' Store locations.  The Debtors also prepared to commence bankruptcy proceedings through which all of the Debtors' assets would be immediately liquidated through going out of business sales conducted by Hilco as agent for the Debtors.

23.    On December 18, 2018, in anticipation of store closing sales, the Debtors experienced a reduction in force of approximately 40 employees comprised of home office employees and members of the field management team.

24.    On or about December 17 and 18, 2018, and prior to the execution of any liquidation agreement or the filing of any bankruptcy petitions, the Debtors received two competing asset purchase agreements for partial going concern transactions related to a portion of the Debtors' store level operations, and in one case its distribution center operations.  The Debtors engaged with the going concern bidders in an effort to develop and evaluate either opportunity for a partial going concern sale transaction.  Unfortunately, neither of the going concern bidders provided an actionable proposal which, in the Debtors' view, would result in a greater value for the Debtors' estate and creditors than proceeding with firm wide "store closing" sales of the Debtors' inventory and other property.

25.    Given the continued interest of the two prospective going concern bidders, however, the Debtors believe that a short post-petition marketing process and auction for some or all of the 33 Stores that were included in one or both of the going concern proposals (collectively, the "Core Stores") may yield additional value to the Debtors' estates and creditors.  Accordingly, the Debtors requested that Hilco submit an alternative proposal for the partial liquidation of the 23

stores for which no third party has indicated any interest in acquiring (collectively, the "Closing Stores").

26.     On January 3, 2019, the Debtors and Hilco executed that certain *Agency Agreement* (as amended, the "Agency Agreement") for the Closing Stores, and the following day, the Debtors' commenced "store closing" themed sales at the Closing Stores with the assistance of Hilco. Concurrently herewith, the Debtors have filed the Store Closing Motion seeking authority to assume the Agency Agreement and continue the "store closing" themed sales at the Closing Stores post-petition without disruption.

27.     After extensive deliberations with their advisors and the Pre-Petition Agent, and several rounds of negotiations with bidders, the Debtors also elected to pursue a stalking horse bid (the "Stalking Horse Bid") from Hilco with regard to the proposed Sale of the Core Stores. Pursuant to that certain *Amended and Restated Agency Agreement* dated January 5, 2019 (the "Stalking Horse APA"), Hilco will act as the Debtors' agent for the purpose of conducting "store closing" themed sales at the Core Stores.

28.     In reaching the decision to proceed with the Stalking Horse Bid, the Debtors determined that, of all the proposals received by the Debtors, the Stalking Horse Bid offered a combination of the best value for the Assets and the greatest level of financial certainty to the Debtors' estates and creditors.   However, due to the continued interest expressed by other prospective bidders, the Debtors believe that a short post-petition marketing process and auction will allow them to maximize value for their estates for the benefit of their stakeholders. Accordingly, concurrently herewith, the Debtors filed the Sale Motion and related motion to shorten notice seeking a hearing on the proposed bid procedures on or before January 18, 2019.

**E.     Objectives in These Chapter 11 Cases**

29.     For the reasons outlined above, the Debtors believe that the commencement of these Chapter 11 Cases is a necessary and prudent measure to maximize the value for their estates and stakeholders.  The Debtors intend to engage in a number of value-maximizing initiatives during these Chapter 11 Cases, including, without limitation, an auction and sale process for their Core Stores.  To that end, on the date hereof, the Debtors filed the Sale Motion seeking authority to, among other things, proceed with a bidding and auction process in order to consummate a sale (the "Sale") that they expect will generate maximum value for the Core Stores.  In consultation with their professional advisors, the Debtors developed certain bidding procedures (the "Bidding Procedures"), which are designed to preserve flexibility in this sale process, generate the greatest level of interest, and result in the highest or best value for the assets.

30.     Among other things, these Bidding Procedures create an appropriate timetable for the Sale, consistent with the Debtors' financial position and milestones under the Debtors' proposed debtor-in-possession financing order and the Debtors' anticipated liquidity position. The Bidding Procedures contemplate a hearing to consider approval of the Sale on February 8, 2019, with bids due on or before February 4, 2019 at 12:00 p.m. (ET) and an auction on February 7, 2019.  While the Debtors will maintain sufficient liquidity during the proposed sale process and the timeline contemplated thereby, their liquidity position only affords the Debtors a limited opportunity to market and sell their assets, including the Core Stores.

31.     Thus, concurrently with the filing of this Declaration, the Debtors have filed a motion (the "Motion to Shorten") seeking to have the Bidding Procedures Motion heard on shortened notice as it pertains to the Debtors' request for the entry of the Bidding Procedures Order.  The Debtors believe that consideration of the Bidding Procedures Order on shortened notice as requested in the Motion to Shorten, and approval of the Bidding Procedures and the

timeline provided for therein, is justified under the circumstances of the Chapter 11 Cases, and

necessary, prudent and in the best interests of the Debtors, their estates and creditors.

32.     Additionally, as noted above, the Debtors have also sought approval of the Store

Closing Motion to continue the "store closing" themed sales at the Closing Stores to the extent that

such sales did not finish prior to the Petition Date.  Furthermore, to avoid incurring unnecessary

administrative expenses and to streamline the rejection process as the Closing Stores complete

their sales, the Debtors have also sought to reject the lease related to the Dark Store *nunc pro tunc*

to the Petition Date and filed a motion seeking approval of lease rejection procedures.  The Debtors

seek to have a hearing on both of these motions at the second day hearing in these Chapter 11

Cases.

### EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS AND APPLICATIONS[6]

33.     Concurrently with the filing of their Chapter 11 petitions, the Debtors are filing

certain applications, motions, and proposed orders.  A summary of the relief requested in each

First Day Motion is set forth below.  I respectfully submit that the relief requested in each First

Day Motion should be granted because such relief is a critical element in stabilizing the Debtors'

business during and facilitating the successful execution of the Debtors' chapter 11 efforts.

Moreover, the relief requested in each of the First Day Motions is necessary to avoid immediate

and irreparable harm to the Debtors' estates.

34.     I have reviewed each of the First Day Motions and confirm that all of the facts set

forth therein are true and correct to the best of my knowledge and belief, based upon my personal

knowledge of the of the Debtors' business, employees, operations, and finances, information

---

[6] Capitalized terms used but not defined in this section of the Declaration shall have the meaning ascribed to such terms in the relevant First Day Motions.

learned from my review of relevant documents, my discussions with members of the Debtors'

senior management and advisors, information provided to me by employees working under my

supervision, or my opinion based upon experience, knowledge, and information concerning the

Debtors' business.

## A.    Administrative Motions

**1.    *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief ("Joint Administration Motion")***

35.    The Debtors request entry of an order directing joint administration of their Chapter

11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and providing that

the Court maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead

case, *In re Beauty Brands, LLC, et al.*

36.    The three Debtor entities are "affiliates" as that term is defined in section 101(2) of

the Bankruptcy Code.  Accordingly, joint administration of these Chapter 11 Cases will allow for

the efficient and convenient administration of the Debtors' interrelated Chapter 11 Cases, will

yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

**2.    *Debtors' Motion for an Order Authorizing Debtors to (I) File a Consolidated List of Creditors; (II) File a Consolidated List of Debtors' Twenty Creditors Holding Largest Unsecured Claims; and (III) Mail Initial Notices ("Consolidated Lists Motion")***

37.    The Debtors seek authority, but not direction, to file a single, consolidated list of

creditors and a single, consolidated list of their thirty largest unsecured creditors in lieu of filing

separate lists for each Debtor.  Given the large number of creditors in these cases, this information

may be utilized most efficiently by providing parties with notice and other similar documents on

a consolidated basis.  As such, the Debtors request authorization to file the lists in consolidated form,

identifying their creditors and equity security holders in substantially the same formats that are currently maintained by the Debtors in the ordinary course of business.

        **3.**      ***Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent, Nunc Pro Tunc to the Petition Date ("<u>Claims and Noticing Agent Retention Application</u>")***

38.      The Debtors request authority to retain Donlin, Recano & Company, Inc. ("<u>DRC</u>") as their Claims and Noticing Agent in accordance with the terms and provisions of the *Standard Claims Administration and Noticing Agreement* attached hereto as Exhibit B to the Claims and Noticing Agent Retention Application effective *nunc pro tunc* to the Petition Date.  The Debtors' selection of DRC has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* dated February 1, 2012 as the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

39.      DRC's services will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these cases.  The Debtors have over 200 creditors.  In view of the number of anticipated claimants and parties requiring notice, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.  Appointment of DRC will maximize efficiency and relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing a large number of claims.

**B.**      **Operational Motions Requesting Immediate Relief**

        **1.**      ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders and (C) Utilize Cash Collateral, (II) Providing Adequate Protection to the Pre-Petition Secured Parties, (III) Modifying the Automatic Stay, (IV) Granting Related***

*Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 ("DIP Motion")*

40.    By the DIP Motion, the Debtors seek, among other things, authorization and approval to obtain DIP Financing under a revolving super-priority senior secured credit facility in an aggregate principal amount not to exceed $9 million (the "DIP Facility") with PNC, in its capacity as administrative agent (in such capacity, the "DIP Agent") and the financial institutions from time to time party to the DIP Credit Agreement, as lenders (collectively, including any financial institution that has issued letters of credit on behalf of any Debtor, the "DIP Lenders"). The Debtors seek interim authority to draw up to $6 million under the DIP Facility.

41.    In exchange for the DIP Lenders' agreement to provide DIP Financing, the Debtors seek by way of the DIP Motion authority, among other things, to pay certain transaction expenses as well as fees, costs, and other expenses as provided in the DIP Orders and the DIP Financing Documents, including Letter of Credit Fees, a Commitment Fee of $150,000, and a Facility Fee, to grant to the DIP Agent, for itself and on behalf of the DIP Lenders, customary DIP Liens in and upon all of the DIP Collateral, subject only to the Carve-Out and any Permitted Prior Liens, to secure the Post-Petition Obligations, and to grant to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claim status for the Post-Petition Obligations, subject only to the Carve-Out, in accordance with the terms of the DIP Orders.

42.    Additionally, through the DIP Motion, the Debtors seek the authority to use, in accordance with the terms of the DIP Financing Documents and as limited by the Approved Budget, Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code of the Pre-Petition Secured Parties and to provide certain adequate protection to such parties,

including Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Payments.

43.     The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the DIP Motion is not granted. The Debtors are entering chapter 11 with minimal cash on hand, and thus access to DIP Financing and the use of Cash Collateral is critical to ensure the Debtors' smooth entry into chapter 11. The commencement of these Chapter 11 Cases will place increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the vital liquidity that would be provided through their proposed interim borrowings as it will, among other things, provide stability, minimize disruption, and provide confidence to the Debtors' vendors and employees. The DIP Financing has been market tested and evaluated by the Debtors and their professionals, and it will provide sufficient liquidity to fund these Chapter 11 Cases. The Debtors negotiated the DIP Financing, the use of Cash Collateral, and the adequate protection proposed in the DIP Motion in good faith and at arm's length, and I submit that the terms of the DIP Facility are reasonable and the best that could be obtained under the facts and circumstances of these Chapter 11 Cases.

**2.      *Debtors' Motion for Interim and Final Orders Granting (I) Authority to (A) Continue Using Existing Bank Accounts, Business Forms, Cash Management System, and Credit Card Programs and Pay All Fees Related Thereto, (B) Implement Ordinary Course Changes to Cash Management System, Including Open and Close Bank Accounts, (C) Continue Intercompany Transactions, and (D) Provide Administrative Priority for Intercompany Claims, (II) A Waiver of the Requirements of Section 345(b) of the Bankruptcy Code, and (III) Related Relief ("Cash Management Motion")***

44.     By the Cash Management Motion, the Debtors request interim and final (i) authority to continue their existing cash management system, including the continued use of their existing bank accounts, business forms, and credit card programs, and payment of all fees related

thereto, (ii) authority to implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts, (iii) authority to continue intercompany transactions; and (iv) a waiver of the requirements of section 345(b) of the Bankruptcy Code, if applicable.

45.    In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system in the ordinary course of business to collect, transfer, and disburse funds generated by their operations (the "Cash Management System").  The Cash Management System consists of four main corporate collection accounts, individual store collection accounts, one operating account, and two disbursement accounts (collectively, the "Bank Accounts").  The Debtors seek authority to continue to pay periodic service charges and other fees in connection with the Bank Accounts and maintenance of the Cash Management System.

46.    The scope of the Debtors' intercompany transactions is limited to transferring funds from the Operating Account held by Beauty Brands, LLC to the Payroll Disbursement Account held by Beauty Brands Payroll, LLC.  Other than with respect to the Payroll Disbursement Account, all of the Debtors' bank accounts are held by Beauty Brands, LLC, such that all other transfers merely reflect the ordinary flow of funds from one account to another held by the same entity.  The Debtors will continue to maintain records of bank transfers necessary to trace and account for all intercompany transactions.

47.    Maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations, given the volume of transactions processed through the Cash Management System each day.  Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations and impede the successful administration of their Chapter 11 Cases.

**3.**      ***Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Pre-Petition Employee Obligations and (B) Maintain and Continue Employee Benefit Programs and Pay Related Administrative Obligations ("Wages and Benefits Motion")***

48.      The Debtors request authority, but not direction, to (a) pay certain pre-petition employee wages, salaries, and accrued compensation, including reimbursable expenses and benefit obligations (collectively, the "Employee Wages and Benefits") and (b) continue certain employee benefit programs and pay related administrative obligations.  As of the Petition Date, certain pre-petition obligations to the Debtors' Employees may be due and owing.

49.      The Debtors do not believe payments of Employee Wages and Benefits to any individual employee will exceed the $12,850 statutory cap.  While the Debtors seek authority, but not direction, to make payments in the ordinary course pursuant to the Non-Insider Bonus Programs during the pendency of these Chapter 11 Cases that are similar to amounts historically paid, the Debtors are not seeking authority to pay, pursuant to this Motion, any bonuses to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.

50.      Many of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Employees may be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for Employee Wages and Benefits.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefit Programs, Employees may not receive appropriate coverage and, thus, may become obligated to pay certain health care and related expenses out of pocket.

51.      Failure to satisfy certain pre-petition obligations may jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' business and efforts in these Chapter 11 Cases.  Without the relief requested in the Wages and Benefits Motion, the

Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors. The loss of valuable Employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet customer demands and the operation of the Core Stores during the short post-petition marketing process. Additionally, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

**4.** ***Debtors' Motion Pursuant to Sections 105(a), 362(d), 363(b), 363(c), and 503(b) of the Bankruptcy Code for Authorization to (A) Continue Their Workers' Compensation, Liability, Property, and Other Insurance Programs, (B) Pay All Obligations in Respect Thereof and (C) Enter into Premium Financing Agreements in the Ordinary Course of Business ("*Insurance Motion*")***

52.     The Debtors request the entry of an order authorizing, but not directing, the Debtors (i) to continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' pre-petition Insurance Programs, or enter into new policies, if necessary, in the ordinary course of business and pay pre-petition obligations in respect thereof and (ii) to continue the Premium Financing Agreements and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' insurance premium financing agreements, or enter into new insurance premium financing agreements, as necessary, in the ordinary course of business and pay pre-petition obligations in respect thereof.

53.     In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance programs, including, but not limited to, workers' compensation, automobile losses and liability, directors' and officers' liability, fiduciary liability, and general liability (collectively, the "Insurance Programs") through several different insurance carriers (collectively, the "Insurance Carriers"). Continuation of the Insurance Programs is essential for preserving the value of the Debtors' assets. Furthermore, pursuant to the chapter 11 operating

guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage, which coverage is provided by the policies included in the Insurance Programs.

54.     Similarly, the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Brokers have a significant amount of institutional knowledge regarding the Debtors' insurance needs.

55.     The Debtors finance the premiums on their Insurance Programs through BankDirect.  If the Debtors are unable to continue making payments under the Premium Finance Agreements, BankDirect may be permitted to terminate the Premium Financing Agreements.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significant increased cost.

**5.      *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Pre-Petition Taxes and Assessments ("<u>Taxes and Fees Motion</u>")***

56.     By the Taxes and Fees Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay various local, state, and federal governmental authorities, including taxing and licensing authorities (collectively, the "<u>Taxing Authorities</u>") all taxes, fees, and related obligations (collectively, the "<u>Taxes</u>") that arose pre-petition, without regard to whether the Taxes accrued or arose before or after the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods before the Petition Date.

57.     In the ordinary course of operating their business, the Debtors collect, withhold, and incur an assortment of Taxes that they remit periodically to various Taxing Authorities.  The Taxes and Fees generally fall into the following categories: sales and use tax, personal property tax, real estate tax, and business licenses.

58.      It is my understanding that many of the Taxes collected pre-petition are not property of the Debtors' estates but, rather, are held in trust for the Taxing Authorities.  The Debtors also seek to pay certain Taxes to, among other things, prevent Taxing Authorities from taking precipitous actions that could disrupt the Debtors' chapter 11 efforts and impose significant liability on the Debtors' estates.  This may include conducting audits, filing liens, and seeking to impose personal liability on the Debtors' directors and officers.  In addition, I have been advised that non-payment of certain Taxes may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.

**6.**      ***Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Honor Certain Pre-Petition Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief ("<u>Customer Programs Motion</u>")***

59.      The Debtors request entry of an order authorizing the Debtors to (i) perform certain pre-petition obligations relating to the Customer Programs as they deem advisable and (ii) continue, renew, replace, modify and/or terminate the Customer Programs as they see fit, in the ordinary course of business.

60.      The success and viability of the Debtors' business depends upon the loyalty of their customers.  Prior to the Petition Date, the Debtors engaged in a variety of marketing and sales practices designed to develop and sustain positive reputations for the Debtors' products in the marketplace and to ensure customer satisfaction and loyalty (collectively, the "<u>Customer Programs</u>"), including, but not limited to the take 10 Program and the Gift Card Program.  The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors, thereby retaining current customers, attracting new customers, and ultimately enhancing revenue and profitability.

61.     The Debtors use the Customer Programs to, among other things, reward customer loyalty, attract customers to their stores, and provide incentives to customers to buy products from their stores.  Without the ability to continue the Customer Programs and to satisfy any related pre-petition obligations, the Debtors risk surrendering their market share of business to their competitors and their ability to sustain bidder interest during the marketing efforts for the Core Stores.

**7.     *Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors and (II) Determining that the Utility Companies are Adequately Assured of Post-Petition Payment ("Utilities Motion")***

62.     The Debtors request the entry of interim and final orders, among other things: (i) prohibiting utility service providers from altering, refusing or discontinuing services to, or discriminating against, the Debtors as a result of the commencement of this case or on account of pre-petition invoices, (ii) approving the Debtors' proposed form of adequate assurance, (iii) establishing procedures for resolving adequate assurance objections by utility providers, and (iv) scheduling a final hearing.

63.     The Utility Companies provide the Debtors with gas, electric, and other similar utility services that are essential to the ability of the Debtors to sustain their operations while their Chapter 11 Cases are pending.  The Debtors could not operate their business or serve their customers in the absence of continuous Utility Services.  Thus, any interruption in such services would disrupt the Debtors' day-to-day operations and be incredibly harmful to their business.

64.     In general, the Debtors have established a good payment history with the Utility Companies, making payments on a regular and timely basis.  Historically, the Debtors have paid on average approximately $225,000 per month on account of the Utility Services.  To provide

adequate assurance to the Utility Companies, as required under section 366 of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to the value of two weeks of Utility Services provided by the Utility Company, based upon the historical average over the 12 months immediately preceding the Petition Date into a newly created segregated account for the benefit of the Utility Companies.

65.     In addition, the Adequate Assurance Procedures are necessary, because if such procedures were not approved, the Debtors could be forced to address numerous additional adequate assurance requests by the Utility Companies in a disorganized manner during the critical first weeks of these Chapter 11 Cases.  Moreover, a Utility Company could unilaterally determine, on or after the 30th day following the Petition Date, that it is not adequately assured of future payment and discontinuing service or making an exorbitant demand for payment to continue service.

**8.**     ***Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims and Encumbrances; (III) Authorizing Customary Bonuses to Employees of Closing Business Locations; (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions; (V) Authorizing the Debtors to Abandon Certain Unsold Property; and (VI) Granting Related Relief (the "Store Closing Motion")***

66.     Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to assume the Agency Agreement by and between the Debtors and Hilco; (ii) authorizing the Debtors to conduct store closing or similar themed sales (collectively, the "Sales") at the Closing Stores in accordance with the terms of the Sale Guidelines; (iii) authorizing, but not directing, the payment of customary retention bonuses to Retained Employees at the Stores pursuant to the Agency Agreement; (iv) waiving compliance with Contractual Restrictions and Applicable Law Restrictions; (v) authorizing the Debtors to

abandon certain unsold property, including Owned FF&E located at the Stores; and (vi) granting certain related relief.

67.    As discussed above, the Debtors decided that proceeding with the Sales at the Closing Stores which are the subject of the Store Closing Motion and selling their Merchandise and Owned FF&E at the Stores (together, the "Store Closure Assets") according to the terms of the Agency Agreement with Hilco was in the best interests of their stakeholders.  As summarized in the Store Closing Motion and as reflected in the Agency Agreement, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estates.  This minimizes the Debtors' risk while at the same time motivating Hilco to maximize proceeds from the Sales.  Additionally, I believe it is more cost effective for the Debtors to allow Hilco to conduct the Sales than for the Debtors to conduct such sales on their own because, among other reasons, Hilco will reimburse the Debtors for expenses of the Sales, thereby reducing the Debtors' rent obligations and other claims related to the Closing Stores.  These significant cost savings help to provide the Debtors with liquidity to, among other things, support the proposed sale process for the Debtors' remaining retail locations and increase the overall recovery for creditors of their estates.  Accordingly, shortly prior to the Petition Date, the Company and Hilco executed the Agency Agreement, and Hilco began the Sales at the Closing Stores.

68.    For the reasons discussed herein and in the Store Closing Motion, continuation of the Sales pursuant to the Sale Guidelines is critical to the Debtors' efforts in these cases and the maximization of recoveries to the estates' creditors.  Moreover, the competitive bidding process engaged in by the Company prior to the commencement of these Chapter 11 Cases ensured that Hilco was chosen in good faith.  Further, the terms and conditions of the Agency Agreement are fair and reasonable, represent the highest and best offer for the Store Closure Assets, and are in the

best interest of these estates.  Accordingly, I submit that sound business justifications exist for the relief requested in the Debtors' Store Closing Motion and respectfully request that the Court enter the interim order approving such relief at the first day hearing to be held in these Chapter 11 Cases.

**9.    *Motion of the Debtors for Expedited Consideration of Debtors' Motion for, Inter Alia, Entry of Bidding Procedures Order ("Motion to Shorten")***

69.    Pursuant to the Motion to Shorten, the Debtors seek entry of an order shortening the notice period with respect to the hearing to consider entry of the order approving the Bidding Procedures, so that the matter can be heard on or before January 18, 2019.

70.    The Debtors believe that a prompt sale of their assets, including a hearing on the Bidding Procedures Order on shortened notice, will reduce unnecessary administrative expenses and thus maximize the value of their estates to the greatest extent possible under the circumstances of these Chapter 11 Cases.  The proposed sale timeline will generate the highest or best possible recoveries, in the most efficient manner possible, to the benefit of the Debtors' creditors and stakeholders.

71.    The Debtors further believe that the contemplated timeline for the sale process is unlikely to have a negative impact on the Debtors' ability to achieve the highest or otherwise best value for their Assets because some or all of the parties that originally expressed interest in purchasing the Assets prior to the Petition Date will have the opportunity to participate in the post-petition sale process, as will parties that did not participate in the pre-petition marketing process. As discussed above, the Bidding Procedures are designed to establish a fair, open, and competitive post-petition bidding and auction process, subject to the Debtors' financial condition and time limitations driven by the milestones established in connection with the Debtors' proposed debtor-in-possession financing and the Stalking Horse APA.  If the Debtors are unable to execute the sale process and obtain value for the Assets as contemplated in the Stalking Horse APA or as part of

the contemplated auction process within the contemplated timeline for the Chapter 11 Cases, the Debtors could be left with no other option but to immediately commence store closing sales at the Core Stores, which will result in a fire-sale liquidation of the Assets.

72.     I also believe that a timely and efficient auction and sale process, such as that contemplated by the Bidding Procedures, is necessary to stabilize the Debtors' business and provide assurances to the Debtors' existing vendors and customers.

## CONCLUSION

73.     In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, the Debtors respectfully request that the relief sought in the First Day Motions be approved.

74.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: January 6, 2019                              */s/ Timothy Boates*
                                                    _____
                                                    Timothy Boates
                                                    Chief Restructuring Officer
                                                    Beauty Brands, LLC and its Affiliates

# Exhibit A

# Current Structure

