## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 19-10031 (___) |
| | ) | |
| Debtors.[1] | ) | Joint Administration Requested |
| | ) | |
| | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND BID PROTECTIONS AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby move (the "Motion") for entry of: (a) an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) scheduling a hearing (the "Sale Hearing") on approval of the proposed sale (the "Sale") of all or substantially all of the Debtors' assets related to the Core Stores (defined below) (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder (as defined herein), and the potential assumption and assignment of certain

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789).  The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

executory contracts and unexpired leases (each, an "Potentially Assumed Contract" and, collectively, the "Potentially Assumed Contracts") in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "Bidding Procedures," a copy of which is attached as **Exhibit 1** to the Bidding Procedures Order), authorizing and approving certain procedures for the potential assumption and assignment of the Potentially Assumed Contracts (collectively, the "Assumption and Assignment Procedures"), authorizing and approving certain bid protections for Hilco Merchant Resources, LLC ("Hilco" or the "Stalking Horse Purchaser"), including a Break-Up Fee and an Expense Reimbursement (each as defined below and together, the "Bid Protections"), and authorizing and approving the form and manner of notice thereof; and (iii) granting related relief; and (b) an order, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), (i) authorizing and approving the Sale, free and clear of all Encumbrances, except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder (as defined herein); (ii) authorizing and approving the potential assumption and assignment of the Potentially Assumed Contracts in connection therewith; and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and may be determined by the Court.

2.      The statutory predicates for the relief requested herein are 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"),

Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.      Pursuant to Local Rule 9013-1(f), the Debtors hereby consent to the entry of a final order or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## **BACKGROUND**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No creditors' committee has been appointed in these cases.  No trustee or examiner has been appointed.

6.      A detailed description of the Debtors' business operations, corporate structure, capital structure, and reasons for commencing these cases is set forth in full in the *Declaration of Timothy Boates in Support of First Day Motions* (the "Boates Declaration"), which was filed contemporaneously herewith and is incorporated herein by reference.   Additional details regarding the Debtors' pre-petition capital raise and sale process are set forth in the *Declaration of Dermott O'Flanagan in Support of Debtors' Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrance, and the Assumption and Assignment of Certain Executory Contracts*

*and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and Bid Protections and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) An Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "O'Flanagan Declaration", and together with the Boates Declaration, the "First Day Declarations").   Additional facts in support of the specific relief sought herein are set forth below.

7.      Contemporaneously with the filing of this Motion, the Debtors have filed a motion (the "Motion to Shorten"), pursuant to Bankruptcy Rule 2002 and Local Rules 6004-1(c) and 9006-1(e), seeking to have this Motion heard on shortened notice as it pertains to the Debtors' request for the entry of the Bidding Procedures Order.  As set forth in the Motion to Shorten, the Debtors request the Court consider entry of the Bidding Procedures Order on or before January 18, 2019.

**A.      The Debtors' Pre-Petition Marking and Sale Process**

8.      As set forth in further detail in the First Day Declarations, the Debtors operate specialty beauty stores under the trade name "Beauty Brands" that provide salon and spa services and retail third-party branded beauty products.  As of the Petition Date, the Debtors operate a total of 58 retail locations in Kansas, Texas, Oklahoma, North Carolina, Arizona, Colorado, Illinois, Nebraska, Iowa, Indiana, Ohio, and Missouri (collectively, the "Stores").  The Debtors also have a corporate office located in Kansas City, Missouri and a distribution center located in Lenexa, Kansas.  The Debtors previously utilized the leased premises located at 410 S. University Avenue, Suite 160, Little Rock, Arkansas, 72205 to operate one of their retail store

locations (Store No. 167); however, the Debtors ceased operations at Store No. 167 on December 1, 2016 and, by separate motion, are seeking to reject the related lease as of the Petition Date. The Debtors do not own any of the real property upon which the Stores, corporate office, or distribution center are located; rather, each location is subject to a lease with the owner of the premises.

9.      Prior to the Petition Date, when the Debtors began experiencing financial difficulties, in addition to a number of other restructuring initiatives, the Debtors, in consultation with their professional advisors, undertook an extensive marketing effort engaging with financial and strategic counterparties to either invest in or acquire the Debtors as a going concern business.

10.     In August 2018, the Debtors retained Lazard Middle Market LLC ("Lazard") to run a capital raise and sale process. Lazard prepared certain solicitation materials to provide to interested parties and maintained a virtual dataroom to facilitate the due diligence process. Lazard contacted over 150 potential financial and strategic investors and solicited their interest in purchasing or investing in the business, either in whole or in part. Of those parties, 43 signed non-disclosure agreements and received access to the Debtors' confidential information. Ultimately, five parties submitted non-binding indications of interest. However, the Debtors determined, in consultation with their advisors, that none of the non-binding indications of interest were actionable.

11.     Following this comprehensive and robust pre-petition marketing process, the Debtors determined that, under the circumstances, the best way to maximize value for their estate and creditors was to commence a firm wide liquidation of the company. In connection therewith, the Debtors solicited both fee based and guarantee liquidation proposals from three of the leading national asset disposition firms that specialize in, among other things, the large scale

liquidation of assets of the type owned by the Debtors.  The Debtors worked with those firms to improve the terms of their proposals to maximize the Debtors' recovery of the value of their assets.  Ultimately, after considering the economic and other terms of the various proposals received, the Debtors chose to proceed with the guarantee proposal submitted by Hilco and selected Hilco to serve as the Debtors' agent for purposes of conducting "store closing" themed sales at all of the Debtors' Store locations.  The Debtors also prepared to commence bankruptcy proceedings through which all of the Debtors' assets would be immediately liquidated through going out of business sales conducted by Hilco as agent for the Debtors.

12.     On or about December 17 and 18, 2018, however, the Debtors received two competing asset purchase agreements for a partial going concern transaction related to a portion of the Debtors' store level operations and distribution center.  The Debtors re-engaged with the going concern bidders in an effort to develop and evaluate either opportunity for a partial going concern sale transaction.  Unfortunately, neither of the going concern bidders provided an actionable proposal which, in the Debtors' view, would result in a greater value for the Debtors' estate and creditors than proceeding with firm wide "store closing" sales of the Debtors' inventory and other property.

13.     Given the continued interest of the two prospective going concern bidders, however, the Debtors believe that a short post-petition marketing process and auction for the 33 Stores that were included in one or both of the going concern proposals (collectively, the "Core Stores", a list of which is attached hereto as **Exhibit D**) may yield additional value to the Debtors' estates and creditors.  Accordingly, the Debtors requested that Hilco submit an alternative proposal for the partial liquidation of the 23 stores for which no third party has indicated any interest in acquiring (collectively, the "Closing Stores").

14.     On January 3, 2019, the Debtors and Hilco executed that certain *Agency Agreement* (as amended, the "Agency Agreement"), and the following day, the Debtors' commenced "store closing" themed sales at the Closing Stores with the assistance of Hilco.  The Debtors intend to seek interim and final approval from the Court to assume the Agency Agreement and continue the "store closing" themed sales at the Closing Stores post-petition without disruption.  Also, in anticipation of such sales, on December 18, 2018, the Debtors experienced a reduction in force of approximately 40 employees comprised of home office employees and members of the field management team.

15.     After extensive deliberations with their advisors and PNC Bank, National Association, in its capacity as administrative agent (in such capacity, the "Pre-Petition Agent" and, together with the Pre-Petition Lenders, the "Pre-Petition Secured Parties") under that certain Revolving Credit and Security Agreement dated March 10, 2017, (as amended, modified, supplemented, or extended from time to time, the "Pre-Petition Credit Agreement"), and several rounds of negotiations with bidders, the Debtors elected to pursue a stalking horse bid (the "Stalking Horse Bid") from the Stalking Horse Purchaser with regard to the Core Stores. Pursuant to that certain *Amended and Restated Agency Agreement* dated January 5, 2019 (the "Stalking Horse APA"), Hilco will act as the Debtors' agent for the purpose of conducting "store closing" themed sales at the Core Stores.

16.     In reaching the decision to proceed with the Stalking Horse Bid, the Debtors determined that, of all the proposals received by the Debtors, the Stalking Horse Bid offered a combination of the best value for the Assets and the greatest level of financial certainty to the Debtors' estates and creditors.

17.     Based on the value already conferred on the Debtors' estates by the Stalking Horse Bid, and the continued interest expressed by other prospective bidders, the Debtors believe that a short post-petition marketing process and auction will allow them to maximize value for their estates for the benefit of their stakeholders.

**B.      The Need for a Timely Sale Process**

18.     Appreciating their challenging financial condition and the tight timeline that likely would govern the post-petition sale process under both the proposed debtor-in-possession financing and Stalking Horse APA, the Debtors accomplished as much as possible prior to the commencement of these chapter 11 cases.  With the Stalking Horse Bid in place, the Debtors are prepared to move forward with the sale process, which will include a post-petition marketing campaign and auction, consistent with the terms of the Stalking Horse APA and proposed Bidding Procedures.

19.     The Stalking Horse APA contemplates the "store closing" themed sales of the Core Stores commencing no later than February 9, 2019 and concluding no later than April 15, 2019.  *See* Stalking Horse APA § 6.1.  Moreover, as a condition to entering into the Stalking Horse APA, the Debtors must obtain entry of the Bidding Procedures Order no later than January 20, 2019 and the Sale Order no later than February 8, 2019.  *See id.* § 10(a)(iii), (iv).

20.     Contemporaneously herewith, the Debtors filed a motion seeking approval of debtor-in-possession financing provided by certain of the Pre-Petition Secured Parties (in such capacity, the "DIP Lenders").  Although the Debtors expect that access to debtor-in-possession financing, together with the use of cash collateral, will provide them sufficient liquidity to consummate the Sale, time is of the essence.  Given the significant costs associated with the

ongoing operations of the Debtors' business and the Debtors' current financial condition, the DIP

Lenders have established strict milestones (the "Milestones") for the sale process:

- The Debtors must file a motion on or before January 6, 2019 requesting authority to assume the Partial GOB Agency Agreement;

- The Debtors must obtain an interim Partial Liquidation Agreement Assumption Order on terms and conditions and in form and substance reasonably acceptable to the DIP Agent on or before January 9, 2019;

- The Debtors must obtain a final Partial Liquidation Agreement Assumption Order on terms and conditions and in form and substance reasonably acceptable to the DIP Agent on or before February 9, 2019;

- The Debtors must file motion on the Petition Date for approval of the Approved Sale and Bidding Procedures, in form and substance reasonably acceptable to the DIP Agent;

- The Debtors must obtain entry of the Bidding Procedures Order on terms and conditions and in form and substance reasonably acceptable to the DIP Agent on or before January 28, 2019;

- The Debtors must conduct an Auction on or before February 7, 2019;

- The Debtors must obtain entry of the Sale Order to the successful bidder in form and substance reasonably acceptable to the DIP Agent on or before February 12, 2019;

- The Approved Sale must be consummated on or before February 22, 2019 or, if the GOB Liquidator is the winning bidder at the Auction, the GOB Liquidator must commence the Full Planned GOB Sales on or before February 14, 2019; and

- The must obtain entry of the Final DIP Order within 25 days of the Petition Date.

## THE STALKING HORSE APA

21.      Under the Stalking Horse APA, which is attached hereto as **Exhibit C**, Hilco is

increasing its payment under the Agency Agreement from sixty-five percent (65%) (the

"Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed

Amount") at the Closing Stores to a Guaranty Percentage of eighty-percent (80%) of the Cost

Value of the Merchandise for both the Closing Stores and Core Stores (the "Adjusted Guaranteed

Amount").  If another party is the Successful Bidder at the Auction, Hilco will continue the Sale

at the Closing Stores at the original Guaranteed Amount, and not the Adjusted Guaranteed

Amount on the Closing Stores (i.e., the additional 15% that Hilco would have paid on the Closing Stores if it was the Successful Bidder).

22.     By this Motion, the Debtors request authority to provide the Stalking Horse Purchaser with standard Bid Protections.  In particular, the Stalking Horse APA provides for the payment of (i) a break- up fee in the amount of $250,000 (the "Break-Up Fee") and (ii) expense reimbursement of up to $50,000 (the "Expense Reimbursement"), in each case, in the event the Debtors consummate an alternative transaction.  *See* Stalking Horse APA § 16. The Debtors must also pay the Stalking Horse Purchaser's actual out-of-pocket costs of signage and freight in an amount equal to $50,000 (the "Signage Costs").  *See id.*

23.     In accordance with Local Rule 6004-1, the significant terms of the Stalking Horse APA are as follows:[2]

| MATERIAL TERMS OF THE STALKING HORSE APA | |
| --- | --- |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Purchaser is not an "insider" of any of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Purchaser has neither discussed nor entered into any agreements with management or key employees regarding compensation or future employment. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | The Stalking Horse APA provides for a mutual release. *See* Stalking Horse APA § 8.7.<br><br>The Sale Order shall provide that the Stalking Horse Purchaser is released of any liability for its actions taken pursuant to the Stalking Horse APA prepetition and is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code. *See id.* § 2(b). |

---

[2] To the extent there is any inconsistency between the terms of the Stalking Horse APA and the summary of such terms in this Motion, the terms of the Stalking Horse APA shall control.  Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the Stalking Horse APA.

|  |  |
|---|---|
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | The sales shall commence simultaneously at all Initial Stores on January 3, 2019[3] and at all Additional Stores no later than February 9, 2019.  Agent shall complete the sales at each Store no later than April 15, 2019.  *See* Stalking Horse APA § 6.1.<br><br>The Bankruptcy Court shall have entered the Bidding Procedures Order approving the Bid Protections by no later than January 20, 2019. The Bankruptcy Court shall have entered the Approval Order by no later than February 8, 2019, or such later date as mutually agreed upon by Merchant and the Agent.  *See id.* § 10(a)(iii), (iv). |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Purchaser has not submitted, and will not be required to submit, a good faith deposit. |
| **Interim Arrangements with Proposed Buyer**<br>Local Rule 6004-1(b)(iv)(G) | The Debtors and Stalking Horse Purchaser are not entering into any interim agreements or arrangements in connection with the Stalking Horse Bid or pursuant to the Stalking Horse APA. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized, subject to applicable law, to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. |

---

[3] The sales at the Initial Stores are subject to the Agency Agreement, which the Debtors are simultaneously and separately seeking approval of.

| | The proceeds received by Agent from such disposition of Remaining Merchandise shall constitute Proceeds under the Stalking Horse APA.  Notwithstanding the foregoing, nothing in Section 3.2(b) of the Stalking Horse APA shall delay the Final Reconciliation under Section 8.7, including the payment of any amounts due thereunder.  The Proceeds from the disposition of Remaining Merchandise shall be reconciled by Agent, Debtors, and PNC, and any amounts due as a result of such reconciliation shall be paid at a later date, as mutually agreed upon by the parties.  *See id.* § 3.2(b). |
|---|---|
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | The Debtors do not seek to have the sale of the Assets in the Stalking Horse Bid declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | After the Sale, the Debtors will retain their books and records. |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Pursuant to the Stalking Horse APA, the Debtors do not seek to sell or otherwise limit their rights to pursue avoidance claims under chapter 5 of the Bankruptcy Code. |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds thereof attaching only to the Guaranteed Amount and other amounts to be received by Merchant under the Stalking Horse APA.  *See* Stalking Horse APA § 2(b).<br><br>To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of |

| | |
|---|---|
| | bulk sale/wholesale or otherwise. *See id.* § 3.2(b). |
| | Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party. *See id.* § 7.2. |
| | Agent shall not become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. *See id.* § 9.1. |
| **Sale Free and Clear of Unexpired Leases**<br>Local Rule 6004-1(b)(iv)(M) | The Debtors do not seek to sell the Assets free and clear of a possessory leasehold interest, license, or other right. |
| **Provisions Providing Bid Protections to Stalking Horse**<br>Local Rule 6004-1(c)(i)(C) | In the event that the Stalking Horse APA shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) involving the Merchandise and Owned FF&E in the Additional Stores, Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) an amount equal to the sum of (i) $250,000 ("Breakup Fee"), (ii) an expense reimbursement of up to $50,000 to cover Agent's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement and the bid procedures (the "Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections"), and (iii) Agent's actual out-of-pocket costs of signage and freight in an amount equal to $50,000 (the "Signage Costs"). *See id.* § 16. |

24.     Additionally, the Stalking Horse Purchaser has agreed to use the Debtors' employees during the "store closing" themed sales at the Core Stores and pay retention bonuses of up to ten percent of base payroll to such employees, subject to Court approval. *See* Stalking Horse APA §§ 9.1, 9.4.

## **BIDDING PROCEDURES**[4]

25.     The Debtors are in the process of soliciting bids for all of the Assets, or any number or combination thereof, in accordance with the Bidding Procedures.  The Bidding Procedures describe, among other things, (i) the assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder. The Bidding Procedures are designed to promote a competitive and expedient sale process.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the Milestones, the deadlines under the Stalking Horse APA, and the Debtors' chapter 11 strategy.

26.     Certain of the key terms of the Bidding Procedures are included below:

(a)     **Qualification as Bidder**: Any person or entity that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder". In order to become a Qualifying Bidder (and thus be able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room")), a Potential Bidder must submit to the Debtors and their

---

[4] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

advisors: (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder; (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with any official committee appointed in the Debtors' chapter 11 cases (the "Committee") and the Pre-Petition Secured Parties (together, the "Consultation Parties"), that the interested party has a *bona fide* interest in consummating a sale transaction; and (iv) sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal, or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid (as defined below); (ii) should it decide to credit bid, the Pre-Petition Agent and DIP Agent, in their capacities as such, are each a Qualifying Bidder and any such credit bid will be considered a Qualifying Bid; and (iii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

**(b)**     **Due Diligence**: The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.   All additional due diligence requests shall be directed to: (a) Timothy Boates ((256) 776-4989; tboates@rasmanagement.com) and/or (b) Gregory Taylor, Esq. ((302) 654-1888; gtaylor@ashbygeddes.com).   The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline. The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder; provided that the Debtors shall notify the Consultation Parties of any decision to withhold such information. Notwithstanding any pre-petition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any

information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

**(c)**    **Bid Requirements**:

i.    *Qualifying Bid.* Other than in the case of a bid submitted by the Stalking Horse Purchaser or the Pre-Petition Agent or DIP Agent, in their capacities as such, to be deemed a "<u>Qualifying Bid</u>," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "<u>Bid Requirement</u>"):

a.    be in writing;

b.    fully disclose the identity of the Qualifying Bidder and whether such party is an "insider" (as defined in section 101 of the Bankruptcy Code) of any Debtor, and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.    set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid;

d.    not propose payment in any form other than cash (except as otherwise expressly set forth in the Bidding Procedures);

e.    state the liabilities proposed to be paid or assumed by such Qualifying Bidder, including any cure amounts for Potentially Assumed Contracts;

f.    specify the Assets that are included in the bid, and state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA;

g.    be accompanied by a clean, executed copy of an asset purchase agreement (the "<u>Modified APA</u>"), along with a marked copy of the Modified APA that reflects any variations from the Stalking Horse APA;

h.    state that such Qualifying Bidder's offer is formal, binding, and unconditional and is irrevocable until two business days after the closing of the Sale;

i.    state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified APA and provide written evidence in support thereof;

j.    contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Modified APA, including, without limitation, such financial and other information

supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve, within one business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information;

k.      identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Modified APA;

l.      a commitment to close the transactions contemplated by the Modified APA by February 9, 2019 for any competing liquidating bids, or February 19, 2019 for any going concern bids;

m.      not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

n.      the aggregate consideration proposed by the Qualifying Bidder must equal or exceed $7,108,646, which is comprised of (A) $6,658,646[5], plus (B) the Break-Up Fee, plus (C) the Expense Reimbursement, plus (D) the Signage Costs, plus (E) $100,000;

o.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

p.      contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Modified APA, with appropriate contact information for such financing sources;

q.      contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any documents or

---

[5] To provide the estates with value comparable to the full Adjusted Guaranteed Amount that the Stalking Horse Purchaser would have paid, a Qualifying Bidder will have to pay a sum that is equivalent to ninety-one and one-third percent (91.3%) of the aggregate Cost Value of the Merchandise at the Core Stores, which captures the value of the 15% increase of the Guaranty Percentage at the Closing Stores that the estate will not be receiving, plus the estimated Sharing Amount set forth in section 3.2(a) of the Stalking Horse APA, plus the Debtors' share of the estimated FF&E set forth in section 7.1 of the Stalking Horse APA.

other information provided in connection with the Bidding Procedures and the Sale;

r.    sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the transactions contemplated by the Modified APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than three days following execution and delivery of such Qualifying Bidder's Modified APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Modified APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.    provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid (as defined below), in accordance with the terms of the Modified APA;

t.    includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified APA;

u.    provides a good faith cash (the "Deposit") in an amount equal to ten percent of the purchase price provided for in the Modified APA (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent") pursuant to the escrow agreement to be provided by the Debtors to the Qualifying Bidders (the "Escrow Agreement"); provided that with respect to a bid for a store location submitted by the landlord under the real property lease for such store (a "Landlord Lease Bid"), the landlord may deduct from its Deposit the amount of any undisputed monetary obligations, as determined by the Debtors, in their discretion, that constitute the cure amount for the applicable real property lease;

      v.       contain a written acknowledgement and representation from the Qualifying Bidder that (i) if the Qualifying Bidder becomes the Successful Bidder at the Auction and (ii) the Bankruptcy Court enters an order approving the sale of the Assets to such Successful Bidder on the terms of the Modified APA, the Debtors are authorized to, and the Debtors shall, use the Deposit to pay the Stalking Horse Purchaser (a) the Break-Up Fee, (b) the Expense Reimbursement, and (c) the Signage Costs; and

      w.     provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Modified APA equal to the amount of the Deposit.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid. Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

ii.     *Bid Deadline*. A Qualifying Bidder, other than the Stalking Horse Purchaser or the Pre-Petition Agent or DIP Agent, in their capacities as such, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the (i) Debtors (Attn: Timothy Boates, Chief Restructuring Officer; tboates@rasmanagement.com); (ii) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory Taylor, Esq.; gtaylor@ashbygeddes.com); and (iii) proposed investment banking advisor to the Debtors, Lazard Middle Market LLC (Attn: Dermott O'Flanagan; dermott.oflanagan@lazard.com) (collectively, the "Notice Parties") so as to be received on or before **February 4, 2019 at 12:00 p.m. (ET)** (the "Bid Deadline"); provided that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.**

iii.    *Evaluation of Qualifying Bids*. The Debtors will promptly deliver copies of all bids from Qualifying Bidders to each of the Consultation Parties. The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by February 5, 2019. One day prior to the Auction Date, the Debtors shall determine, in consultation with the Consultation Parties, which of

the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "<u>Baseline Bid</u>" and the Qualifying Bidder submitting the Baseline Bid, the "<u>Baseline Bidder</u>"), and shall promptly notify the Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

iv.    *No Qualifying Bids*. If no timely Qualifying Bids other than the Stalking Horse Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder.

(d)    **Auction**: If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Bid, then the Debtors shall conduct an auction (the "<u>Auction</u>"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing, and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's rights to the Break-Up Fee, Expense Reimbursement, and Signage Costs; (f) the impact on employees, trade creditors, and landlords; and (g) any other factors the Debtors may reasonably deem relevant. The Auction shall be governed by the following procedures:

i.    the Auction shall be held on **February 7, 2019 at 9:00 a.m. (prevailing Eastern Time)** (the "<u>Auction Date</u>") at Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, Delaware 19801, or such other date and time as the Debtors, after consultation with the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than one day following the delivery of such notice;

ii.    only the Stalking Horse Purchaser, the Pre-Petition Agent and DIP Agent, in their capacities as such, and the other Qualifying Bidders with Qualifying Bids (together, the "<u>Auction Bidders</u>") shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.    only the Debtors, the Auction Bidders, the Consultation Parties, a representative of the United States Trustee's Office, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that all parties must provide counsel for the Debtors one day's written notice of their intent to attend the Auction;

v.      the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.     each of the Auction Bidders shall confirm either in writing or on the record at the Auction that (i) it has not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets if selected as a Successful Bidder;

vii.    bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $100,000 of the Baseline Bid, provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by the Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of (A) the Break-Up Fee, plus (B) the Expense Reimbursement, plus (C) the Signage Costs; (iii) the Stalking Horse Purchaser may not credit bid the Bid Protections in a context involving only liquidation bids; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii.   the Auction may include individual negotiations between the Debtors and the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.     all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x.      the Debtors and their professional advisors in consultation with the Consultation Parties may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order and the DIP Order (as defined in the Bidding Procedures Order) and (ii) disclosed to the Auction Bidders;

xi.     each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.    the Pre-Petition Agent and DIP Agent, in their capacities as such, shall be entitled to credit bid all or a portion of the Pre-Petition Obligations and DIP Obligations (each as defined in the DIP Order) in accordance with section 363(k) of the Bankruptcy Code;

xiii.    the Auction Bidders shall have the right to make additional modifications to the Modified APA or the Stalking Horse APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv.    the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA or the Stalking Horse APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv.    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "Successful Bid").  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Stalking Horse APA, as applicable, requested by each bidder, and the net benefit to the Debtors' estates.  The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Modified APA or the Stalking Horse APA, as applicable.  The Debtors may, in their sole discretion, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xvi.    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY,**

**FROM THE TIME THE BID IS SUBMITTED UNTIL TWO BUSINESS DAYS AFTER THE SALE HAS CLOSED.  EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

**(e)**    **Sale Hearing**: The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court.  The Sale Hearing to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **February 8, 2019**.  The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases.

At the Sale Hearing, the Debtors will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APA or Modified APA submitted by the Successful Bidder, as applicable; (ii) finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax, or similar tax, or deposit under any applicable bulk sales statute; and (iv) unless otherwise ordered by the Court, directing that all cash proceeds generated from the sale of any Assets shall be paid to the Pre-Petition Agent upon the closing of such sale(s) for application against the obligations owing by the Debtors to the Pre-Petition Agent in accordance with the terms and conditions of the DIP Order and the Pre-Petition Credit Agreement; provided, however, that in the event the Stalking Horse Purchaser is not the Successful Bidder, the Debtors shall use the Deposit to first pay the Stalking Horse Purchaser the Bid Protections and Signage Costs from the Deposit.

**(f)**    **Backup Bidder**: Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by February 9, 2019 for any liquidating bids, or February 19, 2019 for any going concern bids (or such date as may be extended by the Debtors), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

**(g)**    **Return of Deposits**: All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five business days following the closing of the Sale.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the

Sale and used first to pay the Stalking Horse Purchaser the Bid Protections and Signage Costs. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Modified APA or the Stalking Horse APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

(h)     **Reservation of Rights**. Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

27.     Consistent with the Milestones and the Stalking Horse APA, as well as the Debtors' need to consummate a sale of the Assets as quickly and efficiently as possible, the Debtors propose the following key dates and deadlines for the sale process:

| DATE | DEADLINE |
|---|---|
| January 18, 2019 | Assumption Notice Deadline |
| February 4, 2019 at 12:00 p.m. (ET) | Bid Deadline |
| February 1, 2019 at 4:00 p.m. (ET) | Sale Objection Deadline |
| February 1, 2019 at 4:00 p.m. (ET) | Contract Objection Deadline[6] |
| February 5, 2019 | Deadline for Debtors to Designate Qualifying Bids |
| February 6, 2019 | Deadline for Debtors to Designate Baseline Bid |
| February 7, 2019 at 9:00 a.m. ET) | Auction |
| As soon as reasonably practicable after the Auction | Deadline to File Notice of Successful Bidder |
| As soon as reasonably practicable after the Auction | Deadline to Serve Notice of Successful Bidder and Successful Bidder's Adequate Assurance of Information |
| Not later than 2 hours prior to the commencement of the Sale Hearing | Adequate Assurance Objection Deadline for Successful Bidder |

---

[6] This objection deadline applies to all objections related to the proposed assumption and assignment of executory contracts and unexpired leases (with the exception of objections related to adequate assurance of future performance by a Successful Bidder).

| February 6, 2019 at 12:00 p.m. (noon) (ET) | Debtors' Deadline to File Reply to Sale Objections |
|---|---|
| February 8, 2019 | Sale Hearing |

28.     The proposed timeline for the Sale is driven, in part, by the Debtors' financial condition and the terms and provisions of both the Stalking Horse APA and DIP Order.  The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of these chapter 11 cases.  Such timeline provides an approximately four-week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets.  Moreover, relevant information regarding the Debtors' business has been made available in the Data Room during the Debtors' sale process, allowing potential bidders to conduct diligence on the Debtors' business, and the Debtors and their advisors began marketing the Assets prior to the commencement of these chapter 11 cases.  To the extent that any potential bidder has not previously conducted such diligence, such bidder will have immediate access to, subject to the execution of an appropriate confidentiality agreement, the information regarding the Debtors' Assets contained in the Data Room.

**NOTICE PROCEDURES FOR THE SALE,
BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

29.     The Debtors also request approval of the sale notice (the "Sale Notice"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**.

30.     Within one business day after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by email, mail, facsimile, or overnight delivery on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors; (iii) counsel to any official committee appointed in these cases; (iv) counsel to PNC Bank, National Association; (v) counsel to the Stalking Horse Purchaser; (vi) all

parties known or reasonably believed to have expressed an interest in acquiring any of the Assets within the six months prior to the Petition Date, including any person or entity that has submitted a bid for the Assets; (vii) all banks at which the Debtors have accounts; (viii) all of the landlords for the Debtors' Stores; (ix) any non-debtor parties to an executory contract or unexpired lease of the Debtors; (x) all parties known by the Debtors to assert any lien, claim, interest, or encumbrance in the Assets; (xi) all applicable federal, state, and local taxing and regulatory authorities having jurisdiction over the Assets; (xii) all environmental authorities having jurisdiction over the Assets, including the Environmental Protection Agency and similar state agencies for each state in which the Assets are located; (xiii) the Federal Trade Commission; (xiv) the Antitrust Division of the United States Department of Justice; (xv) all of the Debtors' other known creditors and equity holders; and (xvi) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the service date (collectively, the "Sale Notice Parties").  Within two business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be published once in the national edition of *USA Today.*

31.    The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' proposed claims and noticing agent, Donlin, Recano & Company, Inc., located at http://www.donlinrecano.com/beautybrands.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

32.    In connection with the Sale, the Debtors may seek to assume and assign to the Successful Bidder (or their designated assignee(s)) the Potentially Assumed Contracts in accordance with the following Assumption and Assignment Procedures.

(a)    On or before January 18, 2019 (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to the Potentially Assumed Contracts that may be potentially

assumed and assigned as part of the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption Notice").

(b)    The Assumption Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Potentially Assumed Contracts.  If a Counterparty objects to (i) the Debtors' ability to assume and/or assign the Potentially Assumed Contract or (ii) the Cure Amount for its Potentially Assumed Contract, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "Contract Objection").

(c)    Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (ET) on February 1, 2019** (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Potentially Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.  Any objections to adequate assurance of future performance by a Successful Bidder shall be filed in accordance with subparagraph (g) below.

(d)    The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory A. Taylor, Esq.;  gtaylor@ashbygeddes.com); (ii) proposed counsel to any official committee appointed in the Debtors' chapter 11 cases; (iii) counsel to PNC Bank, National Association, Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina Stango Kelbon, Esq.; kelbon@blankrome.com); (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey, Esq.; Linda.Casey@usdoj.gov); and (v) counsel to the Stalking Horse Purchaser, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Douglas Herrmann, Esq.; herrmannd@pepperlaw.com).

(e)    If after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Potentially Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than: (i) the Contract Objection Deadline in the event that such Assumption Notice was filed and served within five days of the Assumption Notice Deadline and (ii) two hours prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served more than five days after the Assumption Notice Deadline.

(f)     As soon as practicable after the conclusion or cancellation of the Auction, the Debtors shall file with the Court and serve on the Sale Notice Parties a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Assumed Contracts, and (iv) a certification by the Debtors that the Debtors have provided, or will provide, in coordination with the proposed assignee, evidence supporting the Successful Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information") to each affected Counterparty on a confidential basis.

(g)     As soon as practicable after the conclusion or cancellation of the Auction, the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known): (i) the Notice of Successful Bidder and (ii) the Successful Bidder's Adequate Assurance Information (to the extent not previously provided); provided, however, that the Debtors shall provide the Adequate Assurance Information of a Qualifying Bidder that submitted a Qualifying Bid, as soon as practicable after receipt thereof, to such Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information. The Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance not later than two hours prior to the commencement of the Sale Hearing.

(h)     At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to the Successful Bidder of only those Potentially Assumed Contracts that have been selected by the Successful Bidder to be assumed and assigned (each, a "Selected Assumed Contract," and collectively, the "Selected Assumed Contracts"). The Debtors and their estates reserve any and all rights with respect to any Potentially Assumed Contracts that are not ultimately designated as Selected Assumed Contracts. If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(j)    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

## RELIEF REQUESTED

33.    By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures, the Assumption and Assignment Procedures, and the Bid Protections, and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Sale, free and clear of all Encumbrances, (ii) authorizing and approving the assumption and assignment of the Potentially Assumed Contracts to the Successful Bidder; and (iii) granting related relief.

## BASIS FOR RELIEF

**A.    Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code**

34.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property

of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

35.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

36.    The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. Among other things, the Assets, which include the Core Stores, represent some of the Debtors' most valuable store locations. The Debtors will continue to conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to test the purchase price of the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by

the Stalking Horse Purchaser or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

37.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Sale, the Bidding Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

38.     The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to such estates, the Debtors' creditors, and all parties in interest.  The Debtors submit that ample business justification exists for the consummation of Sale and, therefore, request that this Court approve such Sale.

**B.    The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

39.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

40.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free

and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a

court may approve a sale free and clear if any one subsection is met).  Furthermore, a debtor

possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines,*

*Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

41.    The Debtors submit that, in the interest of attracting the best offers, it is

appropriate to sell their Assets on a final "as is" basis, free and clear of any and all

Encumbrances (except as otherwise expressly set forth in the Sale Order and the Stalking Horse

APA or a Modified APA with a Successful Bidder, as applicable) in accordance with section

363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied

with respect to such Sale.  In particular, the Debtors believe that section 363(f)(2) of the

Bankruptcy Code will be met because the Debtors' Pre-Petition Secured Parties are secured by,

among other things, the Assets and have consented to the Sale, provided that, in the case of the

Pre-Petition Agent, all cash proceeds generated from the sale of any Assets shall be paid to the

Pre-Petition Agent upon the closing of such sale for application against the obligations owing by

the Debtors to the Pre-Petition Agent in accordance with the terms and conditions of the DIP

Order and the Pre-Petition Credit Agreement, until such time as all such obligations have been

paid in full in accordance with the terms and conditions of the Pre-Petition Credit Agreement and DIP Order.

42.     Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. Of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

43.     Furthermore, the Debtors propose that any Encumbrances asserted against the Assets be transferred to and attach to the proceeds of such Sale, solely to the extent any such proceeds exist after payment in full of the Obligations (as defined in the DIP Order).  Application of the proceeds generated by the Sale will be subject to any applicable provisions of the DIP Order.

**C.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

44.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  11 U.S.C. § 363(m).  In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**D.    The Court Should Approve the Bidding Procedures**

45.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets").  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

46.    The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The

Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors.  Moreover, the Debtors are required under both the Stalking Horse APA and the DIP Order to complete the auction and sale process on the timetable set forth in the Bidding Procedures, which timetable is fair and reasonable in light of the circumstances of these circumstances of these chapter 11 cases, including the Debtors' current liquidity position.

47.    The Debtors submit that the Bidding Procedures are fair, transparent, and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court to approve the Bidding Procedures, including, without limitation, the dates established thereby for the Auction and the Sale Hearing.

**E.    The Bid Protections Have a Sound Business Purpose and Should Be Approved**

48.    The Third Circuit has held that, in the bankruptcy sale context, bid protections must provide an actual benefit to a debtor's estate and be necessary to preserve the value of estate assets.  *O'Brien Envtl. Energy, Inc.*, 181 F. 3d at 533; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-07 (3d Cir. 2010).  Bid protections may be necessary to preserve the value of the estate if assurance of such bid protections "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *See O'Brien Envtl. Energy*, 181 F. 3d. at 537. Additionally, if the availability of such bid protections were to induce a bidder to research the

value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

49. The Debtors submit that, because there is a Stalking Horse Purchaser, the Bid Protections are necessary and collectively provide the Debtors' estates with the types of benefits generally contemplated by the Third Circuit. Based on the marketing process that the Debtors and their professional advisors have conducted thus far, the Debtors have determined that the Bid Protections were necessary to attract and retain the Stalking Horse Purchaser. Indeed, the Bid Protections were a material inducement for, and a condition of, the Stalking Horse Purchaser.

50. Moreover, by inducing the Stalking Horse Purchaser to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections serve to encourage more competitive bidding, which will hopefully increase the purchase price of the Assets. As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

51. Furthermore, the Debtors believe that the Bid Protections are well within market, and fair and reasonable in amount in light of the size and nature of the proposed Sale, and the efforts that will be have been expended by the Stalking Horse Purchaser in connection with negotiating and entering into the Stalking Horse APA, which will serve as the baseline for other bids for the Assets. In addition, given that the Bid Protections are to be paid out of the proceeds of any competing transaction that may be consummated, such payment will not diminish the Debtors' estates. Finally, the Stalking Horse Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

52.    Similar types of bid protections have been approved by this Court.  *See, e.g., In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 19, 2015) [Docket No. 494] (authorizing stalking horse break-up fee and expense reimbursement); *In re AgFeed USA, LLC*, Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) [Docket No. 103] (authorizing breakup fee of 3% and expense reimbursement of 1%); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) [Docket No. 1113] (authorizing break-up fee of 2.6%); *In re AES Thames, L.L.C.*, Case No. 11-10334 (KJC) (Bankr. D. Del. Nov. 16, 2011) [Docket No. 471] (authorizing a break-up fee of $300,000 in the event the debtor entered into a stalking horse purchase agreement with a purchase price of at least $10 million); *In re Magic Brands, LLC*, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) [Docket No. 267] (authorizing stalking horse expense reimbursement).

53.    For the foregoing reasons, the Debtors respectfully request that this Court authorize the Bid Protections.

**F.    The Debtors' Assumption of Contracts and Leases Will Satisfy the Requirements of Section 365 of the Bankruptcy Code**

54.    The consummation of any Sale involving the assumption and assignment of an executory contract or unexpired lease will be contingent on the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  That section provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).

55.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."  *In re HQ Global*, 290 B.R. at 511.

56.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See id.; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate.").

57.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Potentially Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to a Potentially Assumed Contract, an Assumption Notice that indicates the proposed Cure Amount for each such contract. As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Potentially Assumed Contract.

58.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit).

59.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed

a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

60.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Potentially Assumed Contract.  In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the bidder's financial wherewithal and willingness to perform under any executory contracts and unexpired leases that are assumed and assigned to such potential bidder.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts and leases at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.[7]

61.    Therefore, the Debtors respectfully request the Court to (a) approve the proposed assumption and assignment of the Potentially Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[8]

---

[7] The Debtors will also provide the Adequate Assurance Information to any Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information in accordance with the terms of the Bidding Procedure Order.

[8] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under

**G.     The Pre-Petition Agent and DIP Agent Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code**

62.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

63.     As a result, the Debtors propose that the Pre-Petition Agent and DIP Agent, in their capacities as such, who holds claims that are secured by valid, binding, enforceable, non-avoidable, and perfected liens on and security interests in substantially all of the Assets pursuant to the terms of the DIP Order, be entitled to credit bid all or a portion of the Pre-Petition Obligations and DIP Obligation (each as defined in the DIP Order) under section 363(k) of the Bankruptcy Code and as provided for in the DIP Order and the Bidding Procedures.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

64.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory

---

such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry

of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

65.    As set forth throughout this Motion, any delay in the Debtors' ability to

consummate the Sale would be detrimental to the Debtors, their creditors and estates, and would

impair the Debtors' ability to take advantage of the substantial cost-savings that can be achieved

by an expeditious closing of the Sale.

66.    For this reason and those set forth above, the Debtors submit that ample cause

exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and

6006(d), to the extent applicable.

## NOTICE

67.    The Debtors will provide notice of this Motion to: (i) the Office of the United

States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims

against the Debtors; (iii) counsel to any official committee appointed in these cases; (iv) counsel

to PNC Bank, National Association; (v) counsel to the Stalking Horse Purchaser; (vi) all parties

known or reasonably believed to have expressed an interest in acquiring any of the Assets within

the six months prior to the Petition Date, including any person or entity that has submitted a bid

for the Assets; (vii) all banks at which the Debtors have accounts; (viii) all of the landlords for

the Debtors' Stores; (ix) any non-debtor parties to an executory contract or unexpired lease of the

Debtors; (x) all parties known by the Debtors to assert any lien, claim, interest, or encumbrance

in the Assets; (xi) all applicable federal, state, and local taxing and regulatory authorities having

jurisdiction over the Assets; (xii) all environmental authorities having jurisdiction over the

Assets, including the Environmental Protection Agency and similar state agencies for each state

in which the Assets are located; (xiii) the Federal Trade Commission; (xiv) the Antitrust Division

of the United States Department of Justice; and (xv) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

### No Prior Request

68.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: January 6, 2019
        Wilmington, Delaware

**ASHBY & GEDDES**

*/s/ Gregory A. Taylor*

Gregory A. Taylor (No. 4008)
Stacy L. Newman (No. 5044)
Katharina Earle (No. 6348)
David F. Cook (No. 6352)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
Phone: (302) 654-1888
Facsimile: (302) 654-2067

*Proposed Counsel for Debtors
and Debtors-in-Possession*

# Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 19-10031 (___) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | **Related Docket No. ____** |
| | ) | |

**ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND BID PROTECTIONS AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of: (a) an order (i) scheduling a hearing (the "Sale Hearing") on approval of the proposed sale (the "Sale") of all or substantially all of the Debtors' assets related to the Core Stores (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder, and the potential assumption and assignment of certain executory contracts and unexpired leases (each, an "Potentially Assumed Contract" and, collectively, the "Potentially Assumed Contracts") in connection therewith; (ii) authorizing and approving certain bidding

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789). The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] Capitalized terms used but not defined herein shall have the meanings given them in the Bidding Procedures (as defined below), or to the extent not defined therein, the Motion.

procedures for the Sale attached hereto as **Exhibit 1** (collectively, the "Bidding Procedures"), authorizing and approving certain procedures for the potential assumption and assignment of the Potentially Assumed Contracts (collectively, the "Assumption and Assignment Procedures"), authorizing and approving certain bid protections for the Stalking Horse Purchaser, including a Break-Up Fee and an Expense Reimbursement (together, the "Bid Protections"), the form and manner of notice of each of the foregoing; and (iii) granting related relief; and (b) an order, substantially in the form attached to the Motion as Exhibit B (the "Sale Order"), (i) authorizing and approving the Sale, free and clear of all Encumbrances, except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder; (ii) authorizing and approving the potential assumption and assignment of the Potentially Assumed Contracts in connection therewith; and (iii) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion; and the Bidding Procedures Hearing (as defined below) having been held; and the Court having found and determined that the relief sought in the Motion as to the Bidding and Auction Process (as defined below) is in the best interests of the Debtors, their estates, and creditors and all parties in interest and that the legal and factual bases set forth in the Motion and at the Bidding Procedures Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[3]

A.      This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order.

B.      Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory and legal predicates for the relief requested in the Motion and provided for herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, and Local Rules 2002-1 and 6004-1.

D.      In the Motion and at the hearing on the Motion as it pertains to the Bidding and Auction Process (the "Bidding Procedures Hearing"), the Debtors demonstrated that good and sufficient notice of the relief granted by this Order has been given under the circumstances, and no further other or further notice need be provided.

E.      The Debtors have articulated good and sufficient business reasons for the Court to approve: (i) the Bidding Procedures, (ii) the Bid Protections and Signage Costs, (iii) the Sale Notice, (iv) the Assumption and Assignment Procedures; and (v) the Assumption Notice.

F.      The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Auction, the Sale, and the Sale Hearing, and any and all objection deadlines related thereto, and no other or further notice is required of the foregoing.

G.      The Bidding Procedures are fair, reasonable, and appropriate, and designed to maximize recovery with respect to the Sale.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

H.     The Assumption and Assignment Procedures provided for herein and in the Assumption Notice are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures and the Assumption Notice have been tailored to provide an adequate opportunity for all Counterparties to assert any Contract Objections.

I.     Entry of this Order is in the best interests of the Debtors, their estates and creditors, and all other interested parties.

J.     Hilco Merchant Resources, LLC shall act as the Stalking Horse Purchaser pursuant to that certain *Amended and Restated Agency Agreement* dated as of January 5, 2019, by and between Beauty Brands, LLC and the Stalking Horse Purchaser (as amended, supplemented, or otherwise modified by the parties thereto) (the "Stalking Horse APA"), substantially in the form attached to the Motion as Exhibit C, and shall be subject to higher and better offers in respect of the Assets included in the Stalking Horse Bid, in accordance with the Bidding Procedures.

K.     Good and sufficient business reasons exist for the Court to authorize the Debtors to enter into the Stalking Horse APA.

L.     The Bidding Procedures, the Stalking Horse APA, and the Bid Protections were negotiated in good faith and at arms' length, and are reasonably designed to promote active bidding at and participation in the Auction, to ensure that the highest or best value is generated for the Assets.

M.     The Stalking Horse Purchaser is not an "insider" or "affiliate" of any of the Debtors, as such terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Purchaser and the Debtors.  The Stalking Horse Purchaser and its advisors have acted in good

faith in connection with the negotiation of the Stalking Horse APA, the Bid Protections, and the Bidding Procedures.

N.      The Bid Protections are necessary to ensure that the Stalking Horse Purchaser will continue to pursue the sale transaction contemplated by the Stalking Horse APA.  To the extent payable under the Stalking Horse APA, the Bid Protections are (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) allowed and shall be paid from the Deposit posted by the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) prior to payment from the Deposit or cash proceeds of the Sale of any obligations owing by the Debtors to the Pre-Petition Agent or DIP Agent, in their capacities as such, under the Pre-Petition Credit Agreement or any order approving debtor-in-possession financing (the "DIP Order"), (iii) commensurate with the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser; and (iv) fair, reasonable, and appropriate in light of the size and nature of the proposed Sale and the efforts that have been and will be expended by the Stalking Horse Purchaser in connection with the Debtors' sale process.

O.      No person or entity, other than the Stalking Horse Purchaser, shall be entitled to any Bidding Fees (as defined below).

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Those portions of the Motion seeking approval of (a) the Debtors' entry into the Stalking Horse APA and all of its terms (including, without limitation, the Break-Up Fee and Expense Reimbursement), (b) the Assumption and Assignment Procedures, (c) the Bidding Procedures, (d) the date and time of the Sale Hearing, and (e) the noticing and objection procedures related to each of the foregoing, including, without limitation, the Sale Notice,

substantially in the form attached hereto as **Exhibit 2** and the Assumption Notice, substantially in the form attached hereto as **Exhibit 3** (sub-clauses (a)-(e) above, collectively, the "Bidding and Auction Process"), are hereby GRANTED to the extent set forth herein.

2.    Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

### Stalking Horse Purchaser and Bid Protections

3.    The Debtors are authorized to enter into the Stalking Horse APA and the Stalking Horse Bid shall be subject to higher or better Qualifying Bids in accordance with the terms and provisions of the Bidding Procedures.

4.    The Bid Protections are approved in their entirety, payable in accordance with, and subject to the Stalking Horse APA and the Bidding Procedures.  Specifically, the Stalking Horse Purchaser shall be entitled to payment of (i) a Break-Up Fee in the amount of $250,000 and (ii) the Expense Reimbursement of up to $50,000.  The Stalking Horse Purchaser is also entitled to Signage Costs in an amount equal to $50,000.

5.    The Debtors are authorized to pay the Stalking Horse Purchaser the Bid Protections and Signage Costs in accordance with the terms and conditions set forth in the Stalking Horse APA and the Bidding Procedures, and without further order of the Court.

6.    The Bid Protections and Signage Costs, to the extent payable under the Stalking Horse APA, shall be (i) allowed and paid from the Deposit posted by the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder); (ii) paid prior to payment of any obligations owing by the Debtors to the Pre-Petition Agent or DIP Agent in

accordance with the terms and conditions of the DIP Order and the Pre-Petition Credit Agreement from the Deposit or cash proceeds of the Sale; and (iii) shall be treated as an administrative expense of the kind specified in sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

7.      Other than with respect to the Stalking Horse Purchaser, neither the Debtors, any statutory committee appointed in these cases, the Pre-Petition Agent, the DIP Lenders, nor any other party shall agree to pay any Qualified Bidder any break-up fee, topping fee, bidding fee, expense reimbursement, or other consideration in exchange for bidding (collectively, the "Bidding Fees").  Moreover, no Qualified Bidder (other than the Stalking Horse Purchaser) shall be granted, entitled to payment of, or receive any Bidding Fees in exchange for bidding.

## Bidding Procedures

8.      The Bidding Procedures are hereby approved.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The Debtors are hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

9.      The Debtors shall have the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder; provided that the Debtors shall notify the Consultation Parties of any decision to withhold such information.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality, or similar provisions relating to any due diligence information, the Debtors and their estates shall be

authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures or the Sale, provided that the information was provided in accordance with this Order.

10.     For all purposes under the Bidding Procedures:  (a) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid; (b) should it decide to credit bid, the Pre-Petition Agent and DIP Agent, in their capacities as such, are each a Qualifying Bidder and any such credit bid will be considered a Qualifying Bid; and (c) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

11.     The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

12.     In the event that the Stalking Horse Bid is the only Qualified Bid received by the Debtors by the Bid Deadline, the Debtors shall not be required to conduct an Auction, and the Stalking Horse Purchaser shall be deemed the Successful Bidder with respect to the Assets.  If, in addition to the Stalking Horse Bid, the Debtors receive at least one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction of the Assets in accordance with the Bidding Procedures.

13.     The Auction will take place at the offices of Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, Delaware 19801 **on February 7, 2019 at 9:00 a.m. (prevailing**

**Eastern Time**), or such other time and location as the Debtors, after consultation with the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than one day following the delivery of such notice.

14.     All persons or entities that participate in the bidding process shall be deemed to have knowingly and voluntarily: (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction, and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

15.     All proceedings of the Auction shall be conducted openly, and the Debtors, the Auction Bidders, the Consultation Parties, a representative of the United States Trustee's Office, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, shall be permitted to attend; provided that all parties must provide counsel for the Debtors one day's written notice of their intent to attend the Auction.  The proceedings of the Auction shall be transcribed.

16.     Each Auction Bidder shall confirm either in writing or on the record at the Auction that (i) it has not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale and (ii) its Qualified Bid represents a binding, good faith, and bona fide

offer to purchase the Assets if selected as a Successful Bidder.

17.     Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things the following non-binding factors: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing, and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's rights to the Break-Up Fee, Expense Reimbursement, and Signage Costs; (f) the impact on employees, trade creditors, and landlords; and (g) any other factors the Debtors may reasonably deem relevant.

18.     The Debtors, subject to the terms of this Order and the Bidding Procedures, shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including, without limitation, to: (a) determine which bidders are Qualifying Bidders; (b) determine which bids are Qualifying Bids; (c) determine which Qualifying Bid is a Baseline Bid; (d) determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the Auction; (e) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (f) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice (other

than the filing of a notice of such adjournment or cancellation on the docket of these chapter 11

cases, which notice may be the hearing agenda in the case of the Sale Hearing) or as provided in

this Order and in the Bidding Procedures; (g) modify the Bidding Procedures consistent with

their fiduciary duties and bankruptcy law; and (h) withdraw the Motion at any time with or

without prejudice.

### Assumption and Assignment Procedures

19.    The following "Assumption and Assignment Procedures" are hereby approved:

(a)    On or before January 18, 2019 (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to the Potentially Assumed Contracts that may be potentially assumed and assigned as part of the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption Notice").

(b)    The Assumption Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Potentially Assumed Contracts.  If a Counterparty objects to (i) the Debtors' ability to assume and/or assign the Potentially Assumed Contract or (ii) the Cure Amount for its Potentially Assumed Contract, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (a "Contract Objection").

(c)    Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (ET) on February 1, 2019** (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Potentially Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.  Any objections to adequate assurance of future performance by a Successful Bidder shall be filed in accordance with subparagraph (g) below.

(d)    The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory A. Taylor, Esq.; gtaylor@ashbygeddes.com); (ii) proposed counsel to any

official committee appointed in the Debtors' chapter 11 cases; (iii) counsel to PNC Bank, National Association, Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina Stango Kelbon, Esq.; kelbon@blankrome.com); (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey, Esq.; Linda.Casey@usdoj.gov); and (v) counsel to the Stalking Horse Purchaser, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Douglas Herrmann, Esq.; herrmannd@pepperlaw.com).

(e)     If after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Potentially Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than: (i) the Contract Objection Deadline in the event that such Assumption Notice was filed and served within five days of the Assumption Notice Deadline and (ii) two hours prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served more than five days after the Assumption Notice Deadline.

(f)     As soon as practicable after the conclusion or cancellation of the Auction, the Debtors shall file with the Court and serve on the Sale Notice Parties a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts (as defined below), (iii) the proposed assignee(s) of such Selected Assumed Contracts, and (iv) a certification by the Debtors that the Debtors have provided, or will provide, in coordination with the proposed assignee, evidence supporting the Successful Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information") to each affected Counterparty on a confidential basis.

(g)     As soon as practicable after the conclusion or cancellation of the Auction, the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known): (i) the Notice of Successful Bidder and (ii) the Successful Bidder's Adequate Assurance Information (to the extent not previously provided); provided, however, that the Debtors shall provide the Adequate Assurance Information of a Qualifying Bidder that submitted a Qualifying Bid, as soon as practicable after receipt thereof, to such Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information. The Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance not later than two hours prior to the commencement of the Sale Hearing.

(h)     At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to the Successful Bidder of only those Potentially Assumed Contracts that have been selected by the Successful Bidder to be assumed and assigned (each, a

"Selected Assumed Contract," and collectively, the "Selected Assumed Contracts"). The Debtors and their estates reserve any and all rights with respect to any Potentially Assumed Contracts that are not ultimately designated as Selected Assumed Contracts. If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(j)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

20.     The Debtors' decision to assume and assign the Potentially Assumed Contracts to the Successful Bidder is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Potentially Assumed Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with these chapter 11 cases.

21.     The Assumption and Assignment Procedures are appropriate and fair to all

Counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and are hereby approved.

22.    The Assumption Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all Counterparties and any other affected parties of the potential assumption and assignment of the Potentially Assumed Contracts and (ii) afford the Counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004, and 6006; and (b) hereby approved.

23.    The inclusion of a contract, lease, or other agreement on an Assumption Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto shall be reserved.

**The Sale Notice**

24.    The Sale Notice is approved, and no other or further notice of the Sale, the Auction, the Sale Hearing, or the Sale Objection Deadline shall be required if the Debtors serve such notice in the manner provided in this Order.

25.    Within one business day of the entry of this Order, the Debtors shall file with the Court and serve the Sale Notice by email, mail, facsimile, or overnight delivery on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 20 largest unsecured claims against the Debtors; (iii) counsel to any official committee appointed in these cases; (iv) counsel to PNC Bank, National Association; (v) counsel to the Stalking Horse Purchaser; (vi) all parties known or reasonably believed to have expressed an interest in acquiring any of the Assets within the six months prior to the Petition Date, including any person

or entity that has submitted a bid for the Assets; (vii) all banks at which the Debtors have accounts; (viii) all of the landlords for the Debtors' Stores; (ix) any non-debtor parties to an executory contract or unexpired lease of the Debtors; (x) all parties known by the Debtors to assert any lien, claim, interest, or encumbrance in the Assets; (xi) all applicable federal, state, and local taxing and regulatory authorities having jurisdiction over the Assets; (xii) all environmental authorities having jurisdiction over the Assets, including the Environmental Protection Agency and similar state agencies for each state in which the Assets are located; (xiii) the Federal Trade Commission; (xiv) the Antitrust Division of the United States Department of Justice; (xv) all of the Debtors' other known creditors and equity holders; and (xvi) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the service date (collectively, the "Sale Notice Parties").

26.     Within two business days of the entry of this Order, the Debtors will cause the Sale Notice to be published once in the national edition of *USA Today.*

27.     The Debtors shall post the Sale Notice as well as the Motion, the Stalking Horse APA, and this Order on the website of the Debtors' claims and noticing agent, at http://www.donlinrecano.com/beautybrands.

**Sale Hearing, Objections, Replies**

28.     Any objections to the Sale or the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local  Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (prevailing Eastern Time) on February 1, 2019** (the "Sale

Objection Deadline"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon (i) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory A. Taylor, Esq.; gtaylor@ashbygeddes.com); (ii) proposed counsel to any official committee appointed in the Debtors' chapter 11 cases; (iii) counsel to PNC Bank, National Association, Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina Stango Kelbon, Esq.; kelbon@blankrome.com); (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Linda Casey, Esq.; Linda.Casey@usdoj.gov); and (v) counsel to the Stalking Horse Purchaser, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Douglas Herrmann, Esq.; herrmannd@pepperlaw.com) (collectively, the "Objection Notice Parties").  If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party shall be barred from objecting to the Sale and shall not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party.

29.     Failure to file a Sale Objection on or before the Sale Objection Deadline (a) shall forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the Sale Order, and/or to the consummation and performance of the Sale contemplated by the Stalking Horse APA or any Modified APA with a Successful Bidder and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to entry of the Sale Order and consummation of the Sale and all transactions related thereto

30.     The Debtors shall have until **February 6, 2019 at 12:00 p.m. (noon) (prevailing Eastern Time)** to file and serve a reply to any objection filed in connection with the Sale,

including any Sale Objection or Contract Objection.

31.    The Sale Hearing shall be held in this Court **on February 8, 2019 at \_\_\_\_:\_\_\_\_0 \_\_\_.m. (prevailing Eastern Time)**.  The Debtors may adjourn or reschedule the Sale Hearing without notice or with limited and shortened notice to parties, including by: (a) an announcement of the adjournment in open court on the date scheduled for the Sale Hearing or (b) filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases prior to the commencement of the Sale Hearing.

32.    The Sale Notice, the Assumption Notice, the Bidding Procedures, the Auction, the Sale Hearing, and the Assumption and Assignment Procedures and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as it relates to the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the proposed assumption and assignment to the Successful Bidder of the Potentially Assumed Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004, and 6006, and such notice and objection periods are hereby approved.

**Related Relief**

33.    The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

34.    In the event that there is a conflict between this Order or the Bidding Procedures, on the one hand, and the Motion, the Stalking Horse APA, a Modified APA, or any notice served in connection with the Motion or this Order, on the other hand, this Order and the Bidding Procedures shall control and govern.

35.    Prior to mailing the Assumption Notice and Sale Notice, as applicable, the

Debtors may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deems necessary or appropriate.

36.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in these chapter 11 cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of this Order.  This Order shall be binding on any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases.

37.    This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules is expressly waived.  The Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and may, in their sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

38.    The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

39.    This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

Dated:  January ___, 2019     _____
        Wilmington, Delaware        The Honorable
                                    United States Bankruptcy Judge

**<u>Exhibit 1</u>**

(Bidding Procedures)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 19-10031 (___) |
| | ) | |
| Debtors.[1] | ) | Joint Administration Requested |
| | ) | |

### BIDDING PROCEDURES

On January 6, 2019, Beauty Brands, LLC and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On January ___, 2019, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order [Docket No.___] (the "Bidding Procedures Order"),[2] which, among other things, authorized the Debtors to solicit bids and approved these procedures (collectively, the "Bidding Procedures") to be employed by the Debtors in connection with the proposed sale (the "Sale") of all or substantially all of the Debtors' assets related to the 33 Core Stores listed on **Schedule 1** hereto (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder (as defined below).

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

**(A)** The Debtors' proposed counsel, Gregory A. Taylor, Esq., Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 at (302) 654-1888 or gtaylor@ashbygeddes.com; and

**(B)** The Debtors' Chief Restructuring Officer, Timothy Boates, RAS Management Advisors, LLC at (256) 776-4989 or tboates@rasmanagement.com.

### Summary of Important Dates and Deadlines

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789). The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

| DATE | DEADLINE |
|---|---|
| January 18, 2019 | Assumption Notice Deadline |
| February 4, 2019 at 12:00 p.m. (ET) | Bid Deadline |
| February 1, 2019 at 4:00 p.m. (ET) | Sale Objection Deadline |
| February 1, 2019 at 4:00 p.m. (ET) | Contract Objection Deadline[3] |
| February 5, 2019 | Deadline for Debtors to Designate Qualifying Bids |
| February 6, 2019 | Deadline for Debtors to Designate Baseline Bid |
| February 7, 2019 at 9:00 a.m. (ET) | Auction |
| As soon as reasonably practicable after the Auction | Deadline to File Notice of Successful Bidder |
| As soon as reasonably practicable after the Auction | Deadline to Serve Notice of Successful Bidder and Successful Bidder's Adequate Assurance of Information |
| Not later than 2 hours prior to the commencement of the Sale Hearing | Adequate Assurance Objection Deadline for Successful Bidder |
| February 6, 2019 at 12:00 p.m. (noon) (ET) | Debtors' Deadline to File Reply to Sale Objections |
| February 8, 2019 at                (ET) | Sale Hearing |

1.      **Stalking Horse Purchaser**

A stalking horse bid for the Assets has been submitted by Hilco Merchant Resources, LLC (the "<u>Stalking Horse Purchaser</u>", and its bid, the "<u>Stalking Horse Bid</u>").  The Stalking Horse Purchaser has executed that certain *Amended and Restated Agency Agreement* dated as of January 5, 2019 (the "<u>Stalking Horse APA</u>") to act as the Debtors' agent for the purpose of conducting "store closing" themed sales at the Core Stores listed on **<u>Schedule 1</u>** hereto.  The Stalking Horse APA guarantees that the Debtors shall receive eighty percent of the aggregate Cost Value of the Merchandise (both as defined in the Stalking Horse APA) contained in both the 23 Closing Stores as well as the 33 Core Stores.

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

2.      **Description of the Assets**

The Debtors are seeking to sell substantially all of their Assets related to the Core Stores, including:

- Merchandise from the Core Stores by means of a "store closing", "sale on

---

[3] This objection deadline applies to all objections related to the proposed assumption and assignment of executory contracts and unexpired leases (with the exception of objections related to adequate assurance of future performance by a Successful Bidder).

everything", "going out of business", "everything must go", or similar sale. Merchandise is defined in the Stalking Horse APA as all (i) new, finished, first-quality saleable goods (including without limitation Liter Goods) in the ordinary course of business located at the Stores as of the applicable Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, and (iii) Distribution Center Merchandise and On-Order Merchandise, if any, received at the Stores no later than fourteen days after the applicable Sale Commencement Date, provided that if such goods are received at the Stores after such fourteen day period, but on or before twenty-eight days after the applicable Sale Commencement Date, such goods shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good; and

- The Owned FF&E in the Stores. Owned FF&E is defined in the Stalking Horse APA as all furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property located at the Cores Stores, the Debtors' warehouse/distribution centers, and the Debtors' corporate office that are owned by the Debtors.

A party may submit a bid for any individual Asset (or combination of Assets) listed on Schedule 1.

## 3.    **Participation Requirements**

Any person or entity that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become a "Qualifying Bidder." In order to become a Qualifying Bidder (and thus be able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room")), a Potential Bidder must submit to the Debtors and their advisors:

(a)    documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(b)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder;

(c)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties (as defined below), that the interested party has a *bona fide* interest in consummating a sale transaction; and

(d)    sufficient information, as determined by the Debtors, to allow the Debtors,

after consultation with the Consultation Parties, to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion) and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors, each of the Consultation Parties, or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid (as defined below); (ii) should it decide to credit bid, the Pre-Petition Agent and DIP Agent, in their capacities as such, are each a Qualifying Bidder and any such credit bid will be considered a Qualifying Bid; and (iii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

## 4.    **Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Bankruptcy Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction (as defined below) and the construction and enforcement of the contemplated transaction documents of such parties, (b) bring any such action or proceeding in the Bankruptcy Court, and (c) be deemed to have consented to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

## 5.    **Due Diligence**

The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) Timothy Boates ((256) 776-4989; tboates@rasmanagement.com) and/or (b) Gregory Taylor, Esq. ((302) 654-1888; gtaylor@ashbygeddes.com).

The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline.

The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder; provided that the Debtors shall notify the Consultation Parties of any decision to withhold such information.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

**6.**    **Bid Requirements**

Other than in the case of a bid submitted by the Stalking Horse Purchaser or the Pre-Petition Agent or DIP Agent, in their capacities as such, to be deemed a 'Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

(a)    be in writing;

(b)    fully disclose the identity of the Qualifying Bidder and whether such party is an "insider" (as defined in section 101 of the Bankruptcy Code) of any Debtor, and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

(c)    set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid;

(d)    not propose payment in any form other than cash (except as otherwise expressly set forth in these Bidding Procedures);

(e)    state the liabilities proposed to be paid or assumed by such Qualifying Bidder, including any cure amounts for Potentially Assumed Contracts;

(f)    specify the Assets that are included in the bid, and state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA;

(g)    be accompanied by a clean, executed copy of an asset purchase agreement (the "Modified APA"), along with a marked copy of the Modified APA that reflects any variations from the Stalking Horse APA;

(h)    state that such Qualifying Bidder's offer is formal, binding, and unconditional and is irrevocable until two business days after the closing of the Sale;

(i)     state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified APA and provide written evidence in support thereof;

(j)     contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Modified APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve, within one business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information;

(k)     identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Modified APA;

(l)     a commitment to close the transactions contemplated by the Modified APA by February 9, 2019 for any competing liquidating bids, or February 19, 2019 for any going concern bids;

(m)     not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

(n)     the aggregate consideration proposed by the Qualifying Bidder must equal or exceed $7,108,646, which is comprised of (A) $6,658,646[4], plus (B) the Break-Up Fee, plus (C) the Expense Reimbursement, plus (D) the Signage Costs, plus (E) $100,000;

(o)     not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(p)     contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing

---

[4] To provide the estates with value comparable to the full Adjusted Guaranteed Amount that the Stalking Horse Purchaser would have paid, a Qualifying Bidder will have to pay a sum that is equivalent to ninety-one and one-third percent (91.3%) of the aggregate Cost Value of the Merchandise at the Core Stores, which captures the value of the 15% increase of the Guaranty Percentage at the Closing Stores that the estate will not be receiving, plus the estimated Sharing Amount set forth in section 3.2(a) of the Stalking Horse APA, plus the Debtors' share of the estimated FF&E set forth in section 7.1 of the Stalking Horse APA.

or other evidence of the ability to close the transactions contemplated by the Modified APA, with appropriate contact information for such financing sources;

(q)     contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

(r)     sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the transactions contemplated by the Modified APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than three days following execution and delivery of such Qualifying Bidder's Modified APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Modified APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(s)     provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid (as defined below), in accordance with the terms of the Modified APA;

(t)     includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified APA;

(u)     provides a good faith cash (the "Deposit") in an amount equal to ten percent of the purchase price provided for in the Modified APA (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent")

pursuant to the escrow agreement to be provided by the Debtors to the Qualifying Bidders (the "Escrow Agreement"); provided that with respect to a bid for a store location submitted by the landlord under the real property lease for such store (a "Landlord Lease Bid"), the landlord may deduct from its Deposit the amount of any undisputed monetary obligations, as determined by the Debtors, in their discretion, that constitute the cure amount for the applicable real property lease;

(v)    contain a written acknowledgement and representation from the Qualifying Bidder that (i) if the Qualifying Bidder becomes the Successful Bidder at the Auction and (ii) the Bankruptcy Court enters an order approving the sale of the Assets to such Successful Bidder on the terms of the Modified APA, the Debtors are authorized to, and the Debtors shall, use the Deposit to pay the Stalking Horse Purchaser (a) the Break-Up Fee, (b) the Expense Reimbursement, and (c) the Signage Costs; and

(w)    provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Modified APA equal to the amount of the Deposit.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

### 7.    Bid Deadline

A Qualifying Bidder, other than the Stalking Horse Purchaser or the Pre-Petition Agent or DIP Agent, in their capacities as such, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties (as identified below) so as to be received on or before **February 4, 2019 at 12:00 p.m. (ET)** (the "Bid Deadline"); provided that the Debtors may extend the Bid Deadline without further order of the Bankruptcy Court, subject to providing notice to the Consultation Parties. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.**

### 8.    Evaluation of Qualifying Bids

The Debtors will promptly deliver copies of all bids from Qualifying Bidders to each of the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by February 5, 2019.

One day prior to the Auction Date, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

### 9.    No Qualifying Bids

If no timely Qualifying Bids other than the Stalking Horse Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Bankruptcy Court approve the Stalking Horse APA and the transactions contemplated thereunder.

### 10.    Auction

If Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Bid, then the Debtors shall conduct an auction (the "Auction"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing, and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's rights to the Break-Up Fee, Expense Reimbursement, and Signage Costs; (f) the impact on employees, trade creditors, and landlords; and (g) any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

i.      the Auction shall be held on **February 7, 2019 at 9:00 a.m. (prevailing Eastern Time)** (the "Auction Date") at Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, Delaware 19801, or such other date and time as the Debtors, after consultation with the Consultation Parties, may notify Qualifying Bidders who have submitted Qualifying Bids; provided that such other date and time is no earlier than one day following the delivery of such notice;

ii.     only the Stalking Horse Purchaser, the Pre-Petition Agent and DIP Agent, in

their capacities as such, and the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.    only the Debtors, the Auction Bidders, the Consultation Parties, a representative of the United States Trustee's Office, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that all parties must provide counsel for the Debtors one day's written notice of their intent to attend the Auction;

v.    the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.    each of the Auction Bidders shall confirm either in writing or on the record at the Auction that (i) it has not engaged in any collusion with respect to the Bidding Procedures, the Auction, or the Sale and (ii) its Qualified Bid represents a binding, good faith, and bona fide offer to purchase the Assets if selected as a Successful Bidder;

vii.    bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $100,000 of the Baseline Bid, provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by the Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of (A) the Break-Up Fee, plus (B) the Expense Reimbursement, plus (C) the Signage Costs; (iii) the Stalking Horse Purchaser may not credit bid the Bid Protections in a context involving only liquidation bids; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii.    the Auction may include individual negotiations between the Debtors and the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix.    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x.    the Debtors and their professional advisors in consultation with the Consultation Parties may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Bankruptcy Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order and the DIP Order (as defined in the Bidding Procedures Order) and (ii) disclosed to the Auction Bidders;

xi.      each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Bankruptcy Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Bankruptcy Court, and (iii) be deemed to have consented to the Bankruptcy Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii.     the Pre-Petition Agent and DIP Agent, in their capacities as such, shall be entitled to credit bid all or a portion of the Pre-Petition Obligations and DIP Obligations (each as defined in the DIP Order) in accordance with section 363(k) of the Bankruptcy Code;

xiii.    the Auction Bidders shall have the right to make additional modifications to the Modified APA or the Stalking Horse APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv.    the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA or the Stalking Horse APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv.    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "Successful Bid").  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Stalking Horse APA, as applicable, requested by each bidder, and the net benefit to the Debtors' estates.  The bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of the

purchaser as set forth in the Modified APA or the Stalking Horse APA, as applicable. The Debtors may, in their sole discretion, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

xvi.    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

## 11.    Sale Hearing

The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Bankruptcy Court. The hearing (the "Sale Hearing") to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **February 8, 2019 at _____ (prevailing Eastern Time)**. The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases.

At the Sale Hearing, the Debtors will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Stalking Horse Purchaser or in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APA or Modified APA submitted by the Successful Bidder, as applicable; (ii) finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax, or similar tax, or deposit under any applicable bulk sales statute; and (iv) unless otherwise ordered by the Bankruptcy Court, directing that all cash proceeds generated from the sale of any Assets shall be paid to the Pre-Petition Agent upon the closing of such sale(s) for application against the obligations owing by the Debtors to the Pre-Petition Agent in accordance with the terms and conditions of the DIP Order and the Pre-Petition Credit Agreement; provided, however, that in the event the Stalking Horse Purchaser is not the Successful Bidder, the Debtors shall use the Deposit to first pay the Stalking Horse Purchaser the Bid Protections and Signage Costs from the Deposit.

## 12.    Backup Bidder

Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to

close the Sale by February 9, 2019 for any liquidating bids, or February 19, 2019 for any going concern bids (or such date as may be extended by the Debtors), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties.

### 13.    <u>Return of Deposits</u>

All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five business days following the closing of the Sale.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale and used first to pay the Stalking Horse Purchaser the Bid Protections and Signage Costs.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Modified APA or the Stalking Horse APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

### 14.    <u>Notice and Consultation Parties</u>

(a)    The term "<u>Notice Parties</u>" as used in these Bidding Procedures shall mean: (i) the Debtors (Attn: Timothy Boates, Chief Restructuring Officer; tboates@rasmanagement.com); (ii) proposed counsel to the Debtors, Ashby & Geddes (Attn: Gregory Taylor, Esq.; gtaylor@ashbygeddes.com); and (iii) proposed investment banking advisor to the Debtors, Lazard Middle Market LLC (Attn: Dermott O'Flanagan; dermott.oflanagan@lazard.com).

(b)    The term "<u>Consultation Parties</u>" as used in these Bidding Procedures shall mean: (i) any official committee appointed in the Debtors' chapter 11 cases (the "<u>Committee</u>") and (ii) the Pre-Petition Secured Parties, in their capacities as such.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of the Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived, discharged, and released without further action; provided that the bidding party will have the same rights as any other Qualifying Bidder set forth above.

If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bidding Procedures; provided that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

15.    **Reservation of Rights**

Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

## Schedule 1

(Core Stores)

| Store # | Name | Address | City | State | Zip |
|---|---|---|---|---|---|
| 101 | Overland Park | 7501 W 119 St | Overland Park | KS | 66213 |
| 102 | Lee's Summit | 951 NE Rice Rd | Lee's Summit | MO | 64086 |
| 103 | Lawrence | 3514 Clinton Pkwy, Suite J | Lawrence | KS | 66047 |
| 104 | KC North | 6519 NW Barry Rd | Kansas City | MO | 64154 |
| 105 | Lenexa | 9570 Quivira Rd | Lenexa | KS | 66215 |
| 106 | Olathe | 15225 W 119 St | Olathe | KS | 66062 |
| 110 | Broomfield | 1270 E 1st Ave. | Broomfield | CO | 80020 |
| 113 | Plano | 6125 W Park Blvd | Plano | TX | 75093 |
| 115 | Co. Springs | 7214 North Academy Blvd | Colorado Springs | CO | 80920 |
| 116 | Frisco | 3211 Preston Road, Suite 16 | Frisco | TX | 75034 |
| 120 | Brentwood | 8582 Eager Rd. | Brentwood | MO | 63144 |
| 121 | Boulder | 1731 28th Street | Boulder | CO | 80301 |
| 124 | St. Charles | 6183 Mid Rivers Mall Drive | St. Charles | MO | 63304 |
| 125 | Topeka | 5820 SW 21st Street | Topeka | KS | 66604 |
| 126 | Plaza | 438 Ward Parkway | Kansas City | MO | 64112 |
| 127 | Independence | 20200 East Jackson Drive | Independence | MO | 64057 |
| 130 | S. Kansas City | 13241 State Line Road | Kansas City | MO | 64145 |
| 132 | Shiloh | 3110 Green Mount Crossing Dr. | Shiloh | IL | 62269 |
| 134 | Liberty | 8410 N Church Road | Kansas City | MO | 64157 |
| 138 | Omaha | 7815 Dodge Street | Omaha | NE | 68114 |
| 143 | West Omaha | 225 N 170th St. STE 110 | Omaha | NE | 68118 |
| 144 | Avondale | 1709 N Dysart Road | Avondale | AZ | 85392 |
| 145 | Legends | 1811 Village West Parkway, Ste. O-101 | Kansas City | KS | 66111 |
| 146 | Fulton Ranch | 105 West Ocotillo Road | Chandler | AZ | 85248 |
| 147 | Wentzville | 1894 Wentzville Pkwy, Suite 100 | Wentzville | MO | 63385 |
| 148 | Waco | 2325 Marketplace Drive | Waco | TX | 76711 |
| 149 | Clive | 10001 University  Ave. | Clive | IA | 50325 |
| 150 | Avon | 9774 E US Hwy 36 | Avon | IN | 46123 |
| 151 | Edwardsville | 6659 Edwardsville Crossing Dr. | Edwardsville | IL | 62025 |
| 153 | Birkdale | 8830 Lindholm Drive, Ste. 100 | Huntersville | NC | 28078 |
| 154 | Summit Fair | 860A NW Blue Parkway | Lee's Summit | MO | 64086 |
| 155 | Normal | 311 A S Veterans Parkway | Normal | IL | 61761 |
| 161 | Shawnee | 15320 Shawnee Mission Pkwy. | Shawnee | KS | 66217 |

**33**

## **Exhibit 2**

(Sale Notice)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 18-_____ (___) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARINGS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On January 6, 2019, Beauty Brands, LLC and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a motion [Docket No. __] (the "Motion") for the entry of (a) an order (the "Bidding Procedures Order")[2] (i) scheduling a hearing (the "Sale Hearing") on approval of the proposed sale (the "Sale") of all or substantially all of the Debtors' assets related to the 33 Core Stores listed on Exhibit D to the Motion (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder (as defined below), and authorizing the potential assumption and assignment of certain executory contracts and unexpired leases (each, an "Potentially Assumed Contract" and, collectively, the "Potentially Assumed Contracts") in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (collectively, the "Bidding Procedures"), authorizing and approving certain procedures for the potential assumption and assignment of the Potentially Assumed Contracts (collectively, the "Assumption and Assignment Procedures"), authorizing and approving certain bid protections for the Stalking Horse Purchaser, and the form and manner of notice of each of the foregoing; and (iii) granting related relief; and (b) an order (the "Sale Order") (i) authorizing and approving the Sale, free and clear of all Encumbrances, except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder; (ii) authorizing and approving the assumption and assignment of the Potentially Assumed Contracts in connection therewith; and (iii) granting related relief.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789).  The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order and the Bidding Procedures, as applicable.  Any summary of the Bidding Procedures or the Bidding Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

On January __, 2019, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. __].

### Stalking Horse Bid and Description of the Assets

A binding stalking horse bid (the "Stalking Horse Bid") has been submitted by Hilco Merchant Resources, LLC ("Hilco" or the "Stalking Horse Purchaser"). The Stalking Horse Purchaser has executed that certain *Amended and Restated Agency Agreement* dated January 5, 2019 (the "Stalking Horse APA") to act as the Debtors' agent for the purpose of conducting "store closing" themed sales at the Core Stores identified on **Schedule 1** hereto. More specifically, the Stalking Horse will sell all of the Merchandise (as defined in the Stalking Horse APA) from the Core Stores and dispose of all furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property at the Cores Stores, the Debtors' warehouse/distribution centers, and the Debtors' corporate office owned by the Debtors.

The Stalking Horse Bid is subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Bidding Procedures.

A party may submit a bid for any individual Asset (or combination of Assets) listed on Schedule 1 in accordance with the terms and provisions of the Bidding Procedures.

### IMPORTANT DATES AND DEADLINES

- ***Bid Deadline***. Any person or entity interested in participating in the Auction must submit a Qualified Bid (as defined in the Bidding Procedures) to the Notice Parties (as identified in the Bidding Procedures) on or before **February 4, 2019 at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

- ***Auction***. An Auction for the Assets has been scheduled for **February 7, 2019 at 9:00 a.m. (prevailing Eastern Time)** and, if necessary, will be conducted at the offices of Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, Delaware 19801.

- ***Sale Objection Deadlines***. Objections to a proposed Sale, including any objection to the sale of any of the Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and/or entry of a Sale Order must be (i) filed in accordance with the Bidding Procedures, (ii) filed with the Bankruptcy Court, and (iii) served on the (a) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory A. Taylor, Esq.; gtaylor@ashbygeddes.com); (b) proposed counsel to any official committee appointed in the Debtors' chapter 11 cases; (c) counsel to PNC Bank, National Association, Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina Stango Kelbon, Esq.; kelbon@blankrome.com); (d) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey, Esq.; Linda.Casey@usdoj.gov); and (e) counsel to the Stalking Horse Purchaser, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100,

Wilmington, DE 19801 (Attn: Douglas Herrmann, Esq.; herrmannd@pepperlaw.com) (collectively, the "Objection Notice Parties") by no later than **February 1, 2019 at 4:00 p.m. (prevailing Eastern Time) (prevailing Eastern Time)**.

- _**Sale Hearing**_.  The Sale Hearing shall be held before the Bankruptcy Court before the Honorable _____, United States Bankruptcy Judge, in the Bankruptcy Court, located at 824 N. Market Street, Wilmington, Delaware 19801 on **February 8, 2019 at \_\_\_\_:\_\_\_\_0 \_\_\_.m. (prevailing Eastern Time)**.

## Additional Information

Any party interested in submitting a bid for the Assets should contact the Debtors' Chief Restructuring Officer, Timothy Boates at (256) 776-4989 or tboates@rasmanagement.com and/or the Debtors' proposed counsel, Gregory Taylor, Esq. at (302) 654-1888 or gtaylor@ashbygeddes.com.

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse APA may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent, Donlin, Recano & Company, Inc., located at http://www.donlinrecano.com/beautybrands.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER BY THE APPLICABLE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, SALE ORDER, THE PROPOSED SALE, OR THE DEBTORS' CONSUMMATION OF THE STALKING HORSE APA OR ANY OTHER ASSET PURCHASE AGREEMENT EXECUTED BY THE DEBTORS AND A SUCCESSFUL BIDDER AT THE AUCTION.**

Dated: January \_\_\_, 2019                                **ASHBY & GEDDES**
      Wilmington, Delaware

                                    _____
                                    Gregory A. Taylor (No. 4008)
                                    Stacy L. Newman (No. 5044)
                                    Katharina Earle (No. 6348)
                                    David F. Cook (No. 6352)
                                    500 Delaware Avenue
                                    P.O. Box 1150
                                    Wilmington, DE  19899
                                    Phone: (302) 654-1888
                                    Facsimile: (302) 654-2067

*Proposed Counsel for Debtors*
*and Debtors-in-Possession*

**Schedule 1**

(Core Stores)

| Store # | Name | Address | City | State | Zip |
|---------|------|---------|------|-------|-----|
| 101 | Overland Park | 7501 W 119 St | Overland Park | KS | 66213 |
| 102 | Lee's Summit | 951 NE Rice Rd | Lee's Summit | MO | 64086 |
| 103 | Lawrence | 3514 Clinton Pkwy, Suite J | Lawrence | KS | 66047 |
| 104 | KC North | 6519 NW Barry Rd | Kansas City | MO | 64154 |
| 105 | Lenexa | 9570 Quivira Rd | Lenexa | KS | 66215 |
| 106 | Olathe | 15225 W 119 St | Olathe | KS | 66062 |
| 110 | Broomfield | 1270 E 1st Ave. | Broomfield | CO | 80020 |
| 113 | Plano | 6125 W Park Blvd | Plano | TX | 75093 |
| 115 | Co. Springs | 7214 North Academy Blvd | Colorado Springs | CO | 80920 |
| 116 | Frisco | 3211 Preston Road, Suite 16 | Frisco | TX | 75034 |
| 120 | Brentwood | 8582 Eager Rd. | Brentwood | MO | 63144 |
| 121 | Boulder | 1731 28th Street | Boulder | CO | 80301 |
| 124 | St. Charles | 6183 Mid Rivers Mall Drive | St. Charles | MO | 63304 |
| 125 | Topeka | 5820 SW 21st Street | Topeka | KS | 66604 |
| 126 | Plaza | 438 Ward Parkway | Kansas City | MO | 64112 |
| 127 | Independence | 20200 East Jackson Drive | Independence | MO | 64057 |
| 130 | S. Kansas City | 13241 State Line Road | Kansas City | MO | 64145 |
| 132 | Shiloh | 3110 Green Mount Crossing Dr. | Shiloh | IL | 62269 |
| 134 | Liberty | 8410 N Church Road | Kansas City | MO | 64157 |
| 138 | Omaha | 7815 Dodge Street | Omaha | NE | 68114 |
| 143 | West Omaha | 225 N 170th St. STE 110 | Omaha | NE | 68118 |
| 144 | Avondale | 1709 N Dysart Road | Avondale | AZ | 85392 |
| 145 | Legends | 1811 Village West Parkway, Ste. O-101 | Kansas City | KS | 66111 |
| 146 | Fulton Ranch | 105 West Ocotillo Road | Chandler | AZ | 85248 |
| 147 | Wentzville | 1894 Wentzville Pkwy, Suite 100 | Wentzville | MO | 63385 |
| 148 | Waco | 2325 Marketplace Drive | Waco | TX | 76711 |
| 149 | Clive | 10001 University  Ave. | Clive | IA | 50325 |
| 150 | Avon | 9774 E US Hwy 36 | Avon | IN | 46123 |
| 151 | Edwardsville | 6659 Edwardsville Crossing Dr. | Edwardsville | IL | 62025 |
| 153 | Birkdale | 8830 Lindholm Drive, Ste. 100 | Huntersville | NC | 28078 |
| 154 | Summit Fair | 860A NW Blue Parkway | Lee's Summit | MO | 64086 |
| 155 | Normal | 311 A S Veterans Parkway | Normal | IL | 61761 |
| 161 | Shawnee | 15320 Shawnee Mission Pkwy. | Shawnee | KS | 66217 |

**33**

**<u>Exhibit 3</u>**

(Assumption Notice)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 18-_____ (___) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF CURE AMOUNTS AND POTENTIAL ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
## UNEXPIRED LEASES IN CONNECTION WITH SALE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On January 6, 2019, Beauty Brands, LLC and its debtor affiliates, in the above-captioned chapter 11 cases (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") a motion [Docket No. __] (the "Motion") for the entry of (a) an order (the "Bidding Procedures Order")[2] (i) scheduling a hearing (the "Sale Hearing") on approval of the proposed sale (the "Sale") of all or substantially all of the Debtors' assets related to the Core Stores (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), except certain permitted Encumbrances as determined by the Debtors and the Successful Bidder (as defined below), and authorizing the potential assumption and assignment of certain executory contracts and unexpired leases (each, an "Potentially Assumed Contract" and, collectively, the "Potentially Assumed Contracts") in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (collectively, the "Bidding Procedures"), authorizing and approving certain assumption and assignment procedures for the Potentially Assumed Contracts provided for herein (collectively, the "Assumption and Assignment Procedures"), authorizing the Debtors to provide certain bid protections for the Stalking Horse Purchaser, including a Break-Up Fee and an Expense Reimbursement, and authorizing and approving the form and manner of notice of each of the foregoing; and (iii) granting related relief; and (b) an order (the "Sale Order") (i) authorizing and approving the Sale, free and clear of all Encumbrances other than those permitted by the Stalking Horse APA or Modified APA; (ii) authorizing and approving the potential assumption and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789). The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order and the Bidding Procedures, as applicable. Any summary of the Bidding Procedures or the Bidding Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

assignment of the Potentially Assumed Contracts in connection therewith; and (iii) granting related relief.

On January __, 2019, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. __].

**You are receiving this Notice because you may be a Counterparty to an executory contract or unexpired lease of the Debtors that potentially could be assumed and assigned to one or more bidders in connection with the propose Sale of the Debtors' Assets.**

## Stalking Horse Bid

A binding stalking horse bid (the "Stalking Horse Bid") has been submitted by Hilco Merchant Resources, LLC ("Hilco" or the "Stalking Horse Purchaser"). The Stalking Horse Purchaser has executed that certain *Amended and Restated Agency Agreement* dated January 5, 2019 (the "Stalking Horse APA") to act as the Debtors' agent for the purpose of conducting "store closing" themed sales at the 33 retail stores operating under the "Beauty Brands" banner (collectively, the "Core Stores"). More specifically, the Stalking Horse will sell all of the Merchandise (as defined in the Stalking Horse APA) from the Core Stores and dispose of all furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property located at the Cores Stores, the Debtors' warehouse/distribution centers, and the Debtors' corporate office that are owned by the Debtors.

The Stalking Horse Bid is subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Bidding Procedures.

## Cure Amounts

Executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale with a Successful Bidder (the "Potentially Assumed Contracts") as of the date hereof and the Debtors' calculation of the cure amount (the "Cure Amount") with respect thereto are set forth on **Schedule 1** hereto.

The inclusion of any contract or lease on **Schedule 1** does not constitute an admission that a particular Potentially Assumed Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Potentially Assumed Contract ultimately will be assumed or assumed and assigned. All rights of the Debtors with respect thereto are reserved.

In accordance with the Assumption and Assignment Procedures and the Bidding Procedures Order, the Debtors may, in connection with a Sale with a Successful Bidder (as defined in the Bidding Procedures) at the Auction (whether such bidder be the Stalking Horse Purchaser or other bidder prevailing at the Auction), seek to assume and assign to the Successful Bidder (or its designated assignee, if applicable) certain executory contracts and unexpired leases, whether or not such contracts and leases are set forth on **Schedule 1** hereto.

## Objections

### A.    Contract Objections

Any objection to the proposed assumption and assignment or proposed Cure Amount of a Potentially Assumed Contract identified in **Schedule 1** must be (i) filed in accordance with the Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on (a) proposed counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801 (Attn: Gregory A. Taylor, Esq.; gtaylor@ashbygeddes.com); (b) proposed counsel to any official committee appointed in the Debtors' chapter 11 cases; (c) counsel to PNC Bank, National Association, Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801 (Attn: Regina Stango Kelbon, Esq.; kelbon@blankrome.com); (d) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey, Esq.; Linda.Casey@usdoj.gov); and (e) counsel to the Stalking Horse Purchaser, Pepper Hamilton LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801 (Attn: Douglas Herrmann, Esq.; herrmannd@pepperlaw.com) (collectively, the "Objection Notice Parties") by no later than **February 1, 2019 at 4:00 p.m. (prevailing Eastern Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CONTRACT OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE CONTRACT OR LEASE. THE CURE AMOUNTS SET FORTH ON SCHEDULE 1 HERETO, AS APPLICABLE, SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE CONTRACT OR LEASE UNDER BANKRUPTCY CODE SECTION 365(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH CONTRACT OR LEASE AGAINST THE DEBTORS, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

### B.    Adequate Assurance Objections

Any objection to the Successful Bidder's (or its known proposed assignee's) proposed form of adequate assurance of future performance with respect to such Potentially Assumed Contract must be (i) filed in accordance with the Bidding Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **February 8, 2019 at ____:____ ___.m. (prevailing Eastern Time)**.

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE**

**ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE CONTRACT OR LEASE. THE SUCCESSFUL BIDDER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(F)(2)(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR LEASE, OR ANY OTHER DOCUMENT.**

<u>**Sale Hearing**</u>

The Sale Hearing shall be held before the Bankruptcy Court before the Honorable _____, United States Bankruptcy Judge, in the Bankruptcy Court, located at 824 N. Market Street, Wilmington, Delaware 19801 on **February 8, 2019 at ____:____0 ___.m. (prevailing Eastern Time)**.

<u>**Additional Information**</u>

Copies of the Motion, the Bidding Procedures Order, the Bidding Procedures, and the Stalking Horse APA may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent, Donlin, Recano & Company, Inc., located at http://www.donlinrecano.com/beautybrands.

Dated: January __, 2019　　　　　　**ASHBY & GEDDES**
　　　　Wilmington, Delaware


　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Gregory A. Taylor (No. 4008)
　　　　　　　　　　　　　　　　Stacy L. Newman (No. 5044)
　　　　　　　　　　　　　　　　Katharina Earle (No. 6348)
　　　　　　　　　　　　　　　　David F. Cook (No. 6352)
　　　　　　　　　　　　　　　　500 Delaware Avenue
　　　　　　　　　　　　　　　　P.O. Box 1150
　　　　　　　　　　　　　　　　Wilmington, DE  19899
　　　　　　　　　　　　　　　　Phone: (302) 654-1888
　　　　　　　　　　　　　　　　Facsimile: (302) 654-2067

　　　　　　　　　　　　　　　　*Proposed Counsel for Debtors*
　　　　　　　　　　　　　　　　*and Debtors-in-Possession*

**<u>Schedule 1</u>**

(Potentially Assumed Contracts and Related Cure Amounts)

# Exhibit B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAUTY BRANDS, LLC, *et al.* | ) | Case No. 19-10031 (___) |
| | ) | |
| Debtors.[1] | ) | Joint Administration Requested |
| | ) | |
| | ) | **Related Docket No. ____** |

### ORDER APPROVING SALE OF ALL OR SUBSTANTIALLY ALL
### OF THE DEBTORS' ASSETS AND GRANTING RELATED RELIEF

Upon consideration of the *Motion for Entry of (A) An Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrance, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and Bid Protections and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) An Order (I) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket __] (the "Motion");[2] and it appearing that the relief requested is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion having been given and it

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789).  The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO 64112.

[2] All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion or in the Amended and Restated Agency Agreement.

appearing that no other notice need be given; and the Debtors and Hilco Merchant Resources, LLC (the "Stalking Horse") having agreed upon terms and conditions for the Stalking Horse to act as the Debtors' exclusive agent to conduct sales (the "Sale") of certain of the Debtors' assets, including, without limitation, the Merchandise and Owned FF&E ("Assets"), which terms and conditions are set forth in that certain Amended and Restated Agency Agreement, by and between the Stalking Horse and Debtors, which is attached hereto as **Exhibit A** (the "Agency Agreement"); and the transaction represented by the Agency Agreement having been determined to be the highest and best offer for the Assets; and a hearing having been held on January___, 2019, whereupon the Court entered an Order approving bidding procedures [Docket No. ___] (the "Bidding Procedures Order"); and a sale hearing having been held on _____ ___, 2019 (the "Sale Hearing"), to consider the remaining relief requested in the Motion and approval of the Agency Agreement; and appearances of all interested parties having been noted on the record of the Sale Hearing; and upon the *Declaration of _____ in Support of* _____ (the "Declaration") and upon all of the proceedings had before the Court (including but not limited to the testimony and other evidence proffered or adduced at the Sale Hearing); and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[2]

**A.**     **Jurisdiction:**  This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134.  Approval of the Debtors' entry into the Agency Agreement, and the transactions contemplated thereby is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

**B.**     **Venue:**  Venue of these cases in this district is proper pursuant to 28 U.S.C. § 1409(a).

**C.**     **Statutory Predicates:**  The statutory predicates for the approval of the Agency Agreement and transactions contemplated therein are sections 105, 363, 364 and 554 of the Bankruptcy Code 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1.

**D.**     **Notice:**  Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 6004, and in compliance with the Bidding Procedures Order.  No other or further notice is required.

**E.**     **Opportunity to be Heard:**  A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (i) the Office of the United States Trustee, (ii) counsel to the Debtors' prepetition and postpetition lender (the "Lender"), (iii) the Office of the United States Attorney for the District of Delaware,

---

[2]  The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

(iv) counsel to the Committee, (v) all parties who are known to assert any lien, claim, interest or encumbrance in or upon any of the Assets, (vi) all lessors of leases for the Stores, (vii) all applicable federal, state, and local taxing authorities (collectively, the "Taxing Authorities"), (viii) all applicable state attorneys general and (ix) all other applicable parties in interest, including all entities on the general case service list as of the date of entry of the Bidding Procedures Order ((i) through (ix) collectively, the "Global Sale Notice Parties"). Objections, if any, to the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

F.      **Marketing Process:** As demonstrated by: (i) the *Declaration of _____*, (ii) the testimony and other evidence proffered or adduced at the Sale Hearing and (iii) the representations of counsel made on the record at the Sale Hearing, the Debtors have thoroughly marketed the Assets and have conducted the bidding solicitation fairly, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Assets, or who the Debtors believed may have had an interest in acquiring or liquidating the Assets, to submit competing bids. The Debtors and the Stalking Horse have respectively negotiated and undertaken their roles leading to the Sale and entry into the Agency Agreement in a diligent, noncollusive, fair and good faith manner. The Debtors have conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bidding Procedures Order.

G.      **Highest and Best Offer:** The Agency Agreement attached hereto as **Exhibit A**, including the form and total consideration to be realized by the Debtors pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtors for the Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

H.     **Business Judgment:**    The Debtors' decision to (i) assume the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement, is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  The Debtors have articulated good and sufficient reasons for the approval of the Agency Agreement and the Transaction.

I.     **Personally Identifiable Information:**    The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing personally identifiable information).  Such transactions do not require the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) of the Bankruptcy Code.

J.     **Time of the Essence:**    Time is of the essence in effectuating the Agency Agreement and proceeding with the Sale contemplated therein without interruption.  Based on the record of the Sale Hearing, the _____ Declaration, and for the reasons stated on the record at the Sale Hearing, the Sale under the Agency Agreement must be commenced as soon as possible following entry of this Order, but in no event later than February 9, 2019 (the "Sale Commencement Date"), to maximize the value that the Stalking Horse may realize from the Sale, and the value that the Debtors may realize from assuming the Agency Agreement. Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a) and 6004(h) and permit the immediate effectiveness of this Order.

K.     **Sale Free and Clear:**    A sale of the Assets other than one free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment)

and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances") and pursuant to the terms of and as provided in the Agency Agreement without the protections of this Order would hinder the Debtors' ability to obtain the consideration provided for in the Agency Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such Assets.  But for the protections afforded to the Stalking Horse under the Bankruptcy Code and this Order, the Stalking Horse would not have offered to pay the consideration contemplated in the Agency Agreement.   In addition, each entity with an Encumbrance upon the Assets, (i) has consented to the Sale or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy

Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Therefore, approval of the Agency Agreement and the consummation of the Sale free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

L.    **Arms-length Sale:** The consideration to be paid by the Stalking Horse under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.

M.    **Good Faith:** The Debtors, their management and their professionals, and the Stalking Horse, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith. The Agency Agreement between the Stalking Horse and the Debtors was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code. The Stalking Horse shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal. The Debtors were free to deal with any other party interested in buying or selling on

behalf of the Debtors' estate some or all of the Assets.  Neither the Debtors nor the Stalking

Horse has engaged in any conduct that would cause or permit the Sale, the Agency Agreement,

or any related action or the transactions contemplated thereby to be avoided under section 363(n)

of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of

the Bankruptcy Code.  The Stalking Horse has not violated section 363(n) of the Bankruptcy

Code by any action or inaction.  Specifically, the Stalking Horse has not acted in a collusive

manner with any person and was not controlled by any agreement among bidders.  The Stalking

Horse's prospective performance and payment of amounts owing under the Agency Agreement

are in good faith and for valid business purposes and uses.

N.        **Insider Status:**  The Stalking Horse is not an "insider" as that term is defined in

section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling

stockholders exists between the Stalking Horse and the Debtors.

O.        **Security Interests:**  The liens provided for in the Agency Agreement and this

Order to secure the obligations of the Debtors under the Agency Agreement to the Stalking

Horse are necessary to induce the Stalking Horse to agree to terms for the Agency Agreement

that maximize value for the Debtors' estates.  The absence of such protections would impact

materially and adversely the value available to the Debtors in the liquidation of their stores in

partnership with a liquidation agent.  But for the protections afforded to the Stalking Horse under

the Bankruptcy Code, this Order, and the Agency Agreement, the Stalking Horse would not have

agreed to pay the Debtors the compensation provided for under the Agency Agreement.  In

addition, the Secured Lenders which hold a security interest in the property to which the Stalking

Horse's security interests attach, have consented to the security interests provided for in the

Agency Agreement, subject to the satisfaction of the terms and conditions set forth in the Agency Agreement and this Order.

P.      **Corporate Authority:**  Subject to the entry of this Order, the Debtors (i) have full corporate or other power to execute, deliver and perform their obligations under the Agency Agreement and all other transactions contemplated thereby (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement), and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) have all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) have taken all actions necessary to authorize and approve the Agency Agreement and the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtors to consummate such transactions.

Q.      **No Successor Liability:**  No sale, transfer or other disposition of the Assets pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Stalking Horse to any liability for claims, obligations or Encumbrances asserted against the Debtors or the Debtors' interests in such Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.  The Stalking Horse is not a successor to the Debtors or their respective estates.

R.      **No Sub Rosa Plan:**  Entry into the Agency Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtors' creditors, nor

impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  Entry into the Agency Agreement does not constitute a sub rosa chapter 11 plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**<u>Motion Granted, Objections Overruled</u>**

1.      The relief requested in the Motion is granted as set forth herein.

2.      Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled in all respects and denied.

**<u>Agency Agreement Approved and Authorized</u>**

3.      The Agency Agreement is approved pursuant to section 363 of the Bankruptcy Code.  The Debtors are hereby authorized and empowered to assume the Agency Agreement pursuant to sections 363(b) and 365(a) of the Bankruptcy Code.  The Agency Agreement (and each of the transactions contemplated therein (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement, which agreement and resolution shall be binding on all parties (including (without limitation) the Debtors, the Committee, the Agent, any successor chapter 7 or chapter 11 trustee, and all other parties in interest) without further order of the Court)) is hereby approved in its entirety and is incorporated herein by reference.  The failure to include specifically any particular provision of the Agency Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agency Agreement and all of its provisions, payments and transactions, be authorized and approved in their entirety.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

4.      The Debtors shall pay to the Lender at closing such portion of the Initial Guaranty Payment as is necessary to result in indefeasible payment in full of all Obligations owing to the Lender in accordance with the terms of the Agency Agreement.

5.      All amounts payable to the Stalking Horse under the Agency Agreement shall be payable to the Stalking Horse without the need for any application of the Stalking Horse therefor or any further order of the Court.

6.      Subject to the provisions of this Order, the Debtors and the Stalking Horse are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale in accordance with the Agency Agreement and the sale guidelines (the "Sale Guidelines") attached hereto as **Exhibit B**, which Sale Guidelines are hereby approved in their entirety.

7.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, the Stalking Horse and each of their respective officers, employees and agents are hereby authorized to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein. The Debtors and/or such other person(s) as are expressly designated to act on the Debtors' behalf, are specifically authorized to act on behalf of the Debtors in connection with the Sale and no other consents or approvals are necessary or required for the Debtors to carry out the Sale, effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

**Order Binding**

8.      This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets.

9.      This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Stalking Horse, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The provisions of this Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Stalking Horse and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any

trustee appointed in this case shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and Stalking Horse and the trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of the trustee without the need for further order of this Court.

**Good Faith**

10.     Entry into the Agency Agreement is undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Stalking Horse shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed, or modified on appeal or vacated by the Court pursuant to a subsequent order or by another court.  The reversal or modification on appeal of the authorization provided herein to assume the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal.  The Stalking Horse is entitled to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code and no appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under the Agency Agreement and this Order.  The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

**Claims of Stalking Horse**

11.     Subject to the Stalking Horse having satisfied its payment obligations under the Agency Agreement and this Order, any amount owed to Stalking Horse by the Debtors under the Agency Agreement shall be granted superpriority claims in the Debtors' chapter 11 cases

pursuant to Bankruptcy Code section 364(c) senior to all superpriority claims including, without limitation, the superpriority claims of the Lender. The Stalking Horse is hereby granted a valid, binding, enforceable and perfected security interest as provided under section 15 of the Agency Agreement without the necessity of filing financing statements to perfect such security interests.

**Conduct of the Sale**

12.    Except as otherwise provided in the Agency Agreement, and subject to the terms thereof, pursuant to section 363(f) of the Bankruptcy Code, the Stalking Horse shall be authorized to sell all Merchandise, the Owned FF&E and other Assets to be sold pursuant to the Agency Agreement free and clear of any and all Encumbrances, including, without limitation, the liens and security interests, as the same may have been amended from time to time, of the Lender whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced, with any presently existing liens (which, for the avoidance of doubt, does not include the Agent's liens granted under the Agency Agreement) encumbering all or any portion of the Store Closure Assets or the Proceeds thereof attaching only to any balance of the Guaranteed Amount and other amounts to be received by the Debtors under the Agency Agreement that are not otherwise paid to Lender to fully satisfy Debtors' indebtedness owed to Lender or payable to Agent under the Agency Agreement. For the sake of clarity, however, nothing in this paragraph is intended to diminish the liens in favor of the Stalking Horse, as reflected in the Agency Agreement and this Order, that attach to, among other things, any remaining Proceeds of the Sale after payment in full of the indebtedness owed by Debtors to Lender.

13.    Except as provided below concerning the liens or claims in the Assets held by Lender, as Prepetition Agent and DIP Agent, if any person or entity that has filed financing

statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreement evidencing liens on or interests in the Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances ("Release Documents") which the person or entity has with respect to the Assets, each such person or entity is hereby directed to deliver all such statements, instruments and releases and the Debtors and the Stalking Horse are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same and the Stalking Horse is authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest; provided that, neither the Debtors nor the Stalking Horse is authorized to file any Release Documents with respect to the liens or claims held by Lender, as Prepetition Agent and DIP Agent, in the Assets without first obtaining the express written consent of Lender and providing drafts of such Release Documents to Lender for its review and approval, which consent and approval shall be in Lender's sole discretion. Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale and related transactions.

14.     Subject to the closing of the Sale, all entities that are presently in possession of some or all of the Assets or other property in which the Debtors hold an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Assets or other property to the Stalking Horse.

15.     The Debtors and the Stalking Horse shall not extend the Sale Termination Date beyond April 15, 2019, unless extended by mutual written agreement of the Debtors and the

Stalking Horse, in their sole discretion, following a commensurate extension of the expiration date of the Stalking Horse Letter of Credit.

16.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtors and the Stalking Horse to consummate the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency Agreement, including, without limitation, conducting and advertising of the Sale (at the contractual rates charged to the Debtors prior to the Petition Date) in accordance with the Agency Agreement, the Sale Guidelines, and this Order.

17.     Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Agency Agreement shall in any way (a) diminish the obligation of any entity to comply with environmental laws, or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Stalking Horse is an operator with respect to any environmental law or regulation.  Moreover, the Sale shall not be exempt from, and the Stalking Horse shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating

deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Order

or the Agency Agreement shall alter or affect the Debtors' and Stalking Horse's obligations to

comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be

deemed to bar any Governmental Unit (as defined in Bankruptcy Code section 101(27)) from

enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the

Stalking Horse's right to assert in that forum or before this Court that any such laws are not in

fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this

Order, or otherwise.  Notwithstanding any other provision in this Order, no party waives any

rights to argue any position with respect to whether the conduct was in compliance with this

Order and/or any applicable law, or that enforcement of such applicable law is preempted by the

Bankruptcy Code.  Nothing in this Order shall be deemed to have made any rulings on any such

issues.

**Disputes Between Government Units and the Debtors or the Stalking Horse**

18.     To the extent that the Sale is subject to any federal, state or local statute,

ordinance, or rule, or licensing requirement solely directed at regulating "going out of business,"

"store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and

together, the "GOB Laws"), including laws restricting safe, professional and non-deceptive,

customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely

in connection with the Sale and including ordinances establishing license or permit requirements,

waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to Sale

(collectively, the "Liquidation Sale Laws"), the following provisions shall apply:

a.     Provided that the Sale is conducted in accordance with the terms of this

Order, the Agency Agreement and the Sale Guidelines, and in light of the provisions in the laws

of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to the provisions of this Order, are authorized to conduct the Sale in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

b.      Within five (5) business days of entry of this Order, the Debtors shall serve copies of this Order, the Agency Agreement and the Sale Guidelines via e-mail, facsimile or regular mail, on:  (i) the Attorney General's office for each state where the Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Sale will be held, (iii) the division of consumer protection for each state where the Sale will be held; and (iv) the chief legal counsel for the local jurisdiction.

c.      To the extent there is a dispute arising from or relating to the Sale, this Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors and counsel for the Stalking Horse at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter.  If the Debtors, the Stalking Horse and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.       In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtors, a landlord, the Stalking Horse or other interested party from asserting (i) that the provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Order, nor the Debtors or the Stalking Horse's conduct pursuant to this Order, violates such GOB Laws and/or Liquidation Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtors' or the Stalking Horse's ability to conduct or to continue to conduct the Sale pursuant to this Order and the Agency Agreement, absent further order of this Court.  The Court grants authority for the Debtors and the Stalking Horse to conduct the Sale pursuant to the terms of this Order, the Agency Agreement, and/or the Sale Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB Laws and/or Liquidation Laws by the Bankruptcy Code.  Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.       If, at any time, a dispute arises between the Debtors and/or the Stalking Horse and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation Law, and subject to any provisions contained in this Order related to GOB Laws and/or Liquidation Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b) through (d) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those Paragraphs.  Any determination with respect to whether a particular law is a GOB Law and/or Liquidation Law shall be made de novo.

19.     Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Order, the Debtors and Stalking Horse are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sale without necessity of further order of this Court as provided in the Agency Agreement or the Sale Guidelines, including, but not limited to, conduct, advertise, post signs, utilize signwalkers, and otherwise promote the advertising the Sale as  a "store closing", "going out of business," "total liquidation,", "sale on everything", "everything must go", "store-closing" or similar-themed sales and without further compliance of Liquidation Laws, all in accordance with the Sale Guidelines, the Agency Agreement and this Order.

20.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtors and the Stalking Horse are unable to resolve the matter consensually with the Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially within two (2) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

21.     Except as expressly provided in the Agency Agreement, the Sale shall be conducted by the Debtors and the Stalking Horse notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" provisions.  The Stalking Horse and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further

order of the Court, and such Side Letters shall be binding as among the Stalking Horse and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 16 and 17 (provided that in no event shall such Side Letters impose additional costs, expense or liability upon the Debtors).  In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

22.     Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 16 and 17 shall apply), no person or entity, including but not limited to any landlord, licensor, utilities, creditors and other interested parties and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the conduct of the Sale and/or (ii) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtors, the Stalking Horse, or the landlords at the Debtors' closing stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

23.     The Stalking Horse shall have the right to use the Debtors' closing stores and all related store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Order and subject to Paragraphs 16 and 17 of this Order and the terms of the Agency Agreement.

24.     Nothing in the Agency Agreement or this Order shall (a) alter or affect the Debtors' obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtors to file an appropriate motion or otherwise seek appropriate relief if the Debtors fail to comply with section 365(d)(3) of the Bankruptcy Code; provided that the conduct of the Sale in accordance with the Sale Guidelines shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

25.     Pursuant to section 554(a) of the Bankruptcy Code, the Debtors and the Stalking Horse, as applicable, are permitted to abandon property of the Debtors' estates in accordance with the terms and provisions of the Agency Agreement, without incurring liability to any person or entity; *provided*, *however*, that, unless the Stalking Horse otherwise consents, the Debtors may only abandon property located in any store (and, if applicable, the distribution center) on or after the applicable Sale Termination Date, provided that the Debtors provide reasonable prior notice to the Lender of their intention to abandon assets that constitute the Lender's collateral.  In the event of any such abandonment, all applicable landlords shall be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtors or other party in interest to object thereto.

26.     The Stalking Horse shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement.

27.     Before any sale, abandonment or other disposition of the Debtors' computers (including software) and/or cash registers and any other point of sale Owned FF&E located at the Stores (collectively, "POS Equipment") that may contain customer lists, identifiable personal and/or confidential information about the Debtors' employees and/or customers, or credit card numbers ("Confidential Information") takes effect, the Debtors shall remove or cause to be removed the Confidential Information from the POS Equipment.

28.     The Stalking Horse shall accept the Debtors' validly-issued gift certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date, and the Debtors shall reimburse Stalking Horse for such amounts during the weekly sale reconciliation provided for and subject to any limitations set forth in section 8.6 of the Agency Agreement. The Stalking Horse shall accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Stalking Horse, and the Debtors shall reimburse Stalking Horse for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in section 8.5 of the Agency Agreement.

29.     All state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  The Debtors and/or the Stalking Horse shall accept return of any goods purchased during the Sale that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within twenty-one (21) days of their purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Subject to the terms of the Agency Agreement, the Debtors shall promptly reimburse Stalking Horse in cash for any refunds Stalking Horse is required to issue to customers in respect of any goods purchased during the Sale that contain such a latent defect.

30.     During the Sale Term, the Stalking Horse shall be granted a limited license and right to use the trade names, logos and customer, mailing and e-mail lists, websites and social media relating to and used in connection with the operation of the stores as identified in the Agency Agreement, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement; *provided*, *however*, that the Stalking Horse shall not receive Personally Identifiable Information from the Debtors.

31.     Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Stalking Horse's actions taken in respect of the Sale shall be deemed to constitute an assumption by Stalking Horse of any of the Debtors' obligations relating to any of the Debtors' employees.  Moreover, the Stalking Horse shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

32.     The Stalking Horse shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  Subject to the terms of the Agency Agreement, the Debtors are directed to remit all taxes arising from the Sale to the applicable Taxing Authorities as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the Taxing Authority.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the Taxing Authority for which the sales taxes are collected.  The Stalking Horse shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agency Agreement.  This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

33.     Subject to the terms set forth in the Agency Agreement, the Debtors and/or the Stalking Horse (as the case may be) are authorized and empowered to transfer Assets among the closing stores and the distribution center.  The Stalking Horse is authorized to sell the Debtors' furniture, fixtures and equipment and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

**Stalking Horse Liens**

34.     Upon payment of the Initial Guaranty Payments (as defined in the Agency Agreement) and delivery of the Letter of Credit (as defined in the Agency Agreement), Stalking Horse shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens (which, for the

avoidance of doubt, does not include the Agent's liens granted under the Agency Agreement) encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds thereof attaching only to any balance of the Guaranteed Amount and other amounts to be received by the Debtors under the Agency Agreement that are not otherwise paid to Lender to fully satisfy Debtors' indebtedness owed to Lender or payable to Agent under the Agency Agreement.

35.    The Stalking Horse shall have, effective upon payment by the Stalking Horse of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the Lender, a valid, duly perfected first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (a) the Merchandise; (b) the Additional Stalking Horse Goods; (c) all Proceeds (including, without limitation, credit card proceeds); (d) the Stalking Horse's commission regarding the sale or other disposition of Merchant Consignment Goods under section 5.4 of the Agency Agreement; (e) the commission regarding the sale or other disposition of Owned FF&E under section 7 of the Agency Agreement (the "Stalking Horse FF&E Commission"); (f) the Stalking Horse's percentage share of such Sharing Amount, and (g) all "proceeds" (within the meaning of section 9 -102(a)(64) of the UCC as in effect in the State of Delaware) of each of the foregoing (all of which are collectively referred to herein as the "Stalking Horse Collateral"), to secure the full payment and performance of all obligations of the Debtors to the Stalking Horse under the Agency Agreement. For the avoidance of doubt, the Stalking Horse Collateral shall not include the Guaranteed Amount, the Sharing Amount or any other amount payable by the Stalking Horse to the Debtors under the Agency Agreement or any proceeds thereof. Upon entry of this Order, payment of the Initial Guaranty Payment and delivery of the Letter of Credit to the Lender, the security interest granted to the Stalking Horse hereunder shall be deemed properly perfected without the necessity of filing

UCC-1 financing statements or any other documentation.  Without any further act by or on behalf of the Stalking Horse or any other party (including (without limitation) the Lender and the Debtors), the Stalking Horse's security interests and liens in the Stalking Horse Collateral created hereunder are (a) validly created, (b) effective upon entry of this Order, perfected, and (c) senior to all other liens and security interests; *provided*, *however*, that (x) until the Debtors receive payment in full of the Guaranteed Amount, the Additional Stalking Horse Goods Fee, the Sharing Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Stalking Horse FF&E Commission) and such other amounts due to the Debtors under the Agency Agreement, the security interest granted to the Stalking Horse hereunder shall be junior and subordinate in all respects to the security interests of the Lender in the Stalking Horse Collateral (subject to the carve out for professionals in the Bankruptcy Case) in the amount of the unpaid portion of the Guaranteed Amount, the Additional Stalking Horse Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Stalking Horse FF&E Commission) and such other amounts due to the Debtors under the Agency Agreement and (y) upon payment in full of the Guaranteed Amount, the Additional Stalking Horse Goods Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Stalking Horse FF&E Commission) and such other amounts due to the Debtors under the Agency Agreement, any security interest or lien of the Lender in the Stalking Horse Collateral and the carve out for professionals in the Bankruptcy Case shall be junior and subordinate in all respects to the security interest and liens of the Stalking Horse in the Stalking Horse Collateral.  The Debtors shall cooperate with the Stalking Horse with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by the Stalking Horse in connection with the security interests and liens

granted under the Agency Agreement. The Debtors will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Stalking Horse Collateral other than in favor of the Stalking Horse, the DIP Agent and Lender, except to the extent that such security interest in, or encumbrance on any of the Stalking Horse Collateral is junior in priority to the senior security interests granted herein to the Stalking Horse. In the event of a Default by any Debtor under the Agency Agreement, in any jurisdiction where the enforcement of its rights hereunder is sought, the Stalking Horse shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

**<u>Other Provisions</u>**

36.     Except as expressly provided in the Agency Agreement, the Stalking Horse shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Stalking Horse, in each case, other than as expressly provided for in the Agency Agreement. The Stalking Horse shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtors, including, without limitation, the Stalking Horse shall not be, or to be deemed to be: (a) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (b) a joint employer, co-employer or successor employer with the Debtors, and the Stalking Horse shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtors, including pursuant to any collective bargaining

agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

37.     The Stalking Horse is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale, and the Agency Agreement.

38.     Nothing contained in any plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plan or in any other order in this chapter 11 cases (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the terms of this Order.

39.     The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, provided that the Committee and Lender consent, which consent shall not be unreasonably withheld or delayed; *provided*, *however*, that any modification or amendment to section 6.1 of the Agency Agreement shall be subject to the prior consent of the Lender in their sole discretion.

40.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 16 and 17 shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (b) any

claim of the Debtors, the landlords and/or the Stalking Horse for protection from interference with the Sale, (c) any other disputes related to the Sale, and (d) to protect the Debtors and/or the Stalking Horse against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Stalking Horse, the landlords or the Sale until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

41.     Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Stalking Horse are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement.  For the avoidance of doubt, the Debtors are not subject to any stay in the implementation of the transactions contemplated by the Agency Agreement.

42.     To the extent that anything contained in this Order explicitly conflicts with a provision in the Agency Agreement or the Sale Guidelines, this Order shall govern and control.

Dated: _____, 2019

_____
The Honorable
UNITED STATES BANKRUPTCY JUDGE

# Exhibit C

EXECUTION VERSION

## AMENDED AND RESTATED AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of January 5, 2019, by and between Beauty Brands, LLC ("Merchant") and Hilco Merchant Resources, LLC ("Agent").

Section 1.  Recitals.

WHEREAS, on January 6, 2019, the Merchant intends to commence a case under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (such case, the "Bankruptcy Case" and such court, the "Bankruptcy Court").

WHEREAS, in connection with the Bankruptcy Case, the Merchant intends to file a motion seeking approval of that certain Agency Agreement dated January 3, 2019 and that certain First Amendment to Agency Agreement dated January 4, 2019 (collectively, the "Original Agency Agreement"), between the Merchant and Hilco Merchant Resources, LLC ("HMR") pursuant to Section 363 of the Bankruptcy Code.

WHEREAS, pursuant to the Original Agency Agreement, Merchant is seeking to appoint Agent to act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's twenty-three (23) retail store locations identified on Exhibit 1(a) attached hereto (collectively, the "Initial Stores") by means of a "store closing", "sale on everything", "everything must go", or similar sale; and (b) disposing of the Owned FF&E (as defined below) in the Initial Stores (the "Initial Sale").

WHEREAS, Merchant further desires Agent to act as Merchant's exclusive agent for the limited purposes of: (x) continuing the Initial Sale and, additionally, (y)(a) selling all of the Merchandise (as hereinafter defined) from Merchant's additional thirty-three (33) retail store locations identified on Exhibit 1(b) attached hereto (collectively, the "Additional Stores" and together with the Initial Stores, the "Stores" and each individually, a "Store") and (b) disposing of the Owned FF&E in the Stores, Distribution Center (as defined below), and Corporate Office (as defined below) (together with the Initial Sale, the "Sale").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 1.  Effectiveness of Agreement.  Upon satisfaction of the conditions precedent set forth in Section 10, this Agreement shall supersede the Original Agreement, which shall be deemed amended in its entirety and restated as provided for herein, and this Agreement shall thereafter govern the Sale with respect to all Stores.

Section 2.  Appointment of Agent/Approval Order.

(a)      Subject to entry of an order of the Bankruptcy Court authorizing Merchant to enter into this Agreement and approving bidding procedures, which shall be in a form mutually acceptable to Agent and Merchant and contain customary terms and conditions, including (i) approval of the Bid Protections and other terms and conditions set forth in Section 16, and (ii) prohibitions on Merchant, Lender, or any other party agreeing to or granting bid protections, break up fees, topping fees, or any other similar fees or expense reimbursements to any other party (the "Bidding Procedures Order"), and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)      Merchant shall use its reasonable best efforts to obtain the Approval Order that shall provide, in forms reasonably satisfactory to Merchant, PNC Bank, N.A. ("Lender") and Agent, *inter alia,* that: (i) this Agreement is in the best interest of the Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) subject to Agent's payment of the Initial Guaranty Payment (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens (which, for the avoidance of doubt, does not include the Agent's liens granted under this Agreement) encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to any balance of the Guaranteed Amount (as defined below) and other amounts to be received by Merchant under this Agreement that are not otherwise paid to Lender to fully satisfy Merchant's indebtedness owed to Lender or payable to Agent under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date Merchant's trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be authorized to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 15 hereof (without the necessity of filing financing statements to perfect the security interests) and the Bankruptcy Court shall find that any security interests granted to Agent pre-petition were valid, binding, enforceable, perfected, and not subject to avoidance; (xiii) subject to the provisions of this Agreement, the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xiv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest and any transfers by Merchant to Agent prior to the commencement of the Bankruptcy Case (including without limitation of any Proceeds hereunder) are not subject to avoidance; (xv) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvi) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amount under this Agreement will be made, in good faith and for valid business purposes and

uses, as a consequence of which Agent is released of any liability for its actions taken pursuant to this Agreement pre-petition and is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xvii) this Agreement is approved pursuant to Bankruptcy Code section 363; (xviii) the Bid Protections set forth in Section 16 are approved; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)    The Approval Order shall further provide that Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.    Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to (i) Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement and (ii) entry of the Approval Order in compliance with the Approval Order Deadlines (as defined below) and in the form and substance required by Section 2 hereof, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive eighty percent (80%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount (as defined below) due to Merchant (if any) in the manner and at the times specified in Section 3.3. The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the Final Inventory Report (as defined below), (B) the aggregate Cost Value of the Merchandise subject to Gross Rings, and (C) any other adjustments to Cost Value as expressly contemplated by this Agreement.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $12,250,000 (the "Merchandise Floor") and not more than $12,450,000 (the "Merchandise Threshold") as of the applicable Sale Commencement Date. To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 35.6% (the "Cost Factor Threshold"). To the

extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with <u>Exhibit 3.1(c)</u> annexed hereto.

(d)     The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

3.2     <u>Compensation to Agent, Sharing:</u>

(a)     After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses (as defined below), all remaining Proceeds (as defined below) shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to five percent (5.0%) of the aggregate Cost Value of the Merchandise ("<u>Agent's Fee</u>"); and THEREAFTER: fifty percent (50.0%) to Agent and fifty percent (50.0%) to Merchant ("<u>Sharing Amount</u>").

(b)     To the extent that there is Merchandise remaining at the Sale Termination Date (the "<u>Remaining Merchandise</u>"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Agent and its affiliates shall be authorized, subject to applicable law, to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo. The proceeds received by Agent from such disposition of Remaining Merchandise shall constitute Proceeds hereunder.   Notwithstanding the foregoing, nothing in this Section 3.2(b) shall delay the Final Reconciliation under Section 8.7, including the payment of any amounts due thereunder.  The Proceeds from the disposition of Remaining Merchandise shall be reconciled by Agent, Merchant, and Lender, and any amounts due as a result of such reconciliation shall be paid at a later date, as mutually agreed upon by the parties.

3.3     <u>Proceeds; Time of Payments; Control of Proceeds.</u>

(a)     For purposes of this Agreement, "<u>Proceeds</u>" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue (including, without limitation, all revenue from salon services (including, without limitation), from hair, nails, massage, etc.)), in each case during the Sale Term and exclusive of Sales Taxes, (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term, and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt, proceeds from the sale of Additional Agent Goods, tips earned by Merchant's employees and Owned FF&E shall not be "Proceeds".

(b)     As of the Sale Commencement Date for the Additional Stores (the "<u>Payment Date</u>"), Agent shall pay to Merchant an amount equal to (w) (i) the Merchandise Floor multiplied by (ii) the Guaranty Percentage, multiplied by (x) 80%, less (y) the amount funded under the Original Agency Agreement, plus (z) the amount of all cash in the Additional Stores on their Sale Commencement Date ((w) multiplied by (x) minus (y) plus (z), the "Initial Guaranty Payment")) by wire transfer to an account designated in writing by Merchant ("<u>Merchant's Account</u>").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Merchant's Account on the later of (i) 30 days after the latest Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent, Merchant and the Lender (the "<u>Final Inventory Report</u>" with the date of completion of such reconciliation and issuance of such

Final Inventory Report to be referred to as the "Inventory Reconciliation Date"). To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7; provided that, if there is any undisputed amounts due Merchant on account of the Sharing Amount prior to the Final Reconciliation Date, Agent shall pay such undisputed amount to Merchant, with any additional amounts to be paid to Merchant only upon the Final Reconciliation. To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation.

(c)    All Proceeds shall be controlled by Agent in the manner provided for below.

(i)    Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)    Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). The Designated Deposit Accounts shall be cash

collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and subject to and in accordance with Section 15 hereof, (i) Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the receipt by Merchant and/or Lender of the Initial Guaranty Payment and issuance of the Letter of Credit; (ii)  Merchant shall obtain Lender's agreement to consent to the granting of such security interests to Agent (and Agent's perfection thereof) and to subordinate its security interest in such accounts and proceeds (including Proceeds); (iii) if requested by Agent, each account shall be subject to an agreement between and among Agent, Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant (a "Control Agreement") and (iv) if, notwithstanding the provisions of this Section 3.3(c), Merchant or Lender receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, solely upon Merchant's and/or Lender's receipt of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant and Lender shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)     From and after the Payment Date, on each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant and Lender of any shortfall in such payment, in which case, Merchant (or Lender, to the extent Lender received any such funds) shall promptly pay to Agent funds in the amount of such shortfall.

(d)     In the event that Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by Agent under Section 3.3(e) below by means of an offset, and, as a result of such funding or payment, Merchant received more value than Merchant would have otherwise received under this Agreement had Agent not funded or paid such obligations, Merchant shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.  If and to the extent Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, Lender shall, within two (2) business days of written demand by Agent, pay to Agent the over-funded amount, provided, however, Lender shall have no obligation to refund any overfunded amount demanded by Agent if Agent's written demand is received by Lender more than three (3) business days after the Inventory Reconciliation Date.

(e)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)     Agent shall purchase from Merchant, in cash on the applicable Sale Commencement Date, all cash in the Stores on and as of the start of business on the applicable Sale

Commencement Date on a dollar for dollar basis.  Cash in the Stores shall be mutually counted by representatives of Agent and Merchant.

3.4     Security.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender as beneficiary ("Beneficiary") in the aggregate original face amount equal to the sum of: (x)(i) the Guaranty Percentage multiplied by (ii) the Merchandise Floor, multiplied by (y) 20%, plus (z) three weeks of estimated Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit").  For the avoidance of doubt, the "Letter of Credit" may be issued in one or more letters of credit, which in the aggregate shall be equal to the foregoing amount(s) as and when required thereby.  After Lender has notified Agent and Merchant that Lender has been indefeasibly paid in full, Agent shall make Merchant the Beneficiary of the Letter of Credit. The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Upon Lender's receipt of payment in full of its claims against Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named co-beneficiary thereunder.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiary shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiary fails to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiary shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.  Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); provided, however, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of estimated Expenses.  Upon issuance of the Letter of Credit under this Agreement, the Merchant and/or Lender shall return (or cause to be returned) to Agent any Letter of Credit (as defined in the Original Agency Agreement) issued under the Original Agency Agreement no later than two (2) business days after receipt of the Letter of Credit issued hereunder, and such Letter of Credit issued under the Original Agency Agreement shall be of no force or effect, including not capable of being drawn upon as of receipt by the Lender or Merchant, as the case may be, of the Letter of Credit issued hereunder.

Section 4.  Expenses of the Sale.

4.1     Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)     actual payroll with respect to all Retained Employees (as defined below) used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term, as well as payroll for any temporary labor engaged for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits (as defined below)) for Retained Employees used in the Sale, in an amount not

to exceed 13.0% of the base payroll for each Retained Employee in the Stores (the "Payroll Benefits Cap");

(c)    the actual Occupancy Expenses categorized on Exhibit 4.1(c) in all cases limited on a per Store, per category, and per diem basis, for the period set forth in Section 6.1, not to exceed the respective categories and amounts shown on Exhibit 4.1(c);

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Center, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Center, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)    fifty percent (50%) of cost of the Inventory Taking Service;

(n)    Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(o)    Agent's reasonable out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(p)    third party payroll processing expenses associated with the Sale;

(q)    costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e);

(r)    Distribution Center Expenses (as defined below) in an amount not to exceed $50,000 per week (prorated for partial weeks);

(s)    Central Service Expenses in an amount equal to $5,000 per week (prorated for partial weeks);

(t)    if Agent exercises the option under section 8.11 to utilize the E-Commerce Platform as a sales platform, amounts set forth on Exhibit 8.11; and

(u)    the actual, reasonable, and agreed upon costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale; provided, however, Agent shall provide Merchant and Lender with advance notice of such costs and expenses, and Merchant's and Lender's consent to such additional costs and expenses shall not be unreasonably withheld, delayed, or denied.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.  There will be no double counting or double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)    "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and E-Commerce Platform updates, functionality, and maintenance, and accounting (collectively, "Central Services").

(ii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)    "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses (except as provided in Section 4.1(s)); (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Center, except as provided

in Section 4.1(r), including (without limitation) the Distribution Center Expenses, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2     Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation (as defined below); provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

4.3     Distribution Center Expenses

Agent shall be responsible for allocating and designating the shipment of Merchandise from the Merchant's Distribution Center to the Stores.  Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the Merchandise located at the Distribution Center and on-order Merchandise.  Agent's obligation to pay Distribution Center Expenses under Section 4.1(r) shall cease on the earlier of (i) the date on which the Agent provides the Merchant with notice that all Merchandise has been shipped from the Distribution Center and (ii) the date that is 28 days after the applicable Sale Commencement Date.  As used herein, "Distribution Center Expenses" means actual costs and expenses of operating the Distribution Center, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Center ("Distribution Center Expenses").

Section 5.     Inventory Taking; Merchandise.

5.1     Inventory Taking.

(a)     Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than twenty-one (21) days after the Sale Commencement Date for the Stores (subject to the availability of the Inventory Taking Service), and, with respect to Merchandise located in Merchant's Distribution Centers or on-order or in-transit to a Store that arrives after the Inventory Date for such Store, such Merchandise shall be counted by representatives of Agent and Merchant upon receipt at such Store.  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service.  Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service.  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives

present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs, Cost Value, and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Price of the Merchandise).  Each Store will be closed during the Inventory Taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant and Agent in writing as soon as practicable following the Inventory Taking.

(b)    At each Store, for the period from the applicable Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of one hundred and one percent (101.0%) of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2    Merchandise Subject to This Agreement.

(a)    For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods (including without limitation Liter Goods (as defined herein)) in the ordinary course of business located at the Stores as of the applicable Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, and (iii) Distribution Center Merchandise and On-Order Merchandise, if any, received at the Stores no later than fourteen (14) days after the applicable Sale Commencement Date, provided that if such goods are received at the Stores after such fourteen (14) day period, but on or before twenty-eight (28) days after the applicable Sale Commencement Date (the "Receipt Deadline"), such goods shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good.   "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, equipment lessors, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise (as defined below); (4) Merchant's Consignment Goods (as defined below); and (5) Additional Agent Goods; (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; or (7) Distribution Center Merchandise, On Order Merchandise, or goods in the Distribution Center, in-transit or on order received at the Stores after the Receipt Deadline.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course.  Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, samples, missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items.

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value or; (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation. Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Distribution Center Merchandise" means all new, finished, first-quality saleable goods (including without limitation Liter Goods) in the ordinary course of business located at Merchant's warehouse/distribution centers (collectively, the "Distribution Center") and reflected on Exhibit 5.2(b).

"On-Order Merchandise" means all new, finished, first-quality saleable goods (including without limitation Liter Goods) in the ordinary course of business that are on-order or in-transit and reflected on Exhibit 5.2(b).

"Merchandise File" shall mean Merchant's "PNC inventory request as of 11.24.18 2.xlsb" file together with all other files received by the Agent on or prior to the applicable Sale Commencement Date.

5.3    Valuation.

(a)    For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the product of (x) the sum of the applicable "On hand", plus the applicable "Intransit Qty", divided by (y) the applicable "total Cost", in each case as reflected in the Merchandise File, and (ii) the Retail Price; provided, however, that with respect to Liter Goods, for purposes of Section 5.3(a)(i), Cost Value shall be the lower of (i) the actual cost of each such item and (ii) the Retail Price.

(b)    For purposes of this Agreement, "Liter Goods" means liter sized product purchased at advantageous costs in support of the Merchant's upcoming liter sale.

(c)    For purposes of this Agreement, "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, stickered, hang-tag, Merchandise File, or other file price as reflected in Merchant's books and records for such item.

(d)    Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the Cost Value (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4    Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  Agent shall retain 20% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive

80% of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Stores at Merchant's expense as soon as practicable and shall not be shipped to the Stores from the Distribution Centers absent Agent's express written consent.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1    Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence simultaneously at all Initial Stores on January 3, 2019 and at all Additional Stores no later than February 9, 2019 (each such date, a "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than April 15, 2019 (the "Sale Termination Date", and the period from the applicable Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the later of (i) the 15th of the month and (ii) the applicable Vacate Date for such Store.

6.2    Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  FF&E.

7.1    Owned FF&E.  Agent shall sell all FF&E at the Stores, the corporate office (the "Corporate Office") and the Distribution Center owned by Merchant (the "Owned FF&E") pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided, however, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement.

7.2    Abandonment of FF&E.  Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party.

Section 8.  Conduct of the Sale.

8.1    Rights of Agent.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the applicable Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines

attached hereto as Exhibit 8.1 (the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the Sale, the Agent, in the exercise of its commercially reasonable discretion (taking into account the Parties' mutual objective of maximizing the results of the Sale) shall have the right:

(a)       to establish Sale prices and discounts and Store hours;

(b)       except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores or the Distribution Center (whether owned, leased, or licensed);

(c)       (i) to be provided by Merchant (at no additional cost to Agent (other than as provided in Section 4.1(s))) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)       to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(e)       to transfer Merchandise between and among the Stores at Agent's expense; <u>provided</u>, <u>however</u>, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking;

(f)       subject to the option under Section 8.11 below, to use Merchant's E-Commerce Platform in connection with the Sale to fulfill customer orders made during the Sale Term and otherwise promote the Sale; and

(g)       subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

8.2    <u>Terms of Sales to Customers; Final/As Is Sales</u>.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the applicable Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3    <u>Sales Taxes</u>.

(a)     During the applicable Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account"). Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account. Merchant will be given access to the computation of gross receipts for verification of all such tax collections. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies. Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Center and corporate office(s), including, without limitation, inventory historically or customarily used by stylists in the ordinary course of business, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise. Agent shall accept returns of goods sold by Merchant prior to the applicable Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the applicable Sale Commencement Date. If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value and Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return. The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in the Merchandise (determined in accordance with this Section 8.5). In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amount, sales of Additional Agent Goods, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Cost Value, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records.

8.8     Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced, provided, however, Lender shall have no obligation to refund any overfunded amount demanded by Agent if Agent's written demand is received by Lender more than three (3) business days after the Inventory Reconciliation Date.

8.9     Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Agent Goods.

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense). Sales of Additional Agent Goods shall be run through Merchant's cash register systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

(b)    In addition to all other compensation due to Merchant under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5.0%) of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods. Agent shall pay Merchant its Additional Agent Goods Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Goods sold pursuant to Section 3.2(b) above).

(c)    Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(d)    Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(e)    Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(f)    Lender hereby acknowledges receipt of notice of the consignment of the Additional Agent Goods and consents to the payments to Agent of Additional Agent Goods proceeds.

8.11    <u>E-Commerce Platform</u>.  Agent shall have the option, exercisable no later than the applicable Sale Commencement Date, to use Merchant's e-commerce site and related sales platform ("<u>E-Commerce Platform</u>") in connection with the Sale to fulfill customer orders made during the Sale Term and otherwise promote the Sale (in Agent's capacity as Agent hereunder).  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders, (i) Merchant shall continue to provide for the operation and maintenance of the E-Commerce Platform and provide Agent with all assistance with respect to the functionality of the E-Commerce Platform, fulfillment of orders, and promotion of the Sale and (ii) Agent shall pay Merchant (as an Expense, which shall be in addition to other Expenses contemplated by this Agreement) for the actual costs and expenses (x) incurred and paid by Merchant after the applicable Sale Commencement Date through the date on which the Agent directs the Merchant to cease fulfilling customer orders, (y) that are directly attributed to the continued operation and maintenance of the E-Commerce Platform, and (z) reflected on <u>Exhibit 8.11</u> ((ii)(x)-(z), the "<u>E-Commerce Platform Expenses</u>"); provided, however, that Agent is only obligated to pay the E-Commerce Platform Expenses to the extent such E-Commerce Platform Expenses are not otherwise included as an Expense of the Sale under Section 4.1 hereof (including, but not limited to, as part of Central Services)).  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders and discontinues using it as a sales platform to fulfill customer orders, Agent's obligations to pay the E-Commerce Platform Expenses shall cease upon the date that is seven (7) days after Agent provides Merchant with notice of Agent's intention to discontinue using the E-Commerce Platform as a sales platform to fulfill customer orders; provided, however, that, if Agent continues the Sale at the Stores after the date on which Agent discontinues using the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function at no cost or expense to Agent.  If Agent exercises the option to use the E-Commerce Platform as a sales platform to fulfill customer orders, in addition to the foregoing, Agent shall provide Merchant with written notice of such election no later than the applicable Sale Commencement Date and Agent and Merchant hereby agree to the following:  (i) all Merchandise sold through the E-Commerce Platform shall be counted based on shipments to customers; (ii) Merchant and Agent shall mutually agree upon an allocation of Merchandise to be sold using the E-Commerce Platform, which Merchandise shall not be subject to the requirement to arrive at the Stores by the Receipt Deadline; (iii) Agent shall be authorized to sell Additional Agent Goods through the E-Commerce Platform; and (iv) the Parties may implement such other processes, procedures, and agreements as may be necessary or appropriate for the efficient and continued operation of the E-Commerce Platform.  In the event Agent elects not to exercise its rights to use the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant agrees that neither Merchant nor any other person or entity shall complete any sale of goods for Merchant's or any other person's or entity's account utilizing the E-Commerce Platform during the Sale Term, Merchant shall otherwise comply with Merchant's obligations under this Agreement in respect of the E-Commerce Platform, and Merchant shall, as a Central Service and at no cost or expense to Agent (other than as part of Central Service Expenses), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function.

8.12    <u>Collective Bargaining Agreements; Leases</u>.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in sections 4.1(a) and 4.1(c) herein.

Section 9.  Employee Matters.

9.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4    Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent and Merchant may determine in their reasonable discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  <u>Conditions Precedent and Subsequent</u>.

(a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the applicable Sale Commencement Date.

(ii)     Lender has executed this Agreement (with all Exhibits attached hereto).

(iii)     The Bankruptcy Court shall have entered the Bidding Procedures Order approving the Bid Protections by no later than January 20, 2019.

(iv)     The Bankruptcy Court shall have entered the Approval Order by no later than February 8, 2019, or such later date as mutually agreed upon by Merchant and the Agent (the "<u>Approval Order Deadline</u>").

(v)     Merchant shall have performed all obligations, taken all actions and made all deliveries to be made by Merchant concurrently with the execution and delivery of this Agreement.

(b)     The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)     All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the applicable Sale Commencement Date.

(ii)     Lender has executed this Agreement (with all Exhibits attached hereto, subject to the Approval Order) and has consented to the granting and perfection of Agent's security interests provided for herein.

Section 11.  <u>Representations, Warranties and Covenants</u>.

11.1     <u>Merchant's Representations, Warranties and Covenants</u>.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Merchant (i) is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware; (ii) has all requisite organizational power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated

hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder (except from and after commencement of the Bankruptcy Case, subject to entry of the Approval Order).  Each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the applicable Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Prior to the applicable Sale Commencement Date, Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)     Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the applicable Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since December 1, 2018, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the applicable Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since December 1, 2018, Merchant has not, and through the applicable Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Stores without Agent's consent from and after the date hereof.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the applicable Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores and to advertise the Sale in the manner provided for in Section 8.1.  Merchant shall, throughout the Sale Term, maintain in good

working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stored. Except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since December 1, 2018, Merchant has not taken, and shall not throughout the applicable Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Since December 1, 2018, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code from and after filing of the Bankruptcy Case or as provided herein and absent a bona fide dispute, through the applicable Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; and (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business, including but not limited to shipping Liter Goods from the Distribution Center to the Stores; provided, however, that Merchant has advised Agent that as of December 14, 2018, Merchant has discontinued in-bound receipts to the Distribution Center.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Center or on order or in transit.

(m)     Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the applicable Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Stores shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with the level and mix set forth on Exhibit 11.1(o).

(p)     Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)     Merchant has not since December 1, 2018 shipped any Excluded Defective Merchandise from the Distribution Center to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Center to the Stores.

(r)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores, E-Commerce Platform, any other retail store location, or any other retail sales channel, except as detailed on Exhibit 11.1(s), nor shall Merchant offer in any of the foregoing channels or locations any promotions or discounts during the Sale Term that are equal to or greater than the promotions or discounts offered by the Agent in the Stores.

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  Insurance.

12.1    Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of

all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

        12.4    <u>Worker's Compensation Insurance</u>.  Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.  <u>Indemnification</u>.

        13.1    <u>Merchant's Indemnification</u>.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

        13.2    <u>Agent Indemnification</u>.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Goods; (v) as set forth in section 8.3 above; and (vi) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

        Section 14.  <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

        (a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

(b)      Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party;

(c)      The Bankruptcy Court approval of a motion by any party to convert the Bankruptcy Case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee; or

(d)      The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15.  <u>Agent's Security Interest</u>.  Effective upon receipt by Merchant and/or Lender of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) the Additional Agent Goods; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interests and liens granted to Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)      Without any further act by or on behalf of Agent or any other party (including (without limitation) the Lender and Merchant), Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, (iii) senior to all other liens and security interests, and (iv) except as otherwise provided herein, payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, <u>provided</u>, <u>however</u>, that (i) until the Merchant receives payment in full of the Guaranteed Amount due to Merchant hereunder, the security interest and lien granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests and lien of Lender in the Agent Collateral (other than the Additional Agent Goods and proceeds thereof in which Merchant has not property or other interest and Lender has no security interest or other lien) but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and (ii) upon payment in full of  the Guaranteed Amount, any security interest or lien of Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interests and liens of Agent.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)      Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)     In the event of an occurrence of an Event of Default by Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 16.  Bidding and Auction.  As additional consideration for entering into this Agreement, Agent has agreed to increase the Guaranty Percentage that it is paying under the Original Agency Agreement from sixty-five percent (65%) of the aggregate Cost Value of the Merchandise in the Initial Stores to eighty percent (80%) of the Cost Value of the Merchandise in all Stores as set forth herein.  In consideration of Agent conducting its due diligence, increasing the Guaranty Percentage, and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"), and in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) involving the Merchandise and Owned FF&E in the Additional Stores, (a) the Original Agency agreement shall continue in full force and effect on the terms set forth therein and the Agent shall continue to conduct the Sale at the Initial Stores thereunder, and (b) Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) an amount equal to the sum of (i) $250,000 ("Breakup Fee"), (ii) an expense reimbursement of up to $50,000 to cover Agent's reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement and the bid procedures (the "Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections"), and (iii) Agent's actual out-of-pocket costs of signage and freight in an amount equal to $50,000.

Section 17.  Miscellaneous.

17.1     Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

| If to Agent: | HILCO MERCHANT RESOURCES, LLC |
|---|---|
| | 5 Revere Drive, Suite 206 |
| | Northbrook, IL 60062 |
| | Attention: Ian S. Fredericks |
| | Tel: (847) 418-2075 |
| | Fax: (847) 897-0859 |
| | Email: ifredericks@hilcotrading.com |

| If to Merchant: | BEAUTY BRANDS, LLC |
|---|---|
| | Timothy D. Boates, Chief Restructuring Officer |
| | RAS Management Advisors, LLC |
| | 1285 Sharps Cove Road |
| | Gurley, Alabama 35748 |
| | Tel:  (256) 776-4989 |
| | Fax: (401) 846-5989 |
| | Email: tboates@rasmanagement.com |

|  |  |
|---|---|
| With copy to: | Gregory A. Taylor, Esq.<br>ASHBY & GEDDES PA<br>500 Delaware Avenue, 8th Floor<br>Wilmington, DE  19801<br>Tel: (302) 654-1888<br>Fax: (302) 654-2067<br>Email: gtaylor@ashbygeddes.com |
| If to Lender: | PNC Bank, National Association<br>350 S. Grand Ave., Ste 3850<br>Los Angeles, CA 90071<br>Attn: Robin Van Meter<br>Tel: (213) 395-7334<br>Email: robin.vanmeter@pnc.com |
| With copy to: | Regina Stango Kelbon, Esq.<br>BLANK ROME LLP<br>1201 N. Market Street<br>Suite 800<br>Wilmington, DE 19801<br>Tel: (302) 425-6424<br>Email: kelbon@blankrome.com |

17.2    Governing Law/Exclusive Jurisdiction.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

17.4    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5    Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

17.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall

constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8    _Section Headings_.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9    _Wiring of Funds_.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    _Nature of Remedies_.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.1(c), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

17.11    _Entire Agreement_.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**BEAUTY BRANDS, LLC**

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**

**PNC BANK, N.A.**

By: _____
Print Name and Title:

## List of Exhibits

Exhibit 1(a) – Initial Store List.
Exhibit 1(b) – Additional Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center and On-Order Merchandise
Exhibit 8.1 – Sale Guidelines
Exhibit 8.11 – E-Commerce Platform Expense Schedule
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Schedule

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: _____
Print Name and Title:

**BEAUTY BRANDS, LLC**

By: _____
Print Name and Title:   Timothy D. Boates, CRO

**Agreed and Accepted as to Sections**
**3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**

**PNC BANK, N.A.**

By: _____
Print Name and Title:

## <u>List of Exhibits</u>

Exhibit 1(a) – Initial Store List.
Exhibit 1(b) – Additional Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center and On-Order Merchandise
Exhibit 8.1 – Sale Guidelines
Exhibit 8.11 – E-Commerce Platform Expense Schedule
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Schedule

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Print Name and Title:

**BEAUTY BRANDS, LLC**

By:_____
Print Name and Title:

**Agreed and Accepted as to Sections
3.3, 3.4, 8.3, 8.8, 8.10, 15, 16, and 17:**

**PNC BANK, N.A.**

By: _____
Print Name and Title: Robin Van Meter
Vice President

### List of Exhibits

Exhibit 1(a) – Initial Store List.
Exhibit 1(b) – Additional Store List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – Distribution Center and On-Order Merchandise
Exhibit 8.1 – Sale Guidelines
Exhibit 8.11 – E-Commerce Platform Expense Schedule
Exhibit 11.1(o) – Inventory Mix
Exhibit 11.1(s) – Promotional Schedule

**Beauty Brands**
**Exhibit 1 (a)**

| Initial Store List |
| --- |

| Store # | Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|
| 107 | Lone Tree | 9197 Westview Rd., Suite B | Lone Tree | CO | 80124 | 6,018 | 3,073 |
| 108 | Peoria | 7445 West Bell Road, Suite 100 | Peoria | AZ | 85382 | 6,697 | 4,414 |
| 118 | Paradise Valley | 4575 East Cactus Road, Ste. 100 | Phoenix | AZ | 85032 | 6,000 | 3,462 |
| 122 | Ft. Worth | 4601 West Freeway, Ste 310 | Ft. Worth | TX | 76107 | 6,318 | 4,450 |
| 123 | S. Aurora | 5640 S. Parker Road | Aurora | CO | 80015 | 5,530 | 3,654 |
| 128 | Watauga | 7600 Denton Highway, Suite 100 | Watauga | TX | 76148 | 6,260 | 4,041 |
| 129 | N. Tucson | 7354 N. LaCholla Blvd. | Tucson | AZ | 85741 | 6,300 | 4,061 |
| 135 | Greenwood | 745 US 31 North, Unit C | Greenwood | IN | 46142 | 6,380 | 4,402 |
| 136 | Fishers | 8510 E 96th Street, Unit C | Fishers | IN | 46038 | 5,885 | 3,932 |
| 137 | Carmel | 2554 E 146th Street | Carmel | IN | 46033 | 6,125 | 3,920 |
| 139 | NW OK City | 8525 N Rockwell Ave | Oklahoma City | OK | 73132 | 6,740 | 4,589 |
| 141 | Penn & Memorial | 13820 N. Pennsylvania Ave | Oklahoma City | OK | 73134 | 7,596 | 4,626 |
| 152 | Ballantyne | 5335 Ballantyne Commons Pkwy, Ste 100 | Charlotte | NC | 28277 | 6,000 | 3,898 |
| 156 | Davenport | 4201 Elmore Avenue | Davenport | IA | 52807 | 6,500 | 4,285 |
| 157 | Papillion | 8920 South 71st Plaza, Ste. 111 | Papillion | NE | 68133 | 7,000 | 5,078 |
| 158 | Tyler | 8942 S. Broadway Ave. #162 | Tyler | TX | 75703 | 8,560 | 6,321 |
| 159 | Southlake | 1041 E. Southlake Blvd., Ste. 100 | Southlake | TX | 76092 | 7,215 | 4,883 |
| 160 | Lawton | 2006 NW 82nd St. | Lawton | OK | 73505 | 7,941 | 5,302 |
| 162 | Addison | 5100 Belt Line RoadSte.852 | Addison | TX | 75254 | 6,844 | 4,775 |
| 163 | Columbus | 4202 Easton Gateway Drive | Columbus | OH | 43219 | 8,013 | 5,387 |
| 164 | San Tan | 2162 East Williams Field Rd., #111 | Gilbert | AZ | 85295 | 7,377 | 5,243 |
| 166 | LaEncantada | 2905 E Skyline Dr., #274 | Tuscon | AZ | 85718 | 6,397 | 4,829 |
| 168 | Crocker Park | 87 Main Street | Westlake | OH | 44145 | 7,180 | 4,699 |
| **23** | | | | | | **6,734** | **4,492** |

**Beauty Brands**
**Exhibit 1 (b)**

**Additional Store List**

| Store # | Name | Address | City | State | Zip |
|---|---|---|---|---|---|
| 101 | Overland Park | 7501 W 119 St | Overland Park | KS | 66213 |
| 102 | Lee's Summit | 951 NE Rice Rd | Lee's Summit | MO | 64086 |
| 103 | Lawrence | 3514 Clinton Pkwy, Suite J | Lawrence | KS | 66047 |
| 104 | KC North | 6519 NW Barry Rd | Kansas City | MO | 64154 |
| 105 | Lenexa | 9570 Quivira Rd | Lenexa | KS | 66215 |
| 106 | Olathe | 15225 W 119 St | Olathe | KS | 66062 |
| 110 | Broomfield | 1270 E 1st Ave. | Broomfield | CO | 80020 |
| 113 | Plano | 6125 W Park Blvd | Plano | TX | 75093 |
| 115 | Co. Springs | 7214 North Academy Blvd | Colorado Springs | CO | 80920 |
| 116 | Frisco | 3211 Preston Road, Suite 16 | Frisco | TX | 75034 |
| 120 | Brentwood | 8582 Eager Rd. | Brentwood | MO | 63144 |
| 121 | Boulder | 1731 28th Street | Boulder | CO | 80301 |
| 124 | St. Charles | 6183 Mid Rivers Mall Drive | St. Charles | MO | 63304 |
| 125 | Topeka | 5820 SW 21st Street | Topeka | KS | 66604 |
| 126 | Plaza | 438 Ward Parkway | Kansas City | MO | 64112 |
| 127 | Independence | 20200 East Jackson Drive | Independence | MO | 64057 |
| 130 | S. Kansas City | 13241 State Line Road | Kansas City | MO | 64145 |
| 132 | Shiloh | 3110 Green Mount Crossing Dr. | Shiloh | IL | 62269 |
| 134 | Liberty | 8410 N Church Road | Kansas City | MO | 64157 |
| 138 | Omaha | 7815 Dodge Street | Omaha | NE | 68114 |
| 143 | West Omaha | 225 N 170th St. STE 110 | Omaha | NE | 68118 |
| 144 | Avondale | 1709 N Dysart Road | Avondale | AZ | 85392 |
| 145 | Legends | 1811 Village West Parkway, Ste. O-101 | Kansas City | KS | 66111 |
| 146 | Fulton Ranch | 105 West Ocotillo Road | Chandler | AZ | 85248 |
| 147 | Wentzville | 1894 Wentzville Pkwy, Suite 100 | Wentzville | MO | 63385 |
| 148 | Waco | 2325 Marketplace Drive | Waco | TX | 76711 |
| 149 | Clive | 10001 University  Ave. | Clive | IA | 50325 |
| 150 | Avon | 9774 E US Hwy 36 | Avon | IN | 46123 |
| 151 | Edwardsville | 6659 Edwardsville Crossing Dr. | Edwardsville | IL | 62025 |
| 153 | Birkdale | 8830 Lindholm Drive, Ste. 100 | Huntersville | NC | 28078 |
| 154 | Summit Fair | 860A NW Blue Parkway | Lee's Summit | MO | 64086 |
| 155 | Normal | 311 A S Veterans Parkway | Normal | IL | 61761 |
| 161 | Shawnee | 15320 Shawnee Mission Pkwy. | Shawnee | KS | 66217 |

**33**

**Beauty Brands**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
| --- | --- | --- |
| Cost Value | Adjustment Points | Adjusted Guaranty |
| 13,250,000 | 0.21% | 76.40% |
| 13,210,000 | 0.21% | 76.61% |
| 13,170,000 | 0.21% | 76.82% |
| 13,130,000 | 0.21% | 77.03% |
| 13,090,000 | 0.21% | 77.24% |
| 13,050,000 | 0.19% | 77.45% |
| 13,010,000 | 0.19% | 77.64% |
| 12,970,000 | 0.19% | 77.83% |
| 12,930,000 | 0.19% | 78.02% |
| 12,890,000 | 0.19% | 78.21% |
| 12,850,000 | 0.17% | 78.40% |
| 12,810,000 | 0.17% | 78.57% |
| 12,770,000 | 0.17% | 78.74% |
| 12,730,000 | 0.17% | 78.91% |
| 12,690,000 | 0.17% | 79.08% |
| 12,650,000 | 0.15% | 79.25% |
| 12,610,000 | 0.15% | 79.40% |
| 12,570,000 | 0.15% | 79.55% |
| 12,530,000 | 0.15% | 79.70% |
| 12,490,000 | 0.15% | 79.85% |
| 12,450,000 | | 80.00% |
| 12,250,000 | | 80.00% |
| 12,210,000 | 0.15% | 79.85% |
| 12,170,000 | 0.15% | 79.70% |
| 12,130,000 | 0.15% | 79.55% |
| 12,090,000 | 0.15% | 79.40% |
| 12,050,000 | 0.20% | 79.20% |
| 12,010,000 | 0.20% | 79.00% |
| 11,970,000 | 0.20% | 78.80% |
| 11,930,000 | 0.20% | 78.60% |
| 11,890,000 | 0.25% | 78.35% |
| 11,850,000 | 0.25% | 78.10% |
| 11,810,000 | 0.25% | 77.85% |
| 11,770,000 | 0.25% | 77.60% |
| 11,730,000 | 0.30% | 77.30% |
| 11,690,000 | 0.30% | 77.00% |
| 11,650,000 | 0.30% | 76.70% |
| 11,610,000 | 0.30% | 76.40% |
| 11,570,000 | 0.35% | 76.05% |
| 11,530,000 | 0.35% | 75.70% |
| 11,490,000 | 0.35% | 75.35% |
| 11,450,000 | 0.35% | 75.00% |

_Note(s):_
_1. Adjustments between the increments shall be on a prorata basis._
_2. In the event that the Cost value of the Merchandise is greater than $13,250,000, each $40,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.23%._

_3. In the event that the Cost value of the Merchandise is less than $11,450,000, each $40,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.37%._

**Exhibit 3.1(c)**

| Cost Factor | | |
|---|---|---|

| Cost Factor | Adjustment Points | Adjusted Guaranty |
|---|---|---|
| **35.60%** | | **80.00%** |
| 35.70% | 0.40% | 79.60% |
| 35.80% | 0.40% | 79.20% |
| 35.90% | 0.40% | 78.80% |
| 36.00% | 0.40% | 78.40% |
| 36.10% | 0.40% | 78.00% |
| 36.20% | 0.40% | 77.60% |
| 36.30% | 0.40% | 77.20% |
| 36.40% | 0.40% | 76.80% |
| 36.50% | 0.40% | 76.40% |
| 36.60% | 0.40% | 76.00% |
| 36.70% | 0.40% | 75.60% |
| 36.80% | 0.40% | 75.20% |
| 36.90% | 0.40% | 74.80% |
| 37.00% | 0.40% | 74.40% |
| 37.10% | 0.40% | 74.00% |
| 37.20% | 0.40% | 73.60% |
| 37.30% | 0.40% | 73.20% |
| 37.40% | 0.40% | 72.80% |
| 37.50% | 0.40% | 72.40% |
| 37.60% | 0.40% | 72.00% |

_Notes:_
_1. Adjustments between the increments shall be on a prorata basis._
_2. In the event that the Cost Factor of Merchandise is greater than 37.60%, each 0.10% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.42%._

**Beauty Brands**
**Exhibit 3.4**

## FORM OF AGENT LETTER OF CREDIT

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 20[  ]

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:    _____
                _____
                _____
                _____

Credit No.: _____
Opener's Reference No.: _____

Gentlemen:

BY ORDER OF:    _____

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of _____ (the "Agent") for a sum or sums not exceeding a total of _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2015, or such earlier date on which the Beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by an officer of _____ (the "Beneficiary").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiary in the form attached as **Exhibit B**.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary, as directed below, in immediately available funds on the next Business Day. If however, a drawing is received by

**Beauty Brands**
**Exhibit 3.4**

_____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms with the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiary in immediately available funds on the second succeeding Business Day.

As used in this Letter of Credit, "<u>Business Day</u>" shall mean any day other than Saturday, Sunday or a day on which banking institutions in _____ are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause, "Drawn under Letter of Credit No. _____, dated _____, 20[  ] of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the Uniform Customs and Practices for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600.

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

**Beauty Brands**
**Exhibit 3.4**

# EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:      Drawing for Amounts Due to:

_____
_____
_____
_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit").  Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby certifies to you that:

(i)      _____ (the "Agent") has not made a payment when due of or for the Guaranteed Amount or Expenses due by the Agent to _____ (the "Merchant'), pursuant to, and as such terms are defined in that certain Agency Agreement, dated as of _____, 20[  ], by and between the Merchant on the one hand, and the Agent, on the other.

(ii)      The amount to be drawn is $_____ (the "Amount Owing").

(iii)      Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iv)      The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No. _____]

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

By: _____

**Beauty Brands**
**Exhibit 3.4**

Name: _____

Title: _____

**Beauty Brands**
**Exhibit 3.4**

## <u>EXHIBIT B</u>

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:     Reduction of Face Amount

_____
_____
_____
_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "<u>Letter of Credit</u>"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officer of _____, in their capacity as Beneficiary of the Letter of Credit hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[  ].

By: _____
Name: _____
Title: _____

Exhibit 4.1(c)

| Store # | Store Name | Rent | Building Contract Service | CAM | In-Store Contract Services | Operating Insurance | Personal Property Tax | Repair & Maintenance | Sytems Consulting/Maintenance | Telephone Costs | Utilities | Total Occupancy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Per Diem | | | | | |
| 101 | Overland Park | 361 | 16 | 138 | 22 | 30 | 2 | 9 | 12 | 35 | 113 | 739 |
| 102 | Lee's Summit | 359 | 15 | 91 | 19 | 36 | 8 | 23 | 12 | 41 | 64 | 668 |
| 103 | Lawrence | 226 | 15 | 118 | 11 | 30 | 4 | 5 | 12 | 31 | 53 | 504 |
| 104 | KC North | 425 | 21 | 141 | 30 | 36 | 7 | 39 | 12 | 33 | 84 | 828 |
| 105 | Lenexa | 415 | 14 | 112 | 13 | 30 | 2 | 46 | 12 | 30 | 60 | 734 |
| 106 | Olathe | 503 | 19 | 319 | 14 | 30 | 3 | 30 | 12 | 33 | 80 | 1,042 |
| 107 | Lone Tree | 425 | 25 | 91 | 5 | 29 | 8 | 15 | 12 | 28 | 42 | 679 |
| 108 | Peoria | 308 | 15 | 82 | 7 | 26 | 4 | 1 | 12 | 27 | 58 | 539 |
| 110 | Broomfield | 490 | 37 | 188 | 5 | 29 | 10 | 36 | 12 | 31 | 60 | 898 |
| 113 | Plano | 548 | 35 | 258 | 10 | 23 | 28 | 18 | 12 | 35 | 68 | 1,035 |
| 115 | Co. Springs | 428 | 14 | 123 | 6 | 29 | 10 | 63 | 12 | 30 | 31 | 745 |
| 116 | Frisco | 406 | 23 | 125 | 8 | 23 | 19 | 46 | 12 | 28 | 35 | 725 |
| 118 | Paradise Valley | 417 | 20 | 109 | 7 | 26 | 5 | 1 | 12 | 28 | 40 | 666 |
| 120 | Brentwood | 392 | 13 | 89 | 6 | 36 | 6 | 48 | 13 | 30 | 44 | 676 |
| 121 | Boulder | 481 | 33 | 90 | 7 | 29 | 8 | 5 | 12 | 28 | 50 | 742 |
| 122 | Ft. Worth | 151 | 33 | 201 | 9 | 23 | 31 | 3 | 12 | 29 | 45 | 536 |
| 123 | S. Aurora | 261 | 16 | 136 | 5 | 29 | 8 | 45 | 12 | 28 | 34 | 574 |
| 124 | St. Charles | 383 | 36 | 93 | 9 | 36 | 6 | 19 | 13 | 39 | 48 | 682 |
| 125 | Topeka | 670 | 21 | 134 | 12 | 30 | 3 | 42 | 12 | 26 | 82 | 1,034 |
| 126 | Plaza | 469 | 11 | 500 | 14 | 36 | 14 | 16 | 12 | 36 | 86 | 1,195 |
| 127 | Independence | 331 | 30 | 60 | 10 | 36 | 6 | 22 | 13 | 32 | 74 | 613 |
| 128 | Watauga | 367 | 15 | 133 | 2 | 23 | 28 | 28 | 12 | 30 | 34 | 672 |
| 129 | N. Tucson | 402 | 30 | 114 | 6 | 26 | 5 | 34 | 12 | 25 | 76 | 729 |
| 130 | S. Kansas City | 711 | 25 | 126 | 14 | 36 | 5 | 9 | 12 | 33 | 89 | 1,060 |
| 132 | Shiloh | 398 | 45 | 91 | 12 | 38 | - | 46 | 13 | 32 | 59 | 735 |
| 134 | Liberty | 370 | 15 | 113 | 11 | 36 | 8 | 38 | 12 | 50 | 44 | 697 |
| 135 | Greenwood | 469 | 20 | 70 | 7 | 22 | 4 | 31 | 11 | 25 | 72 | 730 |
| 136 | Fishers | 495 | 16 | 91 | 7 | 22 | 5 | 23 | 12 | 25 | 32 | 727 |
| 137 | Carmel | 389 | 19 | 122 | 7 | 22 | 5 | 9 | 12 | 25 | 77 | 687 |
| 138 | Omaha | 510 | 25 | 130 | 5 | 22 | 5 | 20 | 12 | 26 | 50 | 806 |
| 139 | NW OK City | 89 | 11 | - | 1 | 28 | 18 | 4 | 12 | 85 | 19 | 267 |
| 141 | Penn & Memorial | 400 | 27 | 63 | 7 | 28 | 19 | 13 | 12 | 37 | 74 | 679 |
| 143 | West Omaha | 233 | 26 | 186 | 4 | 22 | 6 | 7 | 12 | 25 | 43 | 564 |
| 144 | Avondale | 481 | 22 | 106 | 7 | 26 | 1 | 2 | 12 | 36 | 68 | 761 |
| 145 | Legends | 301 | 29 | 267 | 16 | 30 | 4 | 35 | 13 | 34 | 58 | 787 |
| 146 | Fulton Ranch | 481 | 24 | 103 | 7 | 26 | 1 | 15 | 12 | 40 | 76 | 785 |
| 147 | Wentzville | 377 | 19 | 62 | 4 | 36 | 6 | 27 | 13 | 82 | 39 | 667 |
| 148 | Waco | 481 | 25 | 131 | 7 | 23 | 36 | 10 | 12 | 45 | 53 | 823 |
| 149 | Clive | 534 | 26 | 114 | 5 | 21 | - | 7 | 12 | 27 | 57 | 804 |
| 150 | Avon | 484 | 33 | 191 | 7 | 22 | 8 | 3 | 12 | 27 | 92 | 878 |
| 151 | Edwardsville | 451 | 34 | 66 | 5 | 38 | - | 19 | 13 | 30 | 39 | 695 |
| 152 | Ballantyne | 367 | 12 | 94 | 6 | 31 | 8 | 20 | 12 | 34 | 48 | 631 |
| 153 | Birkdale | 474 | 23 | 143 | 6 | 31 | 8 | 25 | 12 | 27 | 48 | 798 |
| 154 | Summit Fair | 432 | 29 | 231 | 11 | 36 | 9 | 26 | 12 | 33 | 54 | 874 |
| 155 | Normal | 112 | 22 | 214 | 4 | 38 | - | 27 | 12 | 43 | 47 | 518 |
| 156 | Davenport | 414 | 21 | 155 | 7 | 21 | - | 8 | 12 | 28 | 56 | 722 |
| 157 | Papillion | 409 | 14 | 151 | 5 | 22 | 23 | 2 | 13 | 22 | 41 | 701 |
| 158 | Tyler | 331 | 17 | 120 | 6 | 23 | 83 | - | 12 | 22 | 38 | 652 |
| 159 | Southlake | 413 | 16 | 808 | 8 | 23 | 79 | 0 | 12 | 36 | 34 | 1,430 |
| 160 | Lawton | 233 | 17 | 40 | 5 | 28 | 31 | 10 | 12 | 28 | 43 | 447 |
| 161 | Shawnee | 369 | 24 | 66 | 6 | 30 | - | 24 | 13 | 36 | 73 | 641 |
| 162 | Addison | 376 | 28 | 273 | 5 | 23 | 83 | 21 | 12 | 36 | 37 | 893 |
| 163 | Columbus | 361 | 30 | 297 | 5 | 17 | - | 6 | 12 | 27 | 18 | 772 |
| 164 | San Tan | 304 | 23 | 292 | 5 | 26 | 42 | 7 | 12 | 27 | - | 736 |
| 166 | LaEncantada | 423 | 28 | 295 | 6 | 26 | 42 | 42 | 12 | 27 | 5 | 906 |
| 168 | Crocker Park | 843 | 12 | 4 | 8 | 17 | - | - | 12 | 30 | 31 | 956 |
| 56 | **Total** | 22,735 | 1,265 | 8,661 | 464 | 1,569 | 758 | 1,130 | 670 | 1,854 | 2,976 | 42,083 |

**Exhibit 5.1(a)**
**Inventory Taking Instructions**

To be mutually agreed upon.

**Exhibit 5.2(b)**

| Distribution Center, On-Order, and In-Transit |
| :---: |

Distribution Center inventory is inventory in location 9003 contained in the Merchandise File.

On-Order inventory is inventory contained in the "on order" tab in the Merchandise File.

**Exhibit 8.1**

**Sale Guidelines**

To be provided.

**Exhibit 8.11**

**E-Commerce Platform Expense Schedule**

To be provided.

## Exhibit 11.1(o)

| Cost Inventory Mix | |
|---|---|
| Accessories | 3.1% |
| Appliances | 5.2% |
| Bath and Body | 4.6% |
| Cosmetics | 22.6% |
| Employee Purchase | 0.1% |
| Fragrance | 1.0% |
| Haircare | 24.8% |
| Luxury Haircare | 17.8% |
| Mens | 3.5% |
| Nails | 3.2% |
| Private Label | 0.1% |
| Skincare | 14.1% |
| *Total* | **100.0%** |

## Exhibit 11.1(s)

| Promotional Activity |
| --- |

To be mutually agreed upon.

# Exhibit D

| Store # | Name | Address | City | State | Zip |
|---|---|---|---|---|---|
| 101 | Overland Park | 7501 W 119 St | Overland Park | KS | 66213 |
| 102 | Lee's Summit | 951 NE Rice Rd | Lee's Summit | MO | 64086 |
| 103 | Lawrence | 3514 Clinton Pkwy, Suite J | Lawrence | KS | 66047 |
| 104 | KC North | 6519 NW Barry Rd | Kansas City | MO | 64154 |
| 105 | Lenexa | 9570 Quivira Rd | Lenexa | KS | 66215 |
| 106 | Olathe | 15225 W 119 St | Olathe | KS | 66062 |
| 110 | Broomfield | 1270 E 1st Ave. | Broomfield | CO | 80020 |
| 113 | Plano | 6125 W Park Blvd | Plano | TX | 75093 |
| 115 | Co. Springs | 7214 North Academy Blvd | Colorado Springs | CO | 80920 |
| 116 | Frisco | 3211 Preston Road, Suite 16 | Frisco | TX | 75034 |
| 120 | Brentwood | 8582 Eager Rd. | Brentwood | MO | 63144 |
| 121 | Boulder | 1731 28th Street | Boulder | CO | 80301 |
| 124 | St. Charles | 6183 Mid Rivers Mall Drive | St. Charles | MO | 63304 |
| 125 | Topeka | 5820 SW 21st Street | Topeka | KS | 66604 |
| 126 | Plaza | 438 Ward Parkway | Kansas City | MO | 64112 |
| 127 | Independence | 20200 East Jackson Drive | Independence | MO | 64057 |
| 130 | S. Kansas City | 13241 State Line Road | Kansas City | MO | 64145 |
| 132 | Shiloh | 3110 Green Mount Crossing Dr. | Shiloh | IL | 62269 |
| 134 | Liberty | 8410 N Church Road | Kansas City | MO | 64157 |
| 138 | Omaha | 7815 Dodge Street | Omaha | NE | 68114 |
| 143 | West Omaha | 225 N 170th St. STE 110 | Omaha | NE | 68118 |
| 144 | Avondale | 1709 N Dysart Road | Avondale | AZ | 85392 |
| 145 | Legends | 1811 Village West Parkway, Ste. O-101 | Kansas City | KS | 66111 |
| 146 | Fulton Ranch | 105 West Ocotillo Road | Chandler | AZ | 85248 |
| 147 | Wentzville | 1894 Wentzville Pkwy, Suite 100 | Wentzville | MO | 63385 |
| 148 | Waco | 2325 Marketplace Drive | Waco | TX | 76711 |
| 149 | Clive | 10001 University  Ave. | Clive | IA | 50325 |
| 150 | Avon | 9774 E US Hwy 36 | Avon | IN | 46123 |
| 151 | Edwardsville | 6659 Edwardsville Crossing Dr. | Edwardsville | IL | 62025 |
| 153 | Birkdale | 8830 Lindholm Drive, Ste. 100 | Huntersville | NC | 28078 |
| 154 | Summit Fair | 860A NW Blue Parkway | Lee's Summit | MO | 64086 |
| 155 | Normal | 311 A S Veterans Parkway | Normal | IL | 61761 |
| 161 | Shawnee | 15320 Shawnee Mission Pkwy. | Shawnee | KS | 66217 |