## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BEAUTY BRANDS, LLC, *et al.*,[1] | ) Case No.  19-10031 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| _____ | ) |
| | ) |
| HILCO MERCHANT RESOURCES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 19-_____ (CSS) |
| | ) |
| BEAUTY BRANDS, LLC | ) |
| and PNC BANK, N.A., | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT OF HILCO MERCHANT RESOURCES, LLC
## FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF
## FROM BEAUTY BRANDS, LLC, AND PNC BANK, N.A.

Hilco Merchant Resources, LLC ("HMR" or "Plaintiff"), as the agent for the store

closing sales of Beauty Brands, LLC ("Beauty Brands") and its affiliated debtors and debtors in

possession (together with Beauty Brands, the "Debtors"), by and through its undersigned

counsel, brings this adversary proceeding for entry of judgments against Debtors and PNC Bank,

N.A. ("PNC" and together with the Beauty Brands, the "Defendants"), in its capacity as pre-

petition and post-petition lender to the Debtors :  (i) awarding Plaintiff damages for breach of

that certain agency agreement dated January 3, 2019 (as amended, the "Agency Agreement"),[2] a

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Beauty Brands, LLC (0290); Beauty Brands Payroll Holdings, Inc. (6218); and Beauty Brands Payroll, LLC (1789).  The location of the Debtors' corporate headquarters is 4600 Madison Avenue, Suite 400, Kansas City, MO, 64112.

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agency Agreement.

copy of which is attached hereto as **Exhibit A** and incorporated fully by reference herein;

(ii) awarding Plaintiff damages for breach of the covenant of good faith and fair dealing with

respect to the Second Amendment; (iii) declaring that (a) Beauty Brands is in default of the

Agency Agreement, (b) to the extent it is determined that the Plaintiff overfunded the

Supplemental Guaranteed Amount, the Defendants are not entitled to the Supplemental

Guaranteed Amount (as defined below), and (c) to the extent it is determined that the Plaintiff

overfunded the Supplemental Guaranteed Amount, the overfunded amount of such Supplemental

Guaranteed Amount shall be returned to the Plaintiff by either or both of the Defendants; (iv)

declaring that Plaintiff has a validly perfected, first priority security interest in, and lien upon, the

Designated Deposit Accounts and all proceeds (including Proceeds) in such accounts and all

other Agent Collateral; (v) to the extent the Court denies the Motion to Compel (as defined

below), granting Plaintiff relief from the automatic stay imposed by section 362(a) of the

Bankruptcy Code in order to exercise any and all of its remedies with respect to the Designated

Deposit Accounts and all proceeds (including Proceeds) and funds in such accounts; (vi)

declaring and seeking to have Beauty Brands specifically perform that, on each business day,

Beauty Brands is required to promptly pay to Plaintiff all funds in the Designated Deposit

Accounts (including without limitation, Proceeds, Proceeds from credit card sales, and all other

amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset

or netting of Expenses or other amounts that may be due to Beauty Brands; (vii) ordering the

turnover to Plaintiff the Initial Sale Withheld Proceeds and the Supplemental Sale Proceeds and

enforcing the actual trust provided for the Agency Agreement, or, in the alternative, imposing a

constructive trust on such funds for Plaintiff's sole and exclusive benefit; (viii) awarding

Plaintiffs the costs and fees incurred in the prosecution of this action; and (ix) granting such

other relief the Court deems just and proper.  In support of this complaint, Plaintiff respectfully states as follows:

## INTRODUCTION

1.      Quite simply, HMR entered into the Agency Agreement and all amendments thereto in good faith and with the expectation that its counterparty would honor its obligations under the agreement.  It is clear, however, that Beauty Brands never intended to honor its obligations to HMR and is breaching the Agency Agreement by improperly holding funds that that HMR is entitled to control and by obtaining approval to convert the Debtors' cases to cases under chapter 7 of the Bankruptcy Code.

2.      Not only has Beauty Brands breached the Agency Agreement by its recent actions, but it has not been dealing in good faith with HMR.  Specifically, after seemingly proceeding with the Supplemental Sale and accepting approximately $900,000 from HMR as required thereunder, Beauty Brands did a complete 180 degree turn and has refused to comply with the express terms of the Agency Agreement and consented to and sought shortened notice of conversion and then affirmatively sought such conversion less than 10 days later.  In light of Beauty Brands' actions, HMR is forced to file this action to protect and recover on behalf its bargained-for rights under the Agency Agreement.

## JURISDICTION AND VENUE

3.      This adversary proceeding is initiated pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding constitutes a core proceeding pursuant to 28

U.S.C. § 157.  Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises in or relates to the above-captioned chapter 11 cases.

5.    Plaintiff consents to the entry of final orders or judgments by this Court with respect to this complaint if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

6.    HMR is a Delaware limited liability company, the Debtors' agent for store closing sales, and a party to the Agency Agreement.  Its primary place of business is 5 Revere Drive, Suite 206, Northbrook, IL 60062.

7.    Beauty Brands is a Delaware limited liability company, debtor in the above-captioned chapter 11 cases, and a party to the Agency Agreement.  Upon information and belief, Beauty Brands' principal place of business is 4600 Madison Avenue, Suite 400, Kansas City, MO, 64112.

8.    Defendant PNC is a commercial bank, pre- and post-petition lender to the Debtors, and a party to certain sections of the Agency Agreement.  Upon information and belief, PNC's principal place of business is The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, PA 15222 and maintains a place of business, at least, at 350 S. Grand Ave, St. 3850, Los Angeles, CA 90071.

## FACTS COMMON TO ALL COUNTS

**I.    Agency Agreement by and Between Beauty Brands and HMR**

9.    In December 2018, HMR was approached by the Debtors to submit liquidation bids for the sale of merchandise, furniture, fixtures and equipment at the Debtors'

stores.  Ultimately, HMR submitted two bids that were accepted by the Debtors—one for a

guarantee deal to assist in closing 23 Stores and one for a guarantee deal to assist the Debtors in

closing all of the Debtors' remaining stores.

10.    On January 3, 2019, Beauty Brands and HMR executed the Agency

Agreement with respect to 23 of the Debtors' stores (the "Initial Sale").

11.    Under the Agency Agreement, for the Initial Sales, HMR guaranteed a

65% recovery to the Debtors on behalf of their Merchandise, subject to adjustment, along with

other potential sharing amounts to the Debtors, in exchange for the right to conduct "store

closing", "sale on everything" or "everything must go"-themed sales of the Debtors' inventory

and FF&E through the Debtors' stores. *See generally* Agency Agreement.

12.    On January 3, 2019, HMR commenced the Initial Sale.

13.    On January 22, 2019, Beauty Brands and HMR executed the Second

Amendment to the Agency Agreement (the "Second Amendment"). *See* Bankr. D.I. 124.  The

Second Amendment provides that any of the Debtors' stores not considered "Stores" under the

original Agency Agreement or sold to a going concern buyer will be liquidated by HMR

according to the terms set forth therein.

14.    Central terms of the Agency Agreement, as amended, include:

a.    Beauty Brands is only entitled to any portion of the Guaranteed
Amount if it strictly complies with all representations, warranties, covenants, terms and
conditions set forth in the Agency Agreement. *See* Agency Agreement, Sec. 3.1(a).

b.    If Beauty Brands complies with all representations, warranties,
covenants, terms and conditions, then HMR guarantees that Beauty Brands shall receive a
Guaranty Percentage of sixty-five percent (65%) of the aggregate Cost Value of the Merchandise
sold during the Initial Sale and sixty-three percent (63%) for Merchandise sold at any of the
Additional Stores, subject to potential adjustments as set forth in the Agency Agreement. *See id*.

c.    After Proceeds are used to repay HMR for amounts paid on
account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds go first to HMR
in an amount equal to six percent (6.0%) of the aggregate Cost Value of the Merchandise; and

thereafter: fifty percent (50.0%) to HMR and fifty percent (50.0%) to Beauty Brands. *See* Agency Agreement, Sec. 3.2(a).

d.      Beauty Brands and PNC are deemed to hold all Proceeds and other amounts due to HMR "in trust" and are not permitted to commingle Proceeds or other amounts due to HMR with any of Beauty Brands' or PNC's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by HMR. *See* Agency Agreement, Sec. 3.3(c)(iii).

e.      Beauty Brands, on each business day, is required to promptly pay to HMR by wire funds transfer all funds in the Designated Deposit Account (including without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Beauty Brands. Sec. 3.3(c)(iv).

f.      HMR is permitted to conduct the Sale and Supplemental Sale at the Stores and Additional Stores, as applicable, until the Sale Termination Date of March 31, 2019. *See id.*, Sec. 6.1; Second Amendment, ¶ 7. The Agency Agreement authorizes HMR, in its discretion and on five days' written notice, to terminate the Sale or Supplemental Sale on a Store-by-Store basis prior to the Sale Termination Date. *See id.*, Sec. 6.1. The Agency Agreement does not authorize Beauty Brands to end the Sale or Supplemental Sale prior to the Sale Termination Date.

g.      Events of Default include (i) Beauty Brands' failing to perform any material obligation, which remains uncured for five days after written notice thereof; (ii) the approval, by the Bankruptcy Court, of to convert the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; and (iii) the termination of the Sale prior to the Sale Termination or the material interruption or impairment of the Sale at any Store for any reason other than a material breach of Event of default caused by HMR. *See id.*, Sec. 14. Upon an Event of Default, the non-defaulting part may in its discretion, elect to terminate the Agency Agreement and seek appropriate damages or equitable relief. *See id.*

h.      Beauty Brands granted HMR first priority, senior security interests in and liens upon the Agent Collateral, which includes, among other things, the Designated Deposit Accounts and all proceeds (including Proceeds) in such accounts, assets subject to the Sale, amounts owed to HMR, and "proceeds" of all the above (within the meaning of Section 9-102(a)(64) of the Uniform Commercial Code). *See id.*, Sec. 15. Upon entry of the Final Order, payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interests and liens granted to HMR are deemed properly perfected and effective without the requirement to file UCC-1 financing statements or any other documentation. *See id.*

## II.      Background Related to Bankruptcy Cases

15.      On January 6, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

(the "Bankruptcy Code"). As of the date hereof, the Debtors are operating (and until 5 pm ET today, will continue to operate) their business and managing their affairs as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

16. On January 8, 2019, the Bankruptcy Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

17. On January 14, 2019, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee").

**A.    Assumption of Agency Agreement, Conclusion of the Initial Sale, and Beauty Brands' Wrongful Withholding of Proceeds**

18. On the Petition Date, the Debtors sought assumption of the Agency Agreement (*see* Bankr. D.I. 14), and this Court approved the Agency Agreement as being operative and effective on an interim basis on January 8, 2019. *See* Bankr. D.I. 48.

19. On January 31, 2019, this Court entered the *Final Order (I) Authorizing The Debtors To Perform In Accordance With The Agency Agreement; (II) Authorizing The Debtors To Sell Certain Assets Through Store Closing Sales, With Such Sales To Be Free And Clear Of All Liens, Claims And Encumbrances; (III) Authorizing Customary Bonuses To Employees Of Closing Business Locations; (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions; (V) Authorizing The Debtors To Abandon Certain Unsold Property; And (VI) Granting Related Relief* (Bankr. D.I. 189) (the "Final Order"), a copy of which is attached hereto as **Exhibit B**, approving the Debtors' assumption of the Agency Agreement, inclusive of the First and Second Amendments, on a final basis.

20. The Final Order, mirroring language in Section 15 of the Agency Agreement, also specifically grants to HMR first priority, senior security interests in and liens upon the Agent Collateral. *See* Final Order, ¶¶ 37, 38.

21.    As of the date hereof, HMR has paid all amounts in respect of the Guaranteed Amount for the initial Stores and the Initial Sale.

22.    As of the date hereof, Beauty Brands or PNC is holding a Letter of Credit issued by Bank of America, N.A., on behalf of HMR in the aggregate amount of $1,013,056.63.

23.    The Sale at the initial 23 closing Stores concluded on or around February 18, 2019.  Section 8.7 of the Agency Agreement now requires Beauty Brands and HMR to reconcile all amounts to determine final amounts owed between the parties.  Prior to the Court approving the conversion of the Debtors' cases, it was anticipated that HMR would owe the Debtors amounts on account of the Sharing Amount.

24.    From and after the Payment Date until the Final Reconciliation is completed, Section 3.3(c) of the Agency Agreement requires all Proceeds be controlled by HMR. While HMR has the right to set up separate Agency Accounts, it may also continue to use Beauty Brands' Designated Deposit Accounts, into which all Proceeds of the Sale are to be deposited, and which shall be deemed to be Agency Accounts over which HMR has sole signatory authority and control.  *See* Agency Agreement, Sec. 3.3(c)(i), (iii).

25.    The Agency Agreement also requires that, on each business day, Beauty Brands transfer to HMR all funds in the Designated Deposit Accounts for the prior day(s) without any offsetting or netting of Expenses or other payment.  *See id.*, Sec. 3.3(c)(iv).  If Beauty Brands is ultimately entitled to any funds on account of its portion of the Sharing Amount, then HMR is to pay such amounts as part of the Final Reconciliation and is not required to do so prior to the completion of the reconciliation.  *See id.*, Sec. 3.3(b).

26.    Upon information and belief, the Debtors are holding at least $415,143.40 in Proceeds from the Initial Sale (the "Initial Sale Withheld Proceeds") based on an alleged right

to the Sharing Amount for the Stores and because the Debtors are "tight on cash." The Agency

Agreement, however, explicitly requires Beauty Brands to transfer all Proceeds to HMR within

one business day of receipt, and HMR is then entitled to possess all Proceeds until the

completion of the Final Reconciliation.

**B.    Debtors' Appointment of a Stalking Horse Bidder**

27.    On January 5, 2019, Beauty Brands and HMR executed that certain

Amended and Restated Agency Agreement with respect to a full-chain liquidation of all of the

Debtors' stores (the "Amended & Restated Agreement").

28.    On January 6, 2019, the Debtors filed the *Debtors' Motion For Entry Of*

*(A) An Order (I) Scheduling A Hearing On The Approval Of The Sale Of All Or Substantially All*

*Of The Debtors' Assets Free And Clear Of All Encumbrances, And The Assumption And*

*Assignment Of Certain Executory Contracts And Unexpired Leases, (II) Approving Certain*

*Bidding Procedures, Assumption And Assignment Procedures, And Bid Protections And The*

*Form And Manner Of Notice Thereof, And (III) Granting Related Relief; And (B) An Order (I)*

*Authorizing The Sale Of All Or Substantially All Of The Debtors' Assets Free And Clear Of All*

*Encumbrances, (II) Authorizing The Assumption And Assignment Of Certain Executory*

*Contracts And Unexpired Leases, And (III) Granting Related Relief* (Bankr. D.I. 16) (the "Sale

Motion"). The Sale Motion sought, in part, to appoint HMR as the Debtors' stalking horse with

respect to a full-chain liquidation of all of the Debtors' stores as provided for in the Amended &

Restated Agreement.

29.    The terms of the Amended & Restated Agreement were similar to those in

the Agency Agreement, except that the Guaranty Percentage would have increased for all of the

Debtors' stores from 65% to 80% of the Cost Value of the Merchandise. *See* Exhibit C to the Sale Motion.

30.     Prior to the hearing to consider approval of the Amended & Restated Agreement as the Debtors' stalking horse bid, the Debtors received an alternate going concern bid from Absolute Beauty, LLC ("Absolute Beauty") for 23 of the Debtors' remaining 33 stores.

31.     On January 18, 2019, a status conference was held with respect to the stalking horse issue.  HMR's position was that the Amended & Restated Agreement should be approved as the stalking horse bid because the Amended & Restated Agreement was determined by the Debtors in their business judgment to be the best bid on the table as of the Petition Date and that Absolute Beauty should not be permitted to essentially bid on the stalking horse role instead of merely bidding at the auction.

32.     The Debtors, however, claimed that they needed more time to evaluate the Absolute Beauty bid so the hearing for the appointment of a stalking horse bid was adjourned until January 23, 2019.  Despite that the Amended & Restated Agreement required that an order approving HMR as the stalking horse bid be entered by January 20, 2019, HMR, as good faith participant to the Amended & Restated Agreement, consented to the Debtors' last minute request for an extension of such deadline in order for the Debtors to evaluate the bid from Absolute Beauty.

33.     Over the next few days, HMR objected to being replaced as the Debtors' proposed stalking horse.  Nevertheless, in order to avoid litigation at that time, and in another act of good faith, HMR agreed at the Debtors' request to terminate the Amended & Restated Agreement (where the Guaranty Percentage would have been 80% for all stores) and instead entered into the Second Amendment to the Agency Agreement (where the Guaranty Percentage

remained 65% for the initial 23 Stores and decreased to 63% for the Additional Stores). *See generally* Second Amendment.

34.     At the January 23, 2019 hearing, the Debtors sought approval of the Debtors' proposed bidding procedures, as well as approval of the Debtors' designation of the Absolute Beauty as the stalking horse. At that hearing, the Debtors' lender, PNC, expressed concerns with respect to the Absolute Beauty bid being designated as the stalking horse bid:

> While the Absolute Beauty bid is a going concern bid, even with all of its enhancements, Your Honor, PNC has concerns because the net cash to the estate is not greater than the Hilco bid; it is, in fact, less.
>
> It appears, however, -- moreover, under the Hilco bid, Absolute Beauty was always free to come in and outbid at the auction. And Hilco would, at that point, remain as the backup bidder, so we always had that floor in place in case there was a hiccup and Absolute Beauty did not close.
>
> However, the debtors have determined to trade the certainty of the Hilco bid as the stalking horse for the Absolute Beauty bid. And we do have concerns about the administrative -- you know, anything happening in this case and any delay in this case and any hiccups or if Absolute Beauty were not to close.

Hrg. Tr., 1/23/19 at 17:23-18:12.

35.     Despite these clear warnings of what was to come of these cases, the Debtors' request to approve Absolute Beauty – and not HMR – as the Debtors' stalking horse was approved.

### C.     Cancellation of Auction and Sale Hearing

36.     Upon information and belief, from January 23, 2019 until February 4, 2019, the Debtors failed to secure additional interest through marketing of their assets. As a consequence and just as PNC predicted, as of the February 4, 2019 bid deadline, no other bids were received by the Debtors, the auction for their assets was cancelled, no back-up bid was

secured, and Absolute Beauty was handed all of the leverage over the Debtors in the negotiations of their efforts to purchase the Debtors' assets. *See* Bankr. D.I. 203.

37.    On February 12, 2019, the Bankruptcy Court held a hearing with respect to the Debtors' proposed sale to Absolute Beauty. At the hearing, the Debtors informed the Bankruptcy Court that due to adjustments with the Absolute Beauty asset purchase agreement (namely, that Absolute Beauty disputed, and refused to pay for, certain inventory delivered to the go-forward stores so a portion of such inventory was sent to the Additional Stores to be liquidated by HMR), among other reasons, the Debtors would become administratively insolvent in the middle of March 2019. In response to the Bankruptcy Court's questioning whether the HMR full-chain liquidation bid was better on a cash-basis, the Debtors responded that HMR's bid was not better and thus would also result in administrative insolvency. Upon information and belief, the Debtors were referring to a liquidation bid that the Debtors requested HMR submit that arose in light of the disputes and downward adjustments with respect to the Absolute Beauty asset purchase agreement. Upon information and belief, the Debtors were *not* referring to HMR's full-chain liquidation bid encapsulated in the Amended & Restated Agreement, which likely would have maintained the Debtors' administrative solvency. However, as the Debtors failed to follow their own process to secure the Amended & Restated Agreement as a back-up bid (by terminating the Amended & Restated Agreement so that it could select Absolute Beauty as the stalking horse), Absolute Beauty was able to utilize its leverage over the Debtors as the best (and only) currently available bid to better Absolute Beauty's deal to the direct detriment of the Debtors' estates and creditors..

38.    With no other alternatives, this Court approved the Absolute Beauty asset purchase agreement and entered its *Order Approving the Sale of the Debtors' Assets Free and*

*Clear of Liens, Claims, and Encumbrances, and the Assumption of Certain Executory Contracts and Unexpired Leases, and Granting Related Relief* (Bankr. D.I. 259).

      **E.**    **Supplemental Sale Begins and HMR Pays the Supplemental Initial Guaranty Payment to Beauty Brands**

      39.    On February 12, 2019, the Debtors filed the *Notice of Debtors' Identification of Additional Stores Under Agency Agreement* (Bankr. D.I. 260) (the "Notice of Additional Stores"), providing notice of the ten Additional Stores covered by the Second Amendment to the Agency Agreement.

      40.    Under the Second Amendment, the Supplemental Sale had a Sale Commencement Date and Payment Date of February 12, 2019. Additionally, the Supplemental Sale at the Additional Stores is scheduled to run through March 31, 2019 (assuming no Event of Default by the Debtors).

      41.    On February 13, 2018, as required under the Agency Agreement and Second Amendment thereto, HMR paid to Beauty Brands $869,684.97 to conduct the Supplemental Sale for the Additional Stores (the "Supplemental Initial Guaranty Payment"), representing 80% of the Estimated Guaranteed Amount for the Additional Stores (63% of the Cost Value of Merchandise at the Additional Stores, subject to adjustment, being the "Supplemental Guaranteed Amount").

      42.    Within three days of the Debtors announcing the Additional Stores and HMR paying the Supplemental Initial Guaranty Payment and issuing the Letter of Credit, the Debtors consented to shortened notice on a motion to convert the cases to chapter 7—where approval of such relief is an Event of Default under the Agency Agreement—and within 10 days thereof, the Debtors independently sought conversion and renewed shortened notice.

43.     Based on Beauty Brands' breaches of the Agency Agreement, HMR has or may have overfunded portions of the Guaranteed Amount in respect of the Supplemental Sale. To date, the Inventory Reconciliation Date has not occurred in respect of the Supplemental Sale. Upon information and belief, the Debtors used the Initial Guaranty Payment, either directly or indirectly, to fund their obligations, including payment of amounts owed to PNC.

44.     On or about February 18, 2019, in accordance with section 3.3(c)(i) and (ii), the Agent requested that Proceeds that would have been deposited in certain Designated Deposit Accounts and or processed through Beauty Brands credit card facilities be redirected to HMR. While Beauty Brands has begun this process, as of the date hereof, this process is not complete such that the Proceeds and other amounts generated pursuant to the Agency Agreement continue to be deposited into the Designated Deposit Accounts.

45.     In connection with the Supplemental Sale at the Additional Stores, Beauty Brands and/or PNC, as a result of being the depository bank for Beauty Brands' non-store specific accounts, are currently in possession of or have dominion or control over Proceeds totaling not less than $702,972.10 (the "Supplemental Sale Proceeds") for the period ending February 23, 2019. From and after February 24, 2019 through the Sale Termination Date, additional Proceeds have been or will be generated and deposited into the Designated Deposit Account until such Proceeds are redirected to HMR.

46.     Agent has demanded that these Supplemental Sale Proceeds be paid to HMR. To date, the Supplemental Sale Proceeds have not been paid to HMR

**E.     Debtors Seek to Convert the Cases Immediately Following the Commencement of the Supplemental Sale**

47.     On February 15, 2019, the U.S. Trustee filed the *United States Trustee's Motion to Convert or Dismiss the Debtors' Chapter 11 Cases* (Bankr. D.I. 276) (the "Conversion

- 14 -

Motion"), seeking the conversion of the Debtors' bankruptcy cases to chapter 7 due to the

Debtors' admission that they will soon become administratively insolvent.  Contemporaneously

therewith, the U.S. Trustee filed the *United States Trustee's Motion for Entry of an Order*

*Scheduling an Expedited Hearing and Shortening Notice with Respect to United States Trustee's*

*Motion to Convert or Dismiss the Debtors' Chapter 11 Cases* (Bankr. D.I. 277) (the "First

Motion to Shorten").  Despite the Debtors' obligations under the Agency Agreement with respect

to the Supplemental Sale continuing through the Sale Termination Date of March 31, 2019 (and

HMR's recent payment of approximately $900,000 in reliance on Beauty Brands' continuing

obligations under the Agency Agreement), the Debtors (inclusive of Beauty Brands) consented

to the U.S. Trustee's First Motion to Shorten, which, if approved, would have set the Conversion

Motion for hearing on February 25, 2019.  *See* First Motion to Shorten, ¶ 10.

   48. On February 16, 2019, HMR filed *Hilco Merchant Resources, LLC's*

*Objection to the United States Trustee's Motion for Entry of an Order Scheduling an Expedited*

*Hearing and Shortening Notice with Respect to United States Trustee's Motion to Convert or*

*Dismiss the Debtors' Chapter 11 Cases* (Bankr. D.I. 280) (the "First Objection").  Part of

HMR's basis for its First Objection was that the entry of an order converting these Debtors'

cases to cases under chapter 7 of the Bankruptcy Code is an Event of Default under the Agency

Agreement, which would result in substantial damages owing to HMR for Beauty Brands'

breach of the Agency Agreement—all to the detriment of the Debtors' estates and creditors.  *See*

First Objection, ¶ 11.

   49. On the morning of February 22, 2019, this Court entered the *Order*

denying the First Motion to Shorten (Bankr. D.I. 297) (the "Denial Order").

50.    Shortly after the filing of the Motion to Shorten, this Court entered the *Order Granting Motion of the Debtors for Expedited Consideration of Debtors' Joinder and Response to United States Trustee's Motion to Convert or Dismiss the Debtors' Chapter 11 Cases* (Bankr. D.I. 303) (the "Order Granting Shortened Notice"), which HMR, through *Hilco Merchant Resources, LLC's Objection to the Motion of the Debtors for Expedited Consideration of Debtors' Joinder and Response to United States Trustee's Motion to Convert or Dismiss the Debtors' Chapter 11 Cases* (Bankr. D.I. 312), requested be vacated and the Motion to Shorten be denied for the reasons set forth therein.

51.    Earlier this morning, this Court approved conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code.

**III.    Additional Breaches of Agency Agreement**

52.    As provided for in paragraph 14 of the Final Order, the Final Order and the Agency Agreement shall survive entry of any conversion order and shall be binding on a chapter 7 trustee.  Additionally, any trustee appointed in the Debtors' cases is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Final Order and the Agency Agreement, and HMR and the trustee are authorized to perform under the Agency Agreement without the need for further order of this Court. *See* Final Order, ¶ 14.

53.    Additionally, upon information and belief, upon the conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, a chapter 7 trustee will be appointed and will take possession of, and gain control over, all of the Debtors' property, including the Merchandise and Owned FF&E subject to the Agency Agreement, and but may not choose to operate the business in a chapter 7 case.  Therefore, as a result of the Debtors' Joinder

to the request for conversion and approval of conversation, in direct and deliberate contravention

of their obligations under the Agency Agreement, several breaches and Events of Default have or

will occur, resulting in additional breaches of the Agency Agreement resulting in HMR's

entitlement to damages and equitable relief.

       54.    Specifically, upon information and belief, the following material breaches

of the Agency Agreement may occur as a result of the Debtors' Events of Default under the

Agency Agreement:

       a.    Beauty Brands has withheld, offset, or netted Proceeds and/or

failed to turnover the Initial Sale Withheld Proceeds and the Supplemental Sale Proceeds in

material breach of sections 3.3(iii) and (iv) of the Agency Agreement.

       b.    Section 9.2 of the Agency Agreement requires that until the Sale

Termination Date (*i.e.*, March 31, 2019), Beauty Brands is not permitted to transfer or dismiss

Beauty Brands' Store employees, except "for cause", without HMR's prior consent. Once these

cases are converted, if a chapter 7 trustee does not continue to be the employer of the Retained

Employees and provide the Retained Employees benefits under the Debtors' benefit plans,

Beauty Brands will be in material breach of section 9.2 of the Agency Agreement;

       c.    Multiple provisions of the Agency Agreement, including but not

limited to sections 4.1(r)(v), 4.3, 7, 8.1(c), 11.1(i), 12.1, 12.2, and 12.4, require Beauty Brands

to provide certain services and/or to pay certain expenses that are integral to HMR's ability to

continue the Sale. Again, because a chapter 7 trustee may not operate the Debtors' business, he

or she may not provide these services or fund these necessary expenses in violation of the

Agency Agreement;

d.      Conversion of the cases and the transfer of all of the property in the Debtors' estates will violate Beauty Brands' warranty that HMR is to have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, assets located therein and the utilities and other services provided there pursuant to section 11.1(h) of the Agency Agreement;

e.      Finally, conversion may result in the violation of Beauty Brands' obligation to maintain various liability, casualty and workers' compensation insurance policies, as set forth in section 12.1, 12.2 and 12.4 of the Agency Agreement, should the chapter 7 trustee determine that such policies do not benefit the Debtors' estates in light of discontinuing the Debtors' going concern business.

55.      Contemporaneously herewith, HMR filed the Emergency Motion Of Hilco Merchant Resources, LLC For Order (A) Enforcing Agency Agreement Order And (B) Compelling Debtors To Comply With Agency Agreement (the 'Motion to Compel") seeking to compel the Debtors to comply with the Final Order by paying all Proceeds, including the Initial Sale Withheld Amounts and the Supplement Sale Proceeds, to HMR immediately and on an ongoing basis.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Based Upon Conversion)

56.      Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

57.      Beauty Brands breached the Agency Agreement by, among other things, filing the Joinder seeking the conversion of these chapter 11 cases to chapter 7 cases, with the knowledge that filing such Joinder constitutes conduct directly seeking to create two Events of

Default, willfully and deliberately disregarding sections 14(c) and 14(d) of the Agency

Agreement without any justification.

58.     Conversion of these cases as requested by the Debtors' Joinder will

directly result in the multiple material breaches of the Agency Agreement by Beauty Brands,

including:

        a.     termination of Store employees without "cause" or HMR's prior consent in violation of section 9.2 of the Agency Agreement;

        b.     failure of Beauty Brands to pay expenses as required by sections 4.1(r)(v), 4.3, 7, 11.1(i), 12.1, 12.2, and 12.4 of the Agency Agreement;

        c.     violation of Beauty Brands' warranty that HMR shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, assets located therein and the utilities and other services provided there pursuant to section 11.1(h) of the Agency Agreement;

        d.     violation of Beauty Brands' obligation to provide HMR with, among other things, access to and the right to use, for no charge, Beauty Brands' software, intangible assets, and access to the Stores to operate the Stores and conduct the Sale pursuant to section 8.1 of the Agency Agreement;

        e.     violation of Beauty Brands' covenant to pay all employee benefit programs for Store employees through the Sale Term pursuant to section 11.1(i) of the Agency Agreement; and

        f.     potentially the violation of Beauty Brands' obligation to maintain various liability, casualty and workers' compensation insurance policies, as set forth in section 12.1, 12.2 and 12.4 of the Agency Agreement.

59.     Plaintiff has suffered harm from Beauty Brands' breaches in the amount to

be proven at trial of at least (i) any over-funded amount of the Guaranteed Amount or the

Supplemental Guaranteed Amount, to which Beauty Brands is not entitled; (ii) lost income from

shares of future Proceeds from the Supplemental Sale; (iii) lost income from the sale of Owned

FF&E at the Additional Stores; (iv) lost income from the sale of any Additional Agent Goods in

the Supplemental Sale;  and (v) expenses incurred in ending the Supplemental Sale.

60.     Plaintiff seeks damages on account of Beauty Brand's breaches.

## SECOND CLAIM FOR RELIEF
### (Breach of Section 3.3(c)(iv) of the Agency Agreement)

61.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

62.     Beauty Brands has breached Section 3.3(c)(iv) of the Agency Agreement by failing, on each business day, to promptly pay to Plaintiff all funds in the Designated Deposit Accounts (including without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Beauty Brands.

63.     Specifically, since at least February 16, 2019, Beauty Brands has failed to pay approximately $1.1 million that is held in the Designated Deposit Accounts despite its obligations under Section 3.3(c)(iv) of the Agency Agreement and express requests from HMR to turnover such amounts.

64.     Plaintiff is suffering harm from Beauty Brands' breaches, including irreparable harm because, upon information and belief, Beauty Brands is or may be using such funds being held in the Designated Deposit Accounts as if such money is its own (which is a further in and of itself of the Agency Agreement).

65.     Plaintiff request temporary, preliminary and final and specific relief that requires Beauty Brands to comply with its obligations to, on each business day, promptly pay to Plaintiff all funds in the Designated Deposit Accounts (including without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Beauty Brands.

66.     Plaintiffs are without any remedy at law.

- 20 -

**THIRD CLAIM FOR RELIEF**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

67.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

68.     The Agency Agreement is governed by Delaware law and the covenant of good faith and fair dealing inheres in every contract governed by Delaware law.

69.     By listing conversion as an Event of Default, it is clear that Plaintiff and Defendant, as parties to the Agency Agreement, implicitly agreed that neither party should actively attempt to bring about an Event of Default (such as conversion) and would have expressly agreed to proscribe such action.

70.     By seeking conversion only a week after effectuating the Supplemental Sale and receiving approximately $900,000 from HMR on behalf of the Supplemental Initial Guaranty Payment—and, upon information and belief, without any justification for Defendant's change in position with respect to the benefits of the continuation of the Supplemental Sale—Defendant is denying HMR the benefit of its bargain by not permitting it to even attempt to continue to execute the Supplemental Sale.  Such conduct is in not taken in good faith and violates the covenant of good faith and fair dealing.

71.     Plaintiff suffers harm from Defendant's breach of the covenant of good faith and fair dealing in the amount to be proven at trial of at least the amount of the (i) any over-funded amount of the Guaranteed Amount or the Supplemental Guaranteed Amount, to which Beauty Brands is not entitled;  (ii) lost income from shares of future Proceeds from the Supplemental Sale; (iii) lost income from the sale of Owned FF&E at the Additional Stores; (iv) lost income from the sale of any Additional Agent Goods in the Supplemental Sale;  and (v) expenses incurred in ending the Supplemental Sale.

72.     Plaintiff seeks damages on account of Beauty Brand's breach of the covenant of good faith and fair dealing.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment that, as a Result of Defendant's Breach of the Agency Agreement, Plaintiff, not Defendant, is Entitled to Supplemental Guaranteed Amount)

73.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

74.     On or about February 12, 2019, Plaintiff paid Beauty Brands $900,000 as the Supplemental Initial Guaranty Payment pursuant to section 3.3(b) of the Agency Agreement and the Second Amendment.

75.     Section 3.1(a) of the Agency Agreement strictly conditions Beauty Brands' entitlement to the Guaranteed Amount upon its "compliance with all representations, warranties, covenants, terms and conditions set forth in [the Agency] Agreement." *Id.*

76.     The filing of the Joinder constitutes a breach of the Agency Agreement and will inevitably lead to the occurrence of multiple Events of Default and further breaches and non-performance by Beauty Brands of the Agency Agreement as set forth in detail above.

77.     As Beauty Brands breached the Agency Agreement and multiple Events of Default are likely to result from Beauty Brands' actions, Plaintiff is entitled, in its discretion, to terminate the Agency Agreement.

78.     Also as a result of Beauty Brands' breach of the Agency Agreement, Beauty Brands fails to satisfy the conditions required to be entitled to any portion of the Supplemental Guaranteed Amount.

79.     This dispute over the Supplemental Guaranteed Amount is a claim premised on Plaintiff's contractual rights under the Agency Agreement and its legal interest in the Supplemental Initial Guaranty Payment.

80.    Plaintiff's claim is asserted against Defendant, who has an interest in contesting such claim.

81.    Plaintiff's and Defendant's conflicting interests are real and adverse, as Defendant, upon information and belief, does not intend to return the Supplemental Initial Guaranty Payment to Plaintiff

82.    The issue of whether Beauty Brands' actions violated the Agency Agreement and whether or not it is entitled to the Supplemental Guaranteed Amount is ripe for adjudication.

83.    Plaintiff seeks an order of the Court declaring that: (i) Beauty Brands is in default of the Agency Agreement; (ii) Beauty Brands is not entitled to the Supplemental Guaranteed Amount; and (iii) Plaintiff is entitled to the entire Supplemental Guaranteed Amount, including repayment of the Supplemental Initial Guaranty Payment.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Judgment that Plaintiff Holds a Validly Perfected, First Priority Security Interest in and Lien on all Proceeds)

84.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

85.    Pursuant to section 3.2 of the Agency Agreement, Proceeds, including the Withheld Proceeds, are subject to Plaintiff's security interest in, and lien upon, the Agent Collateral under sections 3.3(b) and 15 of the Agency Agreement and paragraphs 37 and 38 of the Final Order.

86.    As HMR has made the Initial Guaranty Payment and issued the Letter of Credit (related to both the Sale and Supplemental Sale), upon information and belief, there are no other senior liens on the Proceeds.

87.    Upon information and belief, Plaintiff's security interest in the Proceeds is senior to any other security interest in the Proceeds.

88.    This dispute over the Proceeds, including the Withheld Proceeds, is a claim premised on Plaintiff's contractual rights under the Agency Agreement and its legal interest in the Proceeds and Withheld Proceeds.

89.    Plaintiff's claim is asserted against Defendant, who has an interest in contesting such claim.

90.    Plaintiff's and Defendant's conflicting interests are real and adverse as Defendant has not returned—nor, upon information and belief, does it intend to return—the Withheld Proceeds to Plaintiff.

91.    The issue of whether Plaintiff has a validly perfected, first priority security interest in and lien on such Proceeds is ripe for adjudication.

92.    Plaintiff seeks an order of the Court declaring that Plaintiff has a validly perfected, first priority, senior security interest in, and lien upon, the Proceeds.

## SIXTH CLAIM FOR RELIEF

### (Relief from the Automatic Stay to Enable Plaintiff to Enforce Remedies with Respect to the Proceeds)

93.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

94.    Plaintiff holds a validly perfected, first priority security interest in and lien upon all Proceeds of the Sale and Supplemental Sale, and the reconciliation of the Sale and Supplemental Sale is likely to be in Plaintiff's favor and exceed the total value of the Proceeds, which are the only realized form of Agent Collateral.  Accordingly, Defendant has no equity in the Proceeds.

95.    Plaintiff seeks an order of the Court granting Plaintiff relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code so that Plaintiff may exercise its remedies with respect to the Proceeds.

## SEVENTH CLAIM FOR RELIEF

**(Directing Defendant to Turn Over the Supplemental Initial Guaranty Payment and Proceeds to Plaintiff or, in the Alternative, Imposition of Constructive Trust)**

96.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs.

97.    Plaintiff is entitled to the Supplemental Guaranteed Amount (a portion of which, the Supplemental Initial Guaranty Payment, had been paid by HMR to Beauty Brands) under the terms of the Agency Agreement.

98.    Plaintiff is entitled to, on each business day, to have Beauty Brands promptly pay to Plaintiff all funds in the Designated Deposit Accounts (including without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Beauty Brands.

99.    Plaintiff has a validly perfected, first priority, senior security interest in, and lien upon, the Proceeds of the Sale and Supplemental Sale.

100.    Upon information and belief, such funds are being held by Beauty Brands or PNC.

101.    Based on its validly perfected, first priority senior security interest in the Proceeds and its entitlement to the Supplemental Guaranteed Amount, Plaintiff seeks a judgment of the Court granting Plaintiff the right to demand the return from Beauty Brands of the paid portion of the Supplemental Guaranteed Amount (*i.e.*, the Supplemental Initial Guaranty Payment) and all Proceeds from the Sale and Supplemental Sale.

102.    In the alternative, Plaintiff requests that the Court impose a constructive trust upon funds held by either Beauty Brands or its lender in the amount of at least the paid portion of the Supplemental Guaranteed Amount and Proceeds (including, but not limited to, amounts held in the Designated Deposit Accounts) for the Plaintiff's sole and exclusive benefit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order: (i) (ii) awarding Plaintiff damages from Beauty Brands for its breaches of the Agency Agreement; (iii) awarding Plaintiff damages for Beauty Brands breaches of the covenant of good faith and fair dealing with respect to the Second Amendment; (iv) declaring that (a) Beauty Brands is in default of the Agency Agreement, (b) to the extent it is determined that the Plaintiff overfunded the Supplemental Guaranteed Amount, the Defendants are not entitled to the Supplemental Guaranteed Amount, and (c) to the extent it is determined that the Plaintiff overfunded the Supplemental Guaranteed Amount, the overfunded amount of such Supplemental Guaranteed Amount shall be returned to the Plaintiff by either or both of the Defendants; (iv) declaring that Plaintiff has a validly perfected, first priority security interest in, and lien upon, the Designated Deposit Accounts and all proceeds (including Proceeds) in such accounts and all other Agent Collateral; (v) to the extent the Court denies the Motion to Compel, granting Plaintiff relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code in order to exercise any and all of its remedies with respect to the Designated Deposit Accounts and all proceeds (including Proceeds) and funds in such accounts; (vi) declaring that (and having have Beauty Brands specifically perform) on each business day, Beauty Brands is required to promptly pay to Plaintiff all funds in the Designated Deposit Accounts (including without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit

Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Beauty Brands; (vii) ordering the turnover to Plaintiff of the Initial Sale Withheld Proceeds and the Supplemental Sale Proceeds and enforcing the actual trust provided for the Agency Agreement, or, in the alternative, imposing a constructive trust on such funds for Plaintiff's sole and exclusive benefit; (viii) awarding Plaintiffs the costs and fees incurred in the prosecution of this action; and (ix) granting such other relief the Court deems just and proper.

Dated:  February 25, 2019
        Wilmington, Delaware         **CHIPMAN BROWN CICERO & COLE, LLP**

_____
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:      (302) 295-0191
Email:          desgross@chipmanbrown.com

_Counsel for Hilco Merchant Resources, LLC_